**GREEN & ASSOCIATES, LLC**
Michael S. Green, Esq.
522 Route 18, Suite 5
East Brunswick, New Jersey 08816
Tel.: (732) 390-5900
Fax: (732) 390-5901
E-Mail: green@msgreenlaw.com
*Attorneys for Petitioner Christophe Soulier*

**A.Y. STRAUSS, LLC**
Kory Ann Ferro, Esq.
101 Eisenhower Parkway, Suite 412
Roseland, New Jersey 07068
Tel.: (973) 287-5007
Fax: (973) 226-4104
E-Mail: kferro@aystrauss.com

**DARIO, ALBERT, METZ, EYERMAN, CANDA, CONCANNON, ORTIZ & KROUSE**
Shelley Albert, Esq.
345 Union Street
Hackensack, New Jersey 07601
Tel.: (201) 968-5800
Fax: (201) 968-5801
E-Mail: shelley@damelegal.com

*Attorneys for Respondent Akiko Matsumoto*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CHRISTOPHE SOULIER,<br><br>*Petitioner,*<br><br>v.<br><br>AKIKO MATSUMOTO,<br><br>*Respondent.* | Civil Action No.: 2:20-cv-04720-MCA-MAH<br><br>Civil Action<br><br>**JOINT ~~PROPOSED~~ FINAL PRE-TRIAL CONFERENCE ORDER**<br><br>Judge: Hon. Madeline Cox Arleo, U.S.D.J.<br><br>Final Pretrial Conference: April 25, 2022, 1:00 p.m. EST<br><br>Trial: April 27, 2022, 9:30 a.m. EST |

*On April 25, 2020, on The record*

This matter having come before the Court for a pretrial conference pursuant to *Fed. R. Civ. P. 16*, and Michael S. Green, Esq. having appeared for Petitioner Christophe Soulier, and Kory Ann Ferro, Esq. and Shelley Albert, Esq. having appeared for Respondent Akiko Matsumoto; the following Final Pre-Trial Order is hereby entered:

## 1.    STATEMENT OF FACTS AND PROCEDURAL HISTORY

## A.  PETITIONER'S STATEMENT

This is an emergency petition under the Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980[1] (the "Hague Convention" or "Convention"), and the International Child Abduction Remedies Act ("ICARA")[2], seeking a Court Order for the return to Belgium of twelve year old girl ("A.L.S.") and six year old boy ("A.H.S."), whom the children's mother, Akiko Matsumoto ("Respondent") has wrongfully removed from Belgium and wrongfully retained in New Jersey without the consent of the children's father, Christophe Soulier ("Petitioner").

1.  The Parties were married on July 2, 2004 in Belgium and have resided together in Belgium since that time, except for a year in Italy (returned by September 2005).  They have two children together, A.L.S., born December 5, 2009 (10 years old) and A.H.S., born October 5, 2015 (4 years old). Petitioner is a citizen of France and Sweden.  Respondent is a citizen of Japan and the United States.  The Respondent moved to Belgium in the summer of 2003 and the national register of Belgium indicates she has been domiciled in Belgium since November 2003.  Since moving to Europe, the Parties have continuously been residing together.

2.  The children were born in Belgium and have resided with the Parties in Belgium for all of their lives.  The children are of citizens of France and the United States.  The Parties permanent residence in Belgium is at Watermael-Boitsfort (a neighborhood of Brussels), Drève du Duc, 58.

---

[1] T.I.A.S. No. 11,670, at 1, 22514 U.N.T.S. at 98, *reprinted in* 51 Fed. Reg. 10493 (1986).
[2] 22 U.S.C. 9001 *et seq.* (1995). Congress created ICARA to deal with the sudden abduction of children, and to allow a petitioner to assert his/her rights in exigent circumstances. *See Distler v. Distler*, 26 F. Supp. 2d 723, 727 (D.N.J. 1998).

Case 2:20-cv-04720-MCA-MAH    Document 107    Filed 04/25/22    Page 3 of 62 PageID: 1621

3.    Petitioner has worked since 2002 for Johnson & Johnson in Brussels, except for a 12-month period and since 2005 as a Finance Director in Belgium. The Respondent had worked in Brussels since 2003 first as a classroom teacher for the St. John's International School from 2003 until 2004, from 2006 until 2008 as a paid consultant for CHS (Community Health Services) supporting children between the ages of 3 to 18, who are experiencing learning difficulties or who may be suspected to be suffering from a specific learning and/or attention disorder; and for the International School of Brussels ("ISB") continuously from December 2006 until June 2018..

4.    The children have attended school in Belgium all of their lives but for this past two and a half years. Both children speak French and English. A.L.S. is fluent in French. The children have cousins in France and spend week-ends and holidays with them. Petitioner's parents live in Paris, which is less than an hour-and-half train ride from the Parties' residence in Brussels.

5.    As a result of Respondent working at the ISB, A.L.S., the oldest child, was able to attend school there free of charge, where she was enrolled until June 2018.

6.    In 2017, Petitioner learned from his employer that a position was opening in Tokyo. The Parties travelled to Tokyo in April 2017 in anticipation to find housing and schools for the children. Petitioner was in negotiations with J&J to cover the family's housing costs as wells as school expenses for the children. Upon their return from Tokyo, it appeared that they would be leaving for Tokyo in September 2017, so Respondent took the initiative, without notifying Petitioner, to submit her resignation to her employer ISB, under no local legal obligation and could have delayed such resignation. Unfortunately, the plan to settle in Tokyo did not go forward and the family stayed in Brussels, as a result of J&J's decision not to grant the, previously agreed upon by the Parties, required financial support to cover the families incremental living and schooling costs.

3

7.      While Respondent was able to obtain a replacement position with the ISB until June 2018, when she applied for a permanent position with ISB for the first quarter of 2018, her application was eventually not accepted. As a result, she was without a job and A.L.S. was without a school for 2018/2019 school year. The Parties did not have the financial means at that time to cover the tuition expenses for ISB out of pocket and no other schools were available for the 2018/2019 academic year, not even at the Lycée Français (French School) in Brussels, even though the Parties had together taken all the necessary steps together for their enrollment in that school.

8.      The Respondent blamed Petitioner for this situation, referring to the missed relocation to Japan in 2017. She proposed that she and the children go to the United States for a few months and temporarily live with her family in New Jersey to allow A.L.S. to continue her schooling, while the Parties secure a school position in Brussels for both A.L.S. and A.H.S. Petitioner reluctantly accepted this interim solution. The Respondent and the children left Belgium on August 20, 2018. Petitioner then took the necessary steps to obtain a place for the children to attend the Lycée Français in Brussels for the next school year in 2019/2020, which he was able to secure. So, as per the initial agreement, the children now had schools to attend back in Brussels upon their return from the United States and had been registered in those schools. A.L.S. would have been taught in English for at least one day a week and A.H.S. would have had education with one day in French followed by one day in English. This would further strengthen their respective bilingualism, which was an agreed upon priority of the Parties for their children.

9.      During the winter holidays in 2018/2019, the family was reunited in Brussels. The children were mostly in Belgium for ten days and stayed again at the family's permanent residence.

10.     Prior to the Respondent leaving with the children from Belgium for the U.S., Petitioner wanted to confirm again with the Respondent that the children would return to Belgium

4

and that their schooling in the U.S. was just **a temporary solution**. As a result, the Respondent assured Petitioner that she would return to Belgium with the children after they had finished their school year. The parties signed an agreement concretizing their understanding that the children were in the U.S. temporarily and would return to Belgium no later than July 10, 2019. This Agreement was signed at the Parties' dining room table in their Brussels residence. Contrary to the initial travel authorization delivered in August 2018, the December 2018 authorization included a specific return date that the parties formally agreed to. The inclusion of a return date in such a travel authorization is not mandatory and speaks to the formal and recognized intent of the parties. *See* **Petition, Exhibit P1 – Agreement of the Parties of December 30, 2018.**

11.     Petitioner's first "approval" for the children to go to school in the U.S. was in August, he approved this trip knowing that the Respondent had a return ticket for December 2018 with the children, and therefore did not specify a return. *See* Petition, **Exhibit P2** – the document the Respondent received when she requested **temporary** departure from Belgium for August 17, 2018. In the Belgian registry, the Respondent and the children are recorded as **temporarily out of the country**.

12.     Petitioner's approval in August 2018 only extended to that trip and required another approval from him in December before she left Belgium in December 2018. **It is analogous to the children attending boarding school.** The Respondent was living with her parents with the children and did not obtain permanent housing in any manner, furthermore Respondents' employment as of January 2019 was a temporary contract, as well as the car that she borrowed from a friend (Sally Bliss) meant to return from abroad by the summer 2019. (The law cannot be that a parent can be rewarded for wrongfully retaining children where they were to temporarily go to school. Any parent could then assert the wrongful retention of their children in

another country after sending them away under the ruse of a temporary stay for schooling.)

13.    Petitioner made 3 business trips to the U.S. during the 2018/2019 academic year and took the opportunity to spend time with the family.  During his stay in May 2019, he distinctly could tell that a distance had grown between the Parties.  Respondent expressed that she wanted to stay in the United States with the children and Petitioner made it clear to her that that was not acceptable to him knowing that schooling was secured for both their children in Brussels, and that was not what they had ever agreed to, which was formalized in their December 30, 2018 Agreement.  The Parties clearly discussed that such a decision would also mean that the children would not be with both their parents since Petitioner could not move to the US.

14.    Upon Petitioner's return to Belgium from New Jersey on May 29, 2019, he received a summons to appear before the Family Court of Bergen County, Superior Court of New Jersey, on July 15, 2019.  It was only then that he learned that while he was still in the U.S. visiting with the children and Respondent, the Respondent had filed her application with the Court seeking physical custody without his knowledge and she was attempting to obtain jurisdiction over this issue in the U.S. court.

15.    Petitioner's has had continued parenting time with his children in the United States, since they have been temporarily in the United States.  He has made a great effort to travel to the United States to see his children and **he speaks with them on the telephone on a very regular basis especially since he got them their own device (iPad) in late 2019.**

16.    Below is a list of the visits he has made to the United States since their children temporarily traveled to New Jersey in late August 2018.  It must be noted that the children came to Europe in December 2018 for the holidays – it was the only trip back home that they made since traveling to New Jersey in August 2018 and **the last time that they met with their paternal**

6

family in France (grandparents, uncles, cousins, …).

17.     Petitioner's trips were either for personal reasons or professional obligations in the United States, during all of which he saw the children, and were in:

- October 2018
- February 2019
- May 2019
- July 2019
- August 2019
- October 2019
- December 2019
- February 2020
- November/December 2021
- February 2022

18.     **Unfortunately, often these trips were short and only offered limited interactions with the children. Because of the current Covid-19 related health crisis since 2020, he has not been able to travel to see his children during certain periods and this further shows the consequences of such a unilateral decision to wrongfully retain the children from their home in Brussels where both parents could be in the lives of the children.**

19.     Given the fact that **Respondent does not allow Petitioner to even enter the home where the children currently stay,** he has to privately fund accommodation, rental cars, restaurants. <u>These trips are therefore typically very expensive efforts</u>, besides the logistical challenge to make them happen.  The Respondent also will not talk to him directly about the children's lives, instead using the children as a conduit to do so.  It is not the appropriate actions of a parent that has the majority of physical custody with the children and <u>she is not appropriately co-parenting with Petitioner</u>.

20.     **It was after he was served with papers in May of 2019 that it was then clear to Petitioner that the Respondent had planned her actions for many months and she had intentionally deceived him in December 2018.**  She had signed the agreement on December 30,

2018, it appears, knowing that she was intentionally doing so as a deceit, in order to leave Belgium with the children to go the U.S., only to later be able to argue that the children had been in the U.S. for more than six months to seek the jurisdiction of a New Jersey State Court through the UCCJEA. She now seeks to obtain physical custody of the children and to keep the children in the U.S., despite her agreement with Petitioner otherwise.  Respondent sought legal counsel on this matter in February 2019, while Petitioner only brought up the efforts to secure school position for both kids in March 2019.  Respondent's intentions were therefore not triggered by the supposed change of shared intent.  Furthermore, the respondent was well aware of Petitioner's difficulties in getting a job in the US given the lack of leadership support and specifically the active blocking that Petitioner suffered from a high-ranking finance executive (Kendall OB) in his company, as evidenced by her testimony and the text on February 12th, 2019, where Respondent states "You told me that there was no possibility of US due to Kendall" See attached **Exhibit P7. Her actions were a ruse, a deception, an unconscionable act and her misconduct should not be condoned by this Court.**

21.    As **Petitioner never consented to the removal or relocation of the children from Belgium on a permanent basis, he is also respectfully requesting that this Court order that the Respondent immediately return their children to Belgium as was originally agreed upon.**

## PETITIONER'S PROCEDURAL HISTORY

1. While Petitioner was visiting Respondent and the Parties Children in New Jersey, Respondent filed on May 20, 2019, and without informing Petitioner, a non-dissolution Complaint in Bergen County (1) seeking joint legal custody; (2) naming her as the Parent of Primary Residence and Petitioner as the Parent of Alternate Residence; (3) establishing a parenting time

8

schedule; (4) ordering that the children remain in New Jersey for purposes of schooling; and (5) establishing a child support award under the UCCJEA.

1.      On May 31, 2019, Petitioner filed a unilateral emergent application in Belgium seeking a divorce on an expedited timeframe, which was denied on June 3, 2019, but granted on appeal on June 6, 2019.

2.      Respondent was served with Petitioner's Belgian divorce papers on June 27, 2019.

3.      On July 10, 2019, Petitioner filed a Motion to Dismiss Respondent's non-dissolution Complaint in Bergen County on the basis of lack of jurisdiction

4.      On July 11, 2019, Petitioner filed a complaint with the Belgian police against the Respondent for not returning the children to Belgium pursuant to the Parties' prior agreements.

5.      On July 15, 2019, the French Speaking Court of First Instance of Brussels, Family Court issued a Judgement suspending its decision regarding issues related to the Parties' children pending resolution by the Courts of New Jersey.

6.      On August 1-2, 2019, the Bergen County Court conducted a plenary hearing and on August 2, 2019, the Court dismissed Respondent's complaint based upon a declination of jurisdiction, **due to the unjustifiable conduct by Respondent,** under New Jersey's Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA"). The Bergen County Court declined to stay its decision pending any appeal. **See attached** Exhibit P3, **Superior Court of New Jersey's Order of August 2, 2019 and Transcript of Decision by the Court of August 2, 2019.**

7.      Respondent filed a Notice of Appeal of the Bergen County Court's decision declining jurisdiction under the UCCJEA on August 8, 2019. This appeal is still pending.

8.      Petitioner filed a Hague Convention Application with the Belgian authorities on August 8, 2019 and with the Office of Children's Issues of the United States for the children to be

returned to Belgium under Belgium law, the Hague Convention on International Child Abduction and the International Parental Kidnapping Act.   The taking of the children in this instance is a "wrongful taking" AND their retention in the United States past July 10, 2019 is a "wrongful retention" within the meaning of these laws. See Petition, **Exhibit P4 – Hague Application and Supporting Documentation.**

9.      The Belgium Courts also deferred to the United States Court's jurisdiction under the Hague Convention to decide this issue as the children are now in the United States.

10.     The Director of Office of Children's Issues, United States Department of State, on August 26, 2019, Scott Renner, sent a letter to the Appellate Division reminding the Court that any decision on the appeal filed by the Respondent is to be deferred pending any decision based on the Hague Convention.

11.     On September 4, 2019, the Brussels Court of Appeals issued a Final Judgment affirming the lower court's decision declining jurisdiction over the children pending resolution of the Appeal in New Jersey.

12.     On November 7, 2019, Petitioner filed an Order to Show Cause seeking the immediate return of the children of the parties pursuant to the Petitioner's Hague Convention Application.  See **Exhibit P4 – Petitioner's Hague Convention Application and Supporting Documentation.** The Bergen County Superior Court erred by declining jurisdiction because it had previously declined jurisdiction based on the UCCJEA on November 14, 2019, two disparate standards for subject matter jurisdiction.  (See **Exhibit P5 – Court's Order of November 14, 2019**)

13.     Petitioner filed a Motion for Reconsideration of the Order to Show Cause on November 25, 2019, where the Court in error clearly declined jurisdiction again based on the

prior declination based on the UCCJEA and the appeal of that ruling by the Respondent on January 30, 2020.  See **Exhibit P6 – Court's Order of January 30, 2020 and Transcript of that hearing.**

14.    The Parties were officially divorced in Belgium in November 2019.

15.    **Petitioner filed in the United States District Court in the District of New Jersey the instant Hague Convention Petition on April 21, 2020.** Therefore, this Petition, which was filed on April 21, 2020, was filed within a period of less than one year from the date of the wrongful removal or retention and this Court should therefore order that the children be returned to Belgium immediately pursuant to the Hague Convention.

16.    On April 29, 2020, the New Jersey Appellate Division issued a *Sua Sponte* Order staying Respondent's Appeal pending resolution of this Hague Convention Petition in the United States District Court in the District of New Jersey.

17.    On May 11, 2020, the Respondent filed a Motion to Dismiss the Petitioner's Hague Convention Petition in the United States District Court in the District of New Jersey based on lack of subject matter jurisdiction, which was denied by this Court on December 4, 2020.

**B.    RESPONDENT'S STATEMENT**

1. The parties were married on July 3, 2004 and have two children, A.L.S., born December 5, 2009 (currently 12 years old), and A.H.S., born October 5, 2015 (currently 6 years old). Respondent is an American citizen, Petitioner is a French and Swedish citizen, and the children, although born in Belgium, are American and French citizens.

2. The parties are an international couple having met in France, dated while in America, married in Belgium, celebrated their nuptials in Paris, lived the first year of their marriage in Italy,

and lived as expatriates in Belgium. Petitioner works for an American company, Johnson and Johnson ("J&J"), in Belgium, but frequently sought employment elsewhere including in the United States, Canada, England, Switzerland, Singapore, Japan, and France. Indeed, from 2016 through 2018, Petitioner applied for 16 positions with J&J outside of Belgium, of which 9 were in the United States and 6 were in New Jersey specifically. Petitioner also applied for 1 additional position outside of Belgium through a headhunter during the same time period. Respondent was employed at English-speaking international schools in Belgium which followed an American-style educational system and were designed to serve expatriate community. The parties' daughter, A.L.M., attended the International School of Brussels ("ISB"), an English-speaking American-style international school designed to serve the expatriate community where Respondent taught. A.L.M. never attended a local Belgian school for her formal education because the parties wanted their daughter educated in English with the intent to move to the United States in the future. The parties and their children spent their holidays and school breaks outside of Belgium primarily in either France or the United States. Neither party had nor has family in Belgium. The parties never purchased a home in Belgium.

3. The parties never truly integrated into Belgian society, but rather resided there as expatriates never intending to remain there permanently. They engaged in frequent conversations regarding moving out of Belgium and settling as a family in the United States. In fact, Respondent never obtained an EU driver's license or EU teaching certificates, but rather maintained all of her credentials through the United States. She also retained her United States bank account and credit card, continued to file United States tax returns as a citizen abroad, and vote via absentee ballot in the United States elections. The parties even filed Belgian tax returns as "non-residents" requiring their absence from Belgium for a certain percentage of time each year.

4. In May 2017, Petitioner was approved for a new employment position within J&J in Japan and presented with a contract. The parties took substantial steps to finalize their relocation to Japan including visiting, procuring housing, securing schooling for their daughter at the English-speaking Tokyo International School, and Respondent resigning from her employment position in Belgium. Without warning to or consultation with Respondent, Petitioner then rejected the employment contract. As a result, the parties' daughter was left without any options for her attendance at school in Belgium for the 2018-2019 school year and Respondent was left unemployed. The parties then mutually agreed that Respondent would relocate with the children to New Jersey and they enrolled their daughter in the Montvale public school system for the 2018-2019 school year. Petitioner participated in their daughter's enrollment process for school in New Jersey where she would begin third grade.

5. Respondent and the children flew to New Jersey on August 20, 2018 and Petitioner drove them to the airport and provided a travel authorization necessary when one parent is flying alone with the children. Upon relocating with the children to New Jersey, Respondent took substantial steps to establish herself and the children in New Jersey with the expectation and understanding that New Jersey was the family's new home, and that Petitioner would join them. Respondent updated her teaching certificates in New Jersey, sought and obtained employment in New Jersey, obtained insurance for herself and the children through New Jersey Family Care, purchased a vehicle registered and insured in New Jersey, obtained a pediatrician for the children in New Jersey, maintained the children's pediatric dentist in New Jersey, and enrolled the children in activities in New Jersey. Petitioner was aware and supportive of Respondent's actions in New Jersey in this regard.

13

6. The children undoubtedly acclimatized to New Jersey during the course of the 2018-2019 school year. A.L.S. participated in dance, chorus, student government as a class representative, skiing, softball, soccer, French camp, equestrian camp, soccer, and a local gym membership. She made friends, went to birthday parties, had play dates and engaged in other activities with her friends. A.L.S. excelled in school having been six-months behind in some subjects in September 2018 and fully caught up by December 2018. A.H.S. was enrolled in and excelled in Am-Tree Developmental Nursery School in Montvale, New Jersey. He participated in soccer, French camp, summer camp, and a local gym membership. He made friends, went to birthday parties, had playdates and engaged in other activities with his friends. Petitioner was aware and supportive of the children's activities and progress in New Jersey. Respondent sent regular pictures and videos and kept in regular communication with the children via video chat. He even attended some of the children's activities when he was visiting New Jersey and paid the expenses for half of all of the children's activities in the summer of 2019. The children have now been in New Jersey for nearly four years. They are near completion of their fourth full school year here. A.L.S. is now in middle school getting ready to complete sixth grade and A.H.S. graduated from pre-school and is about to finish kindergarten in the Montvale public schools.

7. Petitioner visited Respondent and the children in New Jersey on three occasions during 2018-2019 in October 2018 for three weeks, February 2019 for a long weekend, and May 2019 for about two weeks. Petitioner was able to continue to work through his employer's New Jersey offices during his visits. As late as February 2019, Petitioner was actively investigating transferring his employment to New Jersey to join Respondent and the children.

8. Respondent returned to Belgium and France with the children to visit Petitioner and his family for approximately one week in December 2018 for the Christmas holiday and, upon their

14

departure, requested a travel authorization as required by customs. Petitioner included a July 10, 2019 "return date" on such document, which Respondent understood was a return for the summer vacation only to engage in the family's tradition of vacationing in France together.

9. In March 2019, Petitioner suddenly, and without warning or consultation, changed the plan by unilaterally pre-registering the children at a French international school in Belgium where the children had never before attended, and which was not taught primarily in English or in an American style. Respondent objected and the parties could not come to a mutual agreement. As such, Respondent filed a Verified Complaint in Bergen County on May 20, 2019 seeking joint legal custody, establishment of a parenting time schedule, a ruling that the children remain in school in New Jersey, and setting child support.

## RESPONDENT'S PROCEDURAL HISTORY

1. Respondent filed a Verified Complaint in Bergen County Superior Court on May 20, 2019 seeking joint legal custody, establishment of a parenting time schedule, a ruling that the children remain in school in New Jersey, and setting child support.

2. Petitioner's filed a unilateral emergent application in Belgium on May 31, 2019, which was denied, but then later granted on appeal on June 6, 2019, allowing Petitioner to serve Respondent with a divorce complaint on an expedited timeframe. Respondent was served with a Complaint for Divorce on June 27, 2019.

3. On July 15, 2019, the French Speaking Court of First Instance of Brussels Belgium, Family Court issued a judgment suspending its decision regarding issues related to the parties' children pending resolution by the Courts of New Jersey.

4. Petitioner appealed this decision, which was affirmed by the Brussels Court of Appeal in a Final Judgment dated September 4, 2019, finding that the children's "attachments" to Belgium were "**objectively weak**" and that the **children's "habitual residence" was more likely New Jersey** than Belgium.

5. On July 10, 2019, Petitioner filed a Motion to Dismiss in the New Jersey proceedings, based upon a lack of jurisdiction. The Court conducted a Plenary Hearing on August 1 and 2, 2019 and dismissed Respondent's case based upon a lack of jurisdiction under the Uniform Child Custody and Jurisdiction Enforcement Act ("UCCJEA"). Respondent filed a Notice of Appeal on August 8, 2019.

6. The parties were officially divorced in Belgium in February 2020, but no issues related to the children have been addressed or resolved as part of same.

7. Petitioner also filed, on July 11, 2019, an International Child Abduction Remedies Act ("ICARA") application in Belgium.

8. On August 16, 2019, the United States Department of State wrote to Respondent regarding Petitioner's ICARA application to determine if a resolution was possible. Counsel for Respondent advised on August 26, 2019 that resolution was not possible thereby releasing the matter for Petitioner to file with the New Jersey Courts. The United States Department of State sent correspondence to the New Jersey Appellate Division on August 26, 2019 and November 12, 2019 advising of the pendency of Petitioner's ICARA application, which resulted in a stay of Respondent's Appeal.

9. On November 7, 2019, Petitioner filed an Order to Show Cause by mail in the Bergen County Superior Court. The Court heard argument a week later on November 14, 2019 at which

time Petitioner's Order to Show Cause was denied for failure to demonstrate "immediate, irreparable and substantial harm" required under *Crowe v. DeGioia*, 90 N.J. 126 (1982).

10.    Petitioner filed a Motion for Reconsideration on November 25, 2019, which was denied on January 30, 2020.

11. Petitioner filed the instant Hague Convention petition on April 21, 2020.

12. On April 29, 2020, the New Jersey Appellate Division *Sua Sponte* stayed the appellate process pending the proceedings in the United States District Court.

## 2.    STIPULATED FACTS

i.    Petitioner is a citizen of Sweden and France.

ii.    Petitioner was born in Sweden and raised in France.

iii.    Petitioner attended graduate studies in Sweden as well as graduate studies at the University of Michigan.

iv.    Petitioner graduated with a master's degree from the Stockholm School of Economics in Sweden in 1998.

v.    Petitioner graduated with a Masters of Business Administration from the University of Michigan in 2002.

vi.    Petitioner moved to Brussels, Belgium in 2002 and began his career working for Johnson & Johnson ("J&J"), where he continues to work now through a wholly-owned subsidiary called Janssen Pharmaceuticals.

vii.    Respondent is a citizen of the United States.

viii.    Respondent was born in Japan and moved to New Jersey at the age of 5 and was subsequently raised in Montvale, New Jersey.

ix.    Petitioner attended undergraduate studies at The College of New Jersey ("TCNJ") and graduate studies at Harvard University.

x.    Petitioner graduated from TCNJ in 2000.

xi.    Petitioner was a Teacher of the Deaf in New Jersey from 2000-2002.

    xii.     Petitioner graduated from Harvard in 2003.

    xiii.    The parties met and began a relationship in Paris, France in June 1998.

    xiv.    Petitioner moved to Brussels, Belgium to join Petitioner in 2003, and the parties resided there together until 2004.

    xv.    The parties were engaged in 2003.

    xvi.    The parties were married on July 2, 2004 in Brussels, Belgium..

    xvii.    The parties resided together in Rome, Italy from 2004-2005 for 12 months.

    xviii.   The parties resided together in Brussels, Belgium from 2005 until August 20, 2018.

    xix.    The parties' daughter, A.L.S., was born in Brussels, Belgium on December 5, 2009.

    xx.    The parties' son, A.H.S., was born in Brussels, Belgium on October 5, 2015.

    xxi.    While residing in Belgium, Respondent worked first for the St. John's International School from 2003 until 2004, then for CHS (Community Health Services) from 2006 until 2008, and for the International School of Brussels ("ISB") from December 2006 until June 2018.

    xxii.    The parties' daughter attended a local nursery (French-speaking) in Brussels for 2 school years before she began attending ISB at the age of 2.5 and continued there through second grade.

    xxiii.   The parties' daughter began dance in a local gym in Brussels, Belgium from the age of 4 until 6, she then began dance through ISB until June 2018. Beginning in kindergarten, the parties' daughter engaged in after school activities offered through and held at the ISB such as piano, rock climbing, yoga, gymnastics, programming, and arts and crafts. The parties' daughter engaged in horseback riding, skiing, and sailing on vacations in France.

    xxiv.   The parties' son attended a local nursery (French-speaking) in Brussels for 2 school years before leaving for the United States in August of 2018.

    xxv.   The parties' children had been attended by a local pediatrician in Brussels, Belgium since their birth until August of 2018.

    xxvi.   The parties have no family residing in Belgium.

    xxvii.   The parties and their children spent the majority of holidays and school breaks in France and in New Jersey.

xxviii. The parties never purchased any real estate in Belgium.   The parties moved within Brussels and co-signed a 9-year lease for a house effective on November 1, 2016.

xxix. From 2016 through 2018, Petitioner applied for 16 positions with J&J outside of Belgium, of which 9 were in the United States and 6 were in New Jersey specifically. Petitioner also applied for 1 additional position outside of Belgium through a headhunter during the same time period.

xxx. In 2017, Petitioner applied for a position with J&J in Tokyo, Japan. In preparation for same, the parties traveled to Tokyo in April 2017, were in negotiations for an apartment there, enrolled their daughter at the Tokyo International School, and Respondent resigned her position at the ISB.

xxxi. In or about June 2017, Petitioner rejected the contract for the J&J Tokyo position.

xxxii. Since Respondent had resigned from the ISB, the parties' daughter was permitted to remain at the ISB free of charge only through January 2018.

xxxiii. Respondent was then able to secure a temporary position at ISB for the 2017-2018 school year enabling the parties' daughter to attend free of charge for the entire 2017-2018 school year only.

xxxiv. Respondent was unable to secure a position at ISB for the 2018-2019 school year and, as such, the parties' daughter could no longer attend the ISB for the 2018-2019 school year without charge.

xxxv. The parties considered several schools in Brussels, Belgium for their children to attend in the 2018-2019 school year.

xxxvi. The parties ultimately applied for their children to attend the Lycée Français, an international French school in Brussels, Belgium.

xxxvii. The Lycée Français did not have availability for the parties' daughter for the 2018-2019 school year, while there was availability for the parties' son for that coming school year.

xxxviii.    The parties agreed that the children would attend school in Montvale, New Jersey for the 2018-2019 school year and that their daughter would be enrolled in the Montvale public school system.

xxxix. Petitioner cooperated and assisted with the parties' daughter's enrollment in the Montvale public school system for her 3rd grade year.

xl.  Petitioner drove Respondent and the children to the airport on August 20, 2018 for their flight to New Jersey.

19

xli.    In August 2018, Petitioner provided a written consent for Respondent to travel abroad with their children to New Jersey..

xlii.    Upon their arrival on August 21, 2018, Respondent and the children stayed with Respondent's parents in their Montvale, New Jersey home, which is where Respondent lived with her parents as a child after the age of five.

xliii.    Respondent borrowed a car in New Jersey during the school year 2018-2019, first from her parents and then from a friend living abroad.

xliv.    Petitioner visited Respondent and the children in New Jersey on October 12-28, 2018; February 15-19, 2019; and May 16-27, 2019.

xlv.    While Petitioner was in New Jersey for specific work-related activities, he visited Respondent and the children during the 2018-2019 year..

xlvi.    Respondent and the children visited Petitioner and his family in Belgium and France from December 22-30, 2018.

xlvii.    On December 30, 2018, Petitioner provided a written consent for Respondent to travel abroad with their children to New Jersey.

xlviii.   Respondent sought reciprocity for her Massachusetts teaching certificate in New Jersey beginning in September 2018.

xlix.    Respondent began applying for employment in New Jersey in October 2018.

l.    Respondent began a position as a 1:1 assistant with Bergen County Special Services on January 14, 2019.

li.    In September 2018, Respondent applied for health insurance for her and the children through New Jersey Family Care, which she received in January 2019 retroactive to September 1, 2018.

lii.    The parties' children began to see a pediatrician in New Jersey, Daniel Schwartz of Broadway Pediatric in Westwood, New Jersey in October 2018.

liii.    The parties' children have always received (even when residing in Belgium), and continue to receive, dental care in New Jersey with Stephen Hung of Lemoine Dental Group in Fort Lee. The parties' children received dental care with Dr. Hung because of the family ties to this dentist's office where Respondent's mother worked for many years. . Prior to August 2018, the children received treatment with Dr. Hung annually when they visited New Jersey each summer.

liv.     The parties' daughter began dance at Northern Valley Dance Academy in Norwood, New Jersey in September 2018. These dance lessons were taken together with a Belgian friend and next-door neighbor in Brussels who was temporarily in the United States for a year simultaneously with the parties' daughter.

lv.      The parties' daughter began chorus through Memorial Elementary School in Montvale, New Jersey in September 2018.

lvi.     The parties' daughter began piano lessons at the Woodside Music Studio in Park Ridge, New Jersey in October 2018.

lvii.    The parties' daughter engaged in ski lessons in January 2019 through the Montvale Ski Club.

lviii.   The parties' daughter participated in softball through the Montvale Rec in the Spring 2019.

lix.     The parties' daughter participated in soccer through the Montvale Rec in August 2019 for a camp, for which the parties equally shared the expense.

lx.      The parties' daughter attended the French Institute Alliance Française in Montclair, New Jersey in July 2019 for which the parties equally shared the expense.

lxi.     The parties' son attended Am-Tree Developmental Nursery School ("Am-Tree") beginning October 2018.

lxii.    On March 22, 2019, Petitioner advised Respondent that he submitted a "pre-inscription" for the parties' children to attend the Lycée Français for the 2019-2020 school year to which Respondent expressed her objection.

lxiii.   On April 10, 2019, the parties engaged in an email exchange in which Respondent asserted that she and the children should remain in New Jersey and Petitioner asserted that they should return to Belgium while he continued to pursue employment in the United States.

lxiv.    Following admission of the parties' children to the Lycée Français, Petitioner advised, on April 18, 2019, Respondent that he had paid a deposit for the children's attendance at the Lycée Français for the 2019-2020 school year in order to secure their spot, to which Respondent again expressed her objection.

lxv.     Respondent filed a non-dissolution Complaint in Bergen County (1) seeking joint legal custody; (2) naming her as the Parent of Primary Residence and Petitioner as the Parent of Alternate Residence; (3) establishing a parenting time schedule; (4) ordering that the children remain in New Jersey for purposes of schooling; and (5) establishing a child support award.

21

lxvi.   On May 31, 2019, Petitioner filed a unilateral emergent application in Belgium seeking a divorce on an expedited timeframe, which was denied on June 3, 2019, but granted on appeal on June 6, 2019.

lxvii.  Respondent was served with Petitioner's Belgian divorce papers on June 27, 2019.

lxviii. On July 10, 2019, Petitioner filed a Motion to Dismiss Respondent's non-dissolution Complaint in Bergen County on the basis of lack of jurisdiction.

lxix.   On July 15, 2019, the French Speaking Court of First Instance of Brussels, Family Court issued a Judgement suspending its decision regarding issues related to the parties' children pending resolution by the Courts of New Jersey.

lxx.    On August 1-2, 2019, the Bergen County Court conducted a plenary hearing and dismissed Respondent's complaint based upon a declination of jurisdiction under New Jersey's Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA"). The Bergen County Court declined Petitioner's request for the children's immediate return to Belgium. The Bergen County Court declined to stay its decision pending any appeal.

lxxi.   Respondent filed a Notice of Appeal of the Bergen County Court's decision declining jurisdiction based on the UCCJEA on August 8, 2019.

lxxii.  On September 4, 2019, the Brussels Court of Appeals issued a Final Judgment affirming the lower court's decision declining jurisdiction over the children pending resolution of the Appeal in New Jersey.

lxxiii. On November 7, 2019, Petitioner filed a Hague Convention application in Bergen County via Order to Show Cause, which was denied on November 14, 2019.

lxxiv.  Petitioner filed a Motion for Reconsideration on November 25, 2019, which was denied on January 30, 2020.

lxxv.   The parties were officially divorced in Belgium.

lxxvi.  Petitioner filed with the United States District Court for the District of New Jersey the instant Hague Convention petition on April 21, 2020.

lxxvii. On April 29, 2020, the New Jersey Appellate Division issued a *Sua Sponte* Order staying Respondent's Appeal pending resolution of this matter.

lxxviii. On May 11, 2020, the Respondent filed a Motion to Dismiss the Petitioner's Hague Convention Petition in the United States District Court for the District of New Jersey based on lack of subject matter jurisdiction, which was denied by this Court on December 4, 2020.

3.    **PETITIONER'S CONTESTED FACTS**

i.      Petitioner's parents are French citizens.

ii.     Respondent acquired the US citizenship in 2004 (at the age of 26).

iii.    Respondent's parents are Japanese citizens. Respondents' parents have asserted to Petitioner on many occasions their intent to retire in Japan.

iv.

v.      The parties' children were born with French citizenship and acquired through separate application United States citizenship..

vi.     Petitioner's family (parents, siblings, nieces and nephews) reside in France, in and around Paris, which is less than an hour-and-half train journey from Brussels.

vii.    Respondent's mother resides in New Jersey, her brother resides in Oregon and the rest of her family resides in Japan.

viii.   When the parties spent holidays/school breaks before August 2018, the spent some in France and generally once a year in the United States.

ix.     The parties move within Brussels in November 2016 was upon the initiative of Respondent. The parties never purchased any real estate in Belgium.  Upon the initiative of Respondent, the Family decided to move within Brussels and to that effect, the parties co-signed a 9-year lease for a house in Brussels, effective on November 1ˢᵗ, 2016  The parties moved within Brussels and co-signed a 9-year lease for a house effective on November 1, 2016.

x.      While residing in Belgium, Respondent worked first for the St. John's International School from 2003 until 2004,  then from 2006 until 2008 as an independent reading specialist, consultant, and tutor for students in the Brussels area, ranging in age from Kindergarten to grade 12 students.; and for the International School of Brussels ("ISB") continuously from December 2006 until June 2018.

i.      While living in Brussels, the parties' daughter engaged in many social, sports and artistic activities. From the age of 4, she regularly engaged in activities like dance, horseback riding, skiing, piano, sailing and also attended other activities like rock climbing, yoga, gymnastics, programming, and arts and crafts.

xi.     The Parties and children have extensive social network in Belgium.

xii.    The parties daughter learned to ski in the French Alps with Petitioner and his family.

xiii.   From 2016-2018, Petitioner also applied for several positions in Belgium, with J&J and outside of J&J.

23

xiv.    Respondent resigned her position at ISB on her own accord, without any legal obligation to do so, against the advice from Petitioner as well as without prior notification to Petitioner.

xv.    Petitioner rejected the Japan contract in 2017 based on the proposal not meeting the upfront agreed minimal financial terms that the parties had previously agreed upon.

xvi.    Respondent was unable to secure a position at ISB for the 2018-2019 school year and, as such, the parties' daughter could no longer attend the ISB for the 2018-2019 school year due to the expense of same that was prohibitive to the parties at that time

xvii.    No schooling/nursery plans were identified nor executed for the parties' son prior to leaving for New Jersey.

xviii.    The parties agreed for the children to attend school in Montvale, New Jersey due to the limited availability of schools for the parties' daughter in Belgium for the 2018-2019 school year.

xix.    The parties agreed that the children and Respondent would stay at Respondent's parents' home in Montvale, New Jersey while they attended school for the 2018-2019 school year. In August 2018, Petitioner provided a written consent for Respondent to travel abroad with their children for a trip to New Jersey.

xx.    The December 30, 2018 travel authorization stipulated a return date of July 10th, 2019 and was co-signed by Respondent.

xxi.    In August 2018, Respondent took the initiative, without involving Petitioner, to seek a temporary leave of the country from the relevant Belgian authorities.

xxii.    Respondent initiated the process of seeking reciprocity for her Massachusetts teaching certificate in New Jersey without Petitioner's knowledge.

xxiii.    Respondent's position as a 1:1 assistant was temporary in nature and contractually would end by the end of the 2018-2019 school year.

xxiv.    Given the temporary nature of their leave, the children continued health insurance coverage in Belgium.

xxv.    During her temporary leave of Belgium, the Respondent maintained her local cellular phone service in Belgium as well as her local bank accounts.

xxvi.    The Parties' children did not attend any French lessons during the 2018-19 school year although that was an agreed intent from the Parties . in order to facilitate their return to Belgium

xxvii.    Following several phone conversations in March 2019, Respondent initiated on April 10, 2019, an email exchange with Petitioner in which Respondent asserted that she and the children should remain in New Jersey and Petitioner asserted that they should return

to Belgium. The email exchanged highlighted the change in the Parties' intent and therefore Petitioner expressed **strong** objections to these new plans.

xxviii. Respondent assisted with the parties' children enrollment in the Lycée Français for the 2019-2020 school.

xxix. Respondent filed her FD Complaint on May 20, 2019 while Petitioner was visiting Respondent and the parties' children in New Jersey and without informing Petitioner.

xxx. On July 11, 2019, Petitioner filed a formal complaint with the Belgian police against the Respondent for not returning the children to Belgium pursuant to the parties' prior agreements.

xxxi. The Bergen County Court declined jurisdiction in August 2019 due to unjustifiable conduct of the respondent.

xxxii. Petitioner filed with the Belgian authorities on August 8, 2019 and with the Office of Children's Issues of the United States for the children to be returned to Belgium under the Hague Convention on International Child Abduction and the International Parental Kidnapping Act.

xxxiii. The Bergen County Court denied Petitioner's Hague petition filed by way of Order to Show Cause in November 2019 based on the Court's prior decision finding a lack of jurisdiction under the UCCJEA.

xxxiv. The Divorce Judgement between The Parties was issued on November 8th, 2019 by the Tribunal de Premiere Instance Francophone de Bruxelles, Tribunal de la Famille.

## 4. RESPONDENT'S CONTESTED FACTS

i. Respondent has not renewed her Japanese passport since it expired in 2012. As Japan does not recognize dual citizens, Respondent is a citizen only of the United States of America.

ii. The parties were married on July 2, 2004 with a civil ceremony in Brussels, Belgium. and a religious ceremony in Paris, France on July 3, 2004.

iii. The parties' children are both citizens of the United States and France, via their birth to a French citizen and a United States citizen both residing abroad, with their children's citizenships for both countries having been acquired on the same day through the respective foreign consulates in Belgium.

iv. Petitioner's family resides in France, Sweden, and the United States.

v. Respondent's family resides in the United States and Japan.

Case 2:20-cv-04720-MCA-MAH    Document 110    Filed 04/25/22    Page 26 of 62 PageID:
1706
Case 2:20-cv-04720-MCA-MAH    Document 107    Filed 04/25/22    Page 26 of 62 PageID: 1644

vi.    While the parties' son was attending a French-speaking nursery school in Brussels, Belgium prior to August of 2018, he refused to speak to any of the nursery school staff in French and responded only in English.

vii.    When the parties spent holidays/school breaks in the United States before August of 2018, they generally did so twice a year and one such trip would last approximately one month every summer.

viii.    When the parties relocated within Belgium to a new apartment in 2016, Respondent agreed to a longer lease term because Petitioner advised Respondent that such leases are easier to break in Belgium to enable them to relocate outside of Belgium in the near future. Petitioner asked Respondent not to reveal their future relocation plans to the landlord when executing the lease.

ix.    Petitioner rejected the contract for the position in Japan in 2017 unilaterally and without consulting with or advising Respondent of his intent to do same.

x.    Petitioner's employment with J&J requires repeated and frequent travel outside of Belgium.

xi.    During the 2018-2019 year, Petitioner continued to inquire about job possibilities in New Jersey.

xii.    On February 12, 2019, Petitioner advised Respondent that the topic of "reverse commute" was brought up with some J&J work colleagues.

xiii.    ISB is a school taught primarily in English that follows an international curriculum and is accredited by an American accreditation association.

xiv.    The parties' daughter participated in soccer through the Montvale Rec in the fall of 2019, which activity she continues to this day in New Jersey.

xv.    The parties' son participated in soccer through the Montvale Rec in August 2019 for a camp, for which the parties equally shared the expense, and then in the fall 2019, an activity in which he continues to participate in New Jersey to this day.

xvi.    The parties' children became members of Lifetime Fitness in Montvale, New Jersey in the summer of 2019 for which the parties equally shared the expense.

xvii.    Respondent purchased a vehicle registered and insured in New Jersey in July 2019.

xviii.    Respondent and the children kept Petitioner up to date on all their activities and actions in New Jersey via email, text message, phone calls, and video calls.

xix.    The parties' daughter participated in the Saddle River Equestrian Camp in Chestnut Ridge, New York in August 2019 for which the parties equally shared the expense.

26

xx.     Petitioner's pre-registration of the children in the Lycée Français in March 2019 was completed by Petitioner unilaterally and without Respondent's knowledge or consent.

xxi.    Petitioner's unilateral action in pre-registering the children in the Lycée Français in March 2019 constituted a change in the parties' agreed upon plans to relocate outside of Belgium to the United States.

xxii.   Following Respondent's March 2019 expressed objections to the children returning to Belgium to attend the Lycée Français, Petitioner continued to unilaterally communicate with the Lycée Français with respect to the children and omitted Respondent from such email correspondence.

xxiii.  Petitioner's payment, in April 2019, of a registration fee for the children to secure a spot for them at the Lycée Français was completed by Petitioner unilaterally, without Respondent's knowledge or consent, and in the face of her previously expressed objections.

xxiv.   The December 30, 2018 travel authorization contained a July 10, 2019 "return date," which the parties discussed and agreed at the time of execution to be a return to Europe for purposes of summer vacation with Petitioner's family only.

xxv.    The Bergen County Court declined jurisdiction in August 2019 based upon a finding that "it would be inequitable to permit New Jersey to -- extend jurisdiction under these circumstances" because the Court felt that it made "little sense to bifurcate the custody and child support issues when these matters can be addressed by the Belgium Court" as part of the divorce.

xxvi.   The Bergen County Court denied Petitioner's Hague petition filed by way of Order to Show Cause in November 2019 based on Petitioner's failure "to show that the facts rise to the level of immediate, irreparable and substantial harm as per *Crowe v. DeGioia*, 90 N.J. 126 (1982)." Petitioner never refiled his Hague petition as an ordinary motion following the denial of his order to show cause.

xxvii.  The children acclimatized to New Jersey as of July 10, 2019.

xxviii. The children's habitual residence as of July 10, 2019 was New Jersey, as their habitual residence changed from Belgium between August 20, 2018 and July 10, 2019.

xxix.   The parties had a shared intent to abandon Belgium.

xxx.    Petitioner consented and acquiesced to the children's relocation to New Jersey.

27

xxxi.   The parties' daughter, A.L.S., is of sufficient age and maturity and objects to a return to Belgium.

xxxii.  There would be an intolerable situation were the children to be ordered to return to Belgium.

xxxiii. If Petitioner claims the children were wrongfully removed in August 2018, the children were well settled in New Jersey as of the date of the filing of his first Hague Convention Petition in November 2019.

xxxiv.  Petitioner and Respondent's Divorce in Belgium became finalized in February 2020 upon the divorce being registered by the commune in Brussels, Belgium.

## 5. PETITIONER'S WITNESSES

Christophe Soulier — Petitioner

| Name | | |
|---|---|---|
| Christina SOULIER | Grandmother of the parties' children<br><br><br><br><br><br><br>Retired M.D. | Ms. Soulier has information pertaining to the habitual residence of the family in Belgium, the Petitioner's actions as a parent when the children were in Belgium and the excellent integration of the parties' children in Belgium prior to their temporary relocation to New Jersey. |
| Laurent COHEN | Family Pediatrician | As their pediatrician since the respective birth of the parties' children, Dr Cohen has information pertaining to their habitual residence in Belgium, the Petitioner's actions as a parent in Belgium and the excellent integration of the parties' children in Belgium prior to their temporary relocation to New Jersey. |
| Charlotte Garrigues | J&J employee and Petitioner's colleague<br><br><br>Business Title: Assistant General Counsel at Johnson & Johnson | Ms. Garrigues has knowledge regarding Petitioner's family's habitual residence in Belgium and Petitioner's intent to and efforts to integrate in Belgium, pursue his career with Johnson & Johnson in Belgium, and as to the temporary nature |

| | | of the parties' children's intended stay in New Jersey. |
|---|---|---|
| Laurence Coudroy | J&J employee and Petitioner's colleague

Business Title: Device Lab Engineering Director at The Janssen Pharmaceutical Companies of Johnson & Johnson | Ms. Coudroy has knowledge regarding Petitioner's family's habitual residence in Belgium and Petitioner's intent to and efforts to integrate in Belgium, pursue his career with Johnson & Johnson in Belgium, and to the temporary nature of the parties' children's intended stay in New Jersey. |

6. **RESPONDENT'S WITNESSES**

    i.    <u>Akiko Matsumoto</u>: Ms. Matsumoto is the Respondent in this matter and will testify concerning the facts and circumstances surrounding her relocation with the children to New Jersey in August 2018, the parties ex-patriate lifestyle in Belgium which prevented any true integration into society there, Petitioner's consistent quest for employment outside of Belgium, Petitioner's statements regarding an agreement to return to the United States to allow Respondent to pursue her career, Petitioner's agreement to and cooperation in Respondent's relocation to New Jersey with the children, the expressed and implied parental intent related to such relocation, the integration of the children into New Jersey upon their relocation, the communications between the parties evidencing ongoing intent for such relocation to last indefinitely in nature, and the expressed desire of the parties' child(ren) to remain in New Jersey.

    ii.    <u>Rachel Duguay Avenick</u>: Ms. Avenick is a family friend who will testify with respect to an October 2018 conversation she had with Petitioner in which he expressed his intent for the family's relocation to New Jersey to be permanent as he detailed his efforts to secure employment in and relocate to New Jersey to join Respondent and the children.

    iii.    <u>Justin Marrotte</u>: Mr. Marrotte was the parties' daughter's softball coach in the Spring of 2019 and the father of a classmate and will testify regarding the daughter's integration into New Jersey.

    iv.    <u>Jennifer Murphy</u>: Ms. Murphy was the parties' daughter's assistant softball coach in the Spring of 2019 and the mother of a classmate and will testify regarding the daughter's integration into New Jersey.

    v.    <u>Jessica Raymond</u>: Ms. Raymond was the parties' son's daycare teacher during the 2018-2019 school year and will testify regarding the son's integration into New Jersey.

7.    **OTHER WITNESSES**

<u>A.L.S</u>: The parties' daughter, whose initials are being utilized here as she is a minor child, was 8 years old at the time of Respondent and the children's relocation to New Jersey in August 2018, 9 years old at the time of the alleged wrongful retention in July 2019, and is currently 12 years old. As detailed in Respondent's Motion *In Limine,* Respondent seeks the Court to conduct an *in camera* interview of A.L.S, to enable the Court to ascertain the child's perspective related to her relocation to New Jersey as well as her expressed desire to remain in New Jersey and the intolerable situation that would result were she to be forced to return to Belgium. It is not anticipated that the child would testify in open Court, however, Respondent requests that the interview of the mature child be conducted.

8.    **PETITIONER'S EXHIBITS**

| Exhibit | Description |
|---------|-------------|
| 1 | **Exhibit P1 – Agreement of the Parties of December 30, 2018,** where it was agreed that the parties' children would return from the State of New Jersey no later than July 10, 2019. |
| 2 | **Exhibit P2 – Belgian registry,** the Respondent and the children are recorded as **temporarily out of the country.** |
| 3 | **Exhibit P3 –** Superior Court of the State of New Jersey, Bergen County, **Order of August 2, 2019, and Transcript of Decision by the Hon. Mitchell Steinhart of August** 2, 2019 after a plenary hearing on UCCJEA jurisdiction, where Judge Steinhart declined jurisdiction based on the "unjustifiable conduct" of the Respondent. |
| 4 | **Exhibit P4 – Petitioner's Hague Convention Application and Supporting Documentation** |
| 5 | **Exhibit P5 –** Superior Court of the State of New Jersey, Bergen County, **Order and decision by the Hon. Mitchell Steinhart of November 14, 2019,** denying Petitioner's Order to Show Cause on his Hague Convention application based on the prior rulings |

| | |
|---|---|
| | declining subject matter jurisdiction based on the UCCJEA and the unjustifiable conduct of the Respondent. |
| 6 | **Exhibit P6** – Superior Court of the State of New Jersey, Bergen County, **Order of January 30, 2020, and Transcript of that hearing and decision by the Hon. Mitchell Steinhart** on Petitioner's Motion for Reconsideration on subject matter jurisdiction based on the Hague Convention. Declining jurisdiction again based on prior ruling declining subject matter jurisdiction based on the UCCJEA. |
| 7 | **Exhibit P7** – Text message from Respondent to Petitioner on February 12, 2019 regarding the possibility of Petitioner working at J&J in the United States. |
| | |
| | |

9.    **RESPONDENT'S EXHIBITS**

| Exhibit | Description |
|---|---|
| 1 | June 7, 2016 Email Exchange Re Fwd: Open D1 Finance Director role in Japan – Vision Care<br><br>Matsumoto 000411-413 |
| 2 | June 28, 2016 Email Exchange Re Fw: Opportunity<br><br>Matsumoto 000414-415 |
| 3 | July 19, 2016 Email Exchange Re Fwd: Would you have interested in D2 role in Singapore? Downside is that it is local package…<br><br>Matsumoto 000416 |
| 4 | October 7-8, 2016 Email Exchange Re Fwd: CFO Task Force – Backfill needed for Robin Naismyth<br><br>Matsumoto 000417-418 |
| 5 | October 18-19, 2016 Email Exchange Re FW: Update on Potential new slates<br><br>Matsumoto 000419-420 |

| Exhibit | Description |
|---------|-------------|
| 6 | November 7, 2016 Email Exchange Re FW: Senior Finance Director Global Research & Development – 8659161017<br><br>Matsumoto 000421-422 |
| 7 | January 11, 2017 Email Exchange Re Fwd: 2 roles that could be interesting for you<br><br>Matsumoto 000423-424 |
| 8 | February 15, 2017 Email Exchange Re FW: (Automated) Sr. Director Supply Chain Finance (APAC) – 1700144599W<br><br>Matsumoto 000425-427 |
| 9 | February 22-23, 2017 Email Exchange Re Fwd: Announcing structure changes<br><br>Matsumoto 000428-430 |
| 10 | May 29, 2017 Email Exchange Re IB in P<br><br>Matsumoto 000518-519 |
| 11 | July 31-August 2, 2017 Email Exchange Re Fwd: IC Position<br><br>Matsumoto 000546-547 |
| 12 | August 2, 2017 Email Re Catching up<br><br>Matsumoto 000548-549 |
| 13 | August 4 & 6, 2017 Email Exchange RE Fwd: Update<br><br>Matsumoto 000550-551 |
| 14 | August 7, 2017 Email Re Potential corridor<br><br>Matsumoto 000552-553 |
| 15 | December 3-4 & 10, 2017 Email Exchange Re Fwd: Joyeuses vacances – your new address?<br><br>Matsumoto 000560-562 |
| 16 | March 2-3 & 14, 2017 Email Exchange Re FW: expentiadatworksheet.xlsx<br><br>Matsumoto 000431-434 |
| 17 | March 6-7, 2017 Email Exchange Re FW: Flights Japan<br><br>Matsumoto 000435-436 |
| 18 | March 8, 2017 Email  Re ISB Re-enrolment form – A.L.M<br><br>Matsumoto 000437 |

| Exhibit | Description |
|---|---|
| 19 | March 29 & April 3-4, 2017 Email Exchange Re FW: Your look-see trip to Tokyo<br><br>Matsumoto 000444-448 |
| 20 | March 29, 2017 Email Re Housing<br><br>Matsumoto 000449 |
| 21 | April 13, 2017 Email Exchange Re Application submission for Tokyo International School<br><br>Matsumoto 000452-453 |
| 22 | April 17, 2017 Email Exchange RE Tomorrow<br><br>Matsumoto 000456-458 |
| 23 | April 18, 20-21 & 25, 2017 Email Exchange Re Changing Friday afternoon<br><br>Matsumoto 000459-463 |
| 24 | April 21 & 25, 2017 Email Exchange Re Thank you for visiting TIS! – A.L.M.'s application to Grade 2<br><br>Matsumoto 000464-466 |
| 25 | April 28 & May 1, 2017 Email Exchange Re: One way move to Japan<br><br>Matsumoto 000467-470 |
| 26 | May 2-4, 2017 Email Exchange Re Checking In<br><br>Matsumoto 000477-479 |
| 27 | May 7-8, 2017 Email Exchange Re Any news?<br><br>Matsumoto 000487-488 |
| 28 | April 14, 15, 17, 21 & 25; May 15, 17, 18, 30 & 31; and June 5 & 6 2017 Email Exchange Re Arkia, Welcome to Tokyo International School!<br><br>Matsumoto 000489-500 |
| 29 | May 17, 2017 Email Exchange Re You forgot phone at home!<br><br>Matsumoto 000502 |
| 30 | May 18, 2017 Email Exchange Re Latest mail to Ryan and Chris – ready to send, any comments?<br><br>Matsumoto 000507-508 |
| 31 | May 19, 20, & 24, 2017 Email Exchange Re Fwd: We are a go!<br><br>Matsumoto 000509-512 |

| Exhibit | Description |
|---|---|
| 32 | May 22, 2017 Email re FW: Requested flight option – CONFIDENTIAL<br><br>Matsumoto 000517 |
| 33 | June 1, 2017 Email Exchange Re FW: Offer Paperwork with attached Offer of Employment<br><br>Matsumoto 000536-539 |
| 34 | March 11, 2018 Email Exchange Re Akira's school of choices – attempt #2 to send<br><br>Matsumoto 000001-13 |
| 35 | May 2, 2018 Email Re OK – I just saw your last email to the Lycee<br><br>Matsumoto 000014-15 |
| 36 | June 11, 2018 Email Exchange Re Final Answer for Akira from le Lycee<br><br>Matsumoto 000016-17 |
| 37 | June 4-5 & 24; August 22-24 & 28, 2018 Email Exchange Re Registration<br><br>Matsumoto 000193-196 |
| 38 | August 20, 2018 Soulier approval of trip to USA (NJ) of Matsumoto and children<br><br>Matsumoto 000023 |
| 39 | Photos of NJ House<br><br>Matsumoto 000150 |
| 40 | October 15-16, 18 & 21, 2018 Email Exchange Re Resume follow-up<br><br>Matsumoto 000116-118 |
| 41 | November 19 & 27, 2018 Email Exchange Re Interest in applying for paraprofessional position at Lake Drive School<br><br>Matsumoto 000126-127 |
| 42 | October 24 & November 7-8, 20, 26 & 29, 2018 Email Exchange Re Thank you for the interview for the Itinerant Teacher – maternity leave cover position<br><br>Matsumoto 000122-125 |
| 43 | November 27, 29-30 & December 5, 10 & 14, 2018 Email Exchange Re Job Offer – Paraprofessional<br><br>Matsumoto 000128-131 |
| 44 | December 6, 2018 Email Exchange Re List of employers – past 20 years<br><br>Matsumoto 000132-134 |

| Exhibit | Description |
|---|---|
| 45 | January 8 & 10, 2019 Email Exchange Re Starting on Monday, January 14th<br><br>Matsumoto 000139-140 |
| 46 | March 29-30, 2018 Email Exchange Re Opportunity<br><br>Matsumoto 000142 |
| 47 | April 11, 2019 Email Re Position Godwin<br><br>Matsumoto 000143 |
| 48 | February 13, 2019 10-Month Non-Certificated Staff Contract<br><br>Matsumoto 000141 |
| 49 | May 31, 2019 Memorandum Re Approval – 2018-2019 Long Term Substitute Teachers<br><br>Matsumoto 000144-145 |
| 50 | December 5, 2019 10-Month Non-Tenured Teachers and Child Study Team Contract<br><br>Matsumoto 000146 |
| 51 | September 13, 2018 Email Re Here is the health insurance possibility for NJ<br><br>Matsumoto 000665 |
| 52 | FamilyCare Health Insurance Policy dated January 23, 2019 with an effective date of September 1, 2018<br><br>Matsumoto 000668 |
| 53 | Memorial Elementary School – Third Grade Report Card – A.L.S.<br><br>Matsumoto 000269-271 |
| 54 | December 18 & January 8 & 10, 2018 Email Exchange Re MCC Registration Confirmation for A.L.M.<br><br>Matsumoto 000228-230 |
| 55 | January 8, 2019 Email Re A.L.S.'s winter concert youtube link<br><br>Matsumoto 000311 |
| 56 | January4 & 8, 2019 Email Exchange Re Fwd: The Big Game – Promo Video – Wizards vs. Montvale Marvels (Buy Tickets)<br><br>Matsumoto 000316-317 |
| 57 | April 8 & 12, 2019 Email Exchange Re Softball – Team Marrotte<br><br>Matsumoto 000333-337 |

| Exhibit | Description |
|---------|-------------|
| 58 | July 11-12, 2019 Email Exchange Re Fwd: Welcome to FIAF Montclair Fun in French Summer Day Camp! (Week 4)<br><br>Matsumoto 000378-380 |
| 59 | July 16, 2019 Email Exchange Re Change in Summer Camp Week<br><br>Matsumoto 000383-388 |
| 60 | October 2018 Text Chain<br><br>Matsumoto 000214 |
| 61 | October 2018 Text Chain<br><br>Matsumoto 000215 |
| 62 | October-November 2018 Text Chain<br><br>Matsumoto 000223 |
| 63 | Text Chain Re Paino<br><br>Matsumoto 000277 |
| 64 | March 2019 Text Chain<br><br>Matsumoto 000278 |
| 65 | April 2019 Text Chain<br><br>Matsumoto 000279 |
| 66 | June 2019 Text Chain<br><br>Matsumoto 000306 |
| 67 | November 2018 Text Chain<br><br>Matsumoto 000310 |
| 68 | October 2018 Text Chain<br><br>Matsumoto 000312 |
| 69 | January 2019 Text Chain<br><br>Matsumoto 000318 |
| 70 | January 2019 Text Chain<br><br>Matsumoto 000319 |
| 71 | April 2019 Text Chain<br><br>Matsumoto 000331 |

Case 2:20-cv-04720-MCA-MAH    Document 110    Filed 04/25/22    Page 37 of 62 PageID:
1717
Case 2:20-cv-04720-MCA-MAH    Document 107    Filed 04/25/22    Page 37 of 62 PageID: 1655

| Exhibit | Description |
|---|---|
| 72 | Photos of children's extracurricular activities<br><br>Matsumoto 000357-361 |
| 73 | Shared photos "USA 2018"<br><br>Matsumoto 000689 |
| 74 | June 28, 2019 Email Exchange Re Fws: Last day of school with attached pictures<br><br>Matsumoto 000260-261 |
| 75 | October 2018, December 2018, February 2019, and May 2019 trip photos<br><br>Matsumoto 000693-697 |
| 76 | December 30, 2018 Soulier approval of trip to USA (NJ) of Matsumoto and children<br><br>Matsumoto 000024 |
| 77 | January 8, 2019 Email Exchange Re 2019-2010 School Calendar<br><br>Matsumoto 000086 |
| 78 | February 2019 Text Chain<br><br>Matsumoto 000087-90 |
| 79 | March 22 & 31 & April 1, 2019 Email Exchange Re Pre-inscription French School Brussels<br><br>Matsumoto 000091-92 |
| 80 | April 8 & 10, 2019 Email Exchange Re TR: admission CM1 et MS<br><br>Matsumoto 000093-98 |
| 81 | April 8, 10-11 & 18, 2019 Email Exchange Re FW: admission CM1 et MS<br><br>Matsumoto 000099-103 |
| 82 | April 19, 2019 Email Re Akira's schooling for next year<br><br>Matsumoto 000104 |
| 83 | April 19, 2019 Email Re Akira's schooling for next year<br><br>Matsumoto 000105 |
| 84 | June 21, 2019 Recording<br><br>Matsumoto 000749 |
| 85 | July 2, 2019 Recording<br><br>Matsumoto 000751 |

| Exhibit | Description |
|---------|-------------|
| 86 | July 17, 2019 Judgment of the French Speaking Court of First Instance of Brussels, Family Court with certified translation<br><br>Matsumoto 000600-622 |
| 87 | September 4, 2019 Final Judgment of the Brussels Court of Appeal with certified translation<br><br>Matsumoto 000623-660 |
| 88 | February 12, 2021 Petitioner's Responses to Respondent's Interrogatories |
| 89 | Johnson & Johnson Produced Documents with Certification of Custodian of Records<br><br>JNJ000016-30 |

## 10.   STATEMENT OF LEGAL ISSUES AND GOVERNING STANDARDS

### A.   PETITIONER'S STATEMENT

The Hague Convention, On the Civil Aspects of International Child Abduction of October 25, 1980, of which the United States is a signatory, is the basis for Petitioner's request for the immediate return of the Parties' children to Belgium.  It is the intent of the Hague Convention "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access."

Pursuant to Article 1 of the Hague Convention, Article 1, **"The objects of the present Convention are - *a)* to secure the prompt return of children wrongfully removed to or retained in any Contracting State."**

Pursuant to Article 2, **"Contracting States shall take all appropriate measures to secure within their territories the implementation of the objects of the Convention. For this purpose they shall use the most expeditious procedures available."  In this instance, that would be this Petition, based on my Hague Convention application.**

Pursuant to Article III of the Hague Convention, Article 3, "The removal or the retention of a child is to be considered wrongful where - *a)*  it is in breach of rights of custody attributed to a person, an

institution or any other body, either jointly or alone, under the law of the State **in which the child was habitually resident (Belgium) immediately before the removal or retention;** and *b)* at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." In the case at bar, the Respondent took the children from where they were "habitually residents" (Belgium) and therefore it was a "wrongful taking" and a "wrongful retention" as she kept them in New Jersey after it was the **shared intent of the parties by agreement to** return them to Belgium by July 10, 2019.

Pursuant to Article 11 of the Hague Convention, "The judicial or administrative authorities of Contracting States shall act expeditiously in proceedings for the return of children."

**Pursuant to Article 12 of the Hague Convention, "Where a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith. The Respondent wrongfully removed and wrongfully retained the children, when she chose not to return to Belgium with the children by July 10, 2019. Petitioner did not know that this was her intent until he received her application on May 29, 2019 with this Court for custody, so it was not until May 29, 2019 that it appeared that she was going to be "wrongfully retaining" the children in the United States past July 10, 2019, when she had agreed to "in writing" to return them. Subsequently, the Respondent did in fact "wrongfully retain" the children in New Jersey past July 10, 2019, and chose unilaterally not to return them, despite the Parties' shared intent.**

_1.Jurisdiction

Case 2:20-cv-04720-MCA-MAH    Document 110    Filed 04/25/22    Page 40 of 62 PageID:
1720
Case 2:20-cv-04720-MCA-MAH    Document 107    Filed 04/25/22    Page 40 of 62 PageID: 1658

This Court has jurisdiction pursuant to 22 U.S.C. § 9003(a), which provides that "[t]he courts of the States and the United States district courts shall have concurrent original jurisdiction of actions arising under the Hague Convention." Both the United States and Belgium are contracting states under the Hague Convention. Accordingly, this Court has subject matter jurisdiction over this action. *Saltos v. Severino*, (D.N.J. July 25, 2018), Civil Action No.: 18-8704, (JLL).

## 2. Legal Standard

The purpose of the Hague Convention is to provide a legal process in order "to restore the status quo prior to any wrongful removal **or retention**, and to deter parents from engaging in international forum shopping in custody cases." *Karpenko v. Leendertz*, 619 F.3d 259, 263 (3d Cir. 2010) (quoting *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 270 (3d Cir. 2007)). A decision under the Hague Convention solely concerns the return of the child, and **should not be taken as a determination of custody.** Hague Convention, Article 19.

For a child to be returned under the Hague Convention, the petitioner must prove by a preponderance of the evidence that the child's habitual residence was in a signatory State and that the child was wrongfully removed. *Karpenko*, 619 F.3d at 263 (citing *Karkkainen v. Kovalchuk*, 445 F.3d 280, 287 (3d Cir.2006)).

Pursuant to Article 3 of the Hague Convention, the removal **or retention** of a child is to be considered wrongful where –

a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident **immediately before the removal or retention; and**

b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention. Hague Convention, Article 3. In the case at bar, but for the wrongful retention of the children in the United States, the Petitioner would have exercised his rights of custody.

In determining whether the Petitioner has made out a *prima facie* claim for relief under the Hague Convention, the Third Circuit has instructed courts to answer the following questions:

(1) When did the removal or retention at issue take place? (2) Immediately prior to the removal or retention, in which state was the child habitually resident? (3) Did the removal or retention breach the rights of custody attributed to the petitioner under the law of the habitual residence? (4) Was the petitioner exercising those rights at the time of the removal or retention?

*Karkkainen*, 445 F.3d at 287.

Once petitioner asserts a *prima facie* claim, the burden shifts to the Respondent opposing the removal of the child to assert one of the affirmative defenses articulated in the Hague Convention. *Id.* at 288. "These affirmative defenses are narrowly construed to effectuate the purposes of the Convention and, even where a defense applies, the court has the discretion to order the child's return." *Id.* Pursuant to the Hague Convention, a respondent can prove any of the following affirmative defenses:

(1) that a grave risk that the child's return would expose him or her to physical or psychological harm or otherwise place the child in an intolerable situation [proven] by clear and convincing evidence; (2) that the child's return would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms [proven] by clear and convincing evidence; (3) that the child is now settled in his or her new environment [proven] by preponderance of the evidence; (4) that the person from whom the child was removed was not exercising custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention [proven] by preponderance of the evidence; or (5) that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views [proven] by preponderance of the evidence. *Karpenko*, 619 F.3d at 263 n.3; *see also* 22 U.S.C.A. § 9003(e)(2) (setting forth the burdens for each affirmative defense).

41

Case 2:20-cv-04720-MCA-MAH    Document 110    Filed 04/25/22    Page 42 of 62 PageID:
1722
Case 2:20-cv-04720-MCA-MAH    Document 107    Filed 04/25/22    Page 42 of 62 PageID: 1660

### 3. Petitioner's Burden

a.    Date of Wrongful Retention

The first step is for the Court to determine what date the allegedly wrongful retention occurred, "so as to establish the relevant date of habitual residence for purposes of the Convention." *Karkkainen*, 445 F.3d at 290. In situations where parents mutually agree to permit their child to travel outside their home country with one parent for a specified period of time, courts in the Third Circuit have found that **the retention date occurs when the travelling out of state parent fails to return the child.** *See Karkkainen*, 45 F.3d at 290; *Paulus v. Cordero*, No. 12-986, 2012 U.S. Dist. LEXIS 90374, at *8 (M.D. Pa. June 29, 2012). Here, the parties signed an agreement concretizing their understanding that the children were in the U.S. temporarily for schooling for one year and would **return to Belgium no later than July 10, 2019**. Therefore, **the date the allegedly wrongful retention occurred was** July 10, 2019.

### 4. Habitual Residence

The Third Circuit has defined "habitual residence" as "the place where [the child] has been physically present for an amount of time sufficient for acclimatization and which has a degree of settled purpose from the child's perspective." *Karpenko*, 619 F.3d at 263 (quoting *Karkkainen*, 445 F.3d at 291-92). In making this determination, courts may consider the "child's experience in and contacts with her surroundings, focusing on whether she developed a certain routine and acquired a sense of environmental normalcy by forming meaningful connections with the people and places she encountered in a country prior to the retention date." *Karkkainen*, 445 F.3d at 292 (internal quotation marks, citation, and alterations omitted).

However, the federal courts have noted the **"difficulty, if not impossibility" of finding whether a young child has acclimatized to a country, or even has the ability to do so.** In the

case at bar, the children at issue are only ten and four years old. Most of their lives have been spent in Belgium, which was their last clear habitual residence prior to the wrongful taking and retention in New Jersey by the Respondent.

"The Convention does not set an age at which a child is automatically considered to be sufficiently mature, rather the determination is to be made on a case-by-case basis." *Tsai-Yi Yang*, 499 F.3d 259, 279. In *Tsai-Yi Yang*, **the District Court found, and the Court of Appeals affirmed, that a ten-year-old child was not of sufficient age or maturity for her views to be appropriately considered.** *Id.* The District Court based this determination on the fact that the ten-year-old child testified generally that she preferred to stay in the United States, rather than particularized objections to returning to Canada. *Id.* Though the ten-year-old child did express some objections to returning to Canada, they were "not necessarily sufficient" to meet the exception. *Id.*

The Ninth Circuit recognized in *Mozes v. Mozes*, 239 F.3d 1067 (9th Cir. 2001) that young children "normally lack the material and psychological wherewithal to decide where they will reside." Further, despite a stated preference for the acclimatization prong, the minority has declared this entire inquiry useless when applied to a young child. The Sixth Circuit emphasized that young children fall outside the Convention's purview because *Feder*, 63 F.3d at 224 (declaring Australia the habitual residence). See also *Delvoye v. Lee*, 329 F.3d 330 at 332-34 (2003) (mother traveled under a three month tourist visa, brought only one or two suitcases, and left her belongings in New York).

So, although the preferred method to determine habitual residence by the court is the "acclimatization standard", where the aspects of the child's life are considered to attempt to determine whether the child would consider themselves acclimated to one place over another; the first thing to analyze

under this standard is whether the child is old enough to form meaningful relationships and is actually capable of acclimating to a certain place over another. Other factors to consider under the acclimatization standard is the period a child spends in a certain location, academic activities, social engagements, sports programs, etc.. This standard will not always work because, as alluded to before, some children are not old enough to have these meaningful relationships. If anything, clearly the children who had spent all their lives in Belgium, until their temporary stay in New Jersey, had formed the most meaningful relationships in Belgium.

When the child is at such a young age, the court should then analyze the second test, the **parents' shared intent.** To determine the parents' shared intent, it must be clear what the intent actually is. In the case at bar, it is clear based on the documents signed by both parties what the shared intent was, and **that was for the children to be returned to Belgium on July 10, 2019.**

Pursuant to *Ahmed v Ahmed*, 867 F3d 682, at 689 (2017); *Mozes*, 239 F.3d at 1076, young children are "unable to acclimate, making the standard generally unworkable." Similarly, the Third Circuit concluded that where "a child is born while his . . . mother is temporarily present in a country other than that of her habitual residence it does seem, however, that the child will normally have no habitual residence until living in a country on a footing of some stability." Id. Where a child is so young that he or she has not yet formed any meaningful ties to a community, regardless of where it is, the acclimatization prong is meaningless in a "habitual residence" analysis and leaves the child without the protection of the Convention. The federal appellate courts have ruled that a child's habitual residence is where the child has acclimatized; **where the family as a unit has manifested a settled purpose to change or maintain an habitual residence, and the parents have a shared intent as to where the child would live.**

Acclimatization is the degree to which a child has developed intimate connections with a residence, which may be measured by criteria such as school or childcare enrollment; medical

treatment; or the child's age and length of stay in a country. **However, an infant or very young child cannot acclimatize to any place independently of where his or her parent(s) are.** *Ahmed*, 867 F.3d at 689. 78 *Delvoye*, 329 F.3d at 334 (citing E.M. Clive, The Concept of Habitual Residence, JURID. REV. part 3, 138, 146 (1997)). Jeff Atkinson, "The Meaning of Habitual Residence under the Hague Convention on Civil Aspects of International Child Abduction and the Hague Convention on the Protection of Children," 63 Okla. L. Rev. 647, 656-58 (2011) ("Atkinson Article"). 22 Circuits have held that an infant's habitual residence is not automatically derived from her mother's location. **"Thus, with a young child, the shared parental intent is generally expressed as the last shared intention of the parents to establish a residence for the child, and is ideally based upon empirical evidence of historical actions taken by the parents."** *Saltos v. Severino*, (D.N.J. July 25, 2018), Civil Action No.: 18-8704, (JLL).

 **In the case at bar, clearly the empirical evidence of historical actions taken by the parties shows their shared intention was for the children to return to Belgium.**

 The shared parental intent also comes into play where no acclimatization can occur due to **the child's young age and inability to acclimatize.** Within the analysis, the court must "focus on the child" and his surrounding circumstances. To find **evidence of a shared intent,** the court has to look to the spectrum of parental behavior, **from written agreements to actions.** See *Whiting v. Krassner, 391 F.3d 540 at 542 (3d Cir. 2004, 391)* (finding that the parties' signed agreement to raise the child in Canada for two years and the parents' initial compliance controlled her habitual residence), and in *Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir. 1995), the Third Circuit found that the parents had "shared intentions" to move to Australia despite the parents' different interpretations of the move. The facts that the court reviewed to reach its conclusion of shared intentions included that the parents had no definitive return date when they left the United States,

the parents had allowed the minor child to attend preschool, the parents had sought employment in Australia, and the parents had sold their home in the United States.

The Two-Pronged Test Adopted by the majority of the federal Circuits use a balancing test of both objective and subjective evidence to determine a child's habitual residence. Like the Eighth Circuit did in 2003 and 2009 with its decisions in *Silverman v. Silverman*, 338 F.3d 886, 898 (8th Cir. 2003) and *Sorenson v. Sorenson*, 559 F.3d 871, 874 (8th Cir. 2009), the Second Circuit held in 2005 in *Gitter v. Gitter*, 396 F.3d 124, 132–33 (2d Cir. 2005) that a habitual residency analysis should consider two factors: (1) subjective intent of the parents; AND (2) objective evidence of habitual residency. Courts should begin by considering whether the child's presence in the country was intended to be temporary or permanent. Objective evidence should also be used to consider habitual residence, including a change in geography, and some indication of acclimatization. See, e.g., *Mozes*, 239 F.3d at 1078. These factors allow the child to become acclimatized to their environment. Id. The Ninth Circuit noted that being habitually resident in a place requires that the child be settled in some sense, but does not require that the family intend to live there until they die. Id. at 1074. The court found support for this proposition in the Convention's stated purpose of preventing parents from seeking custody of their children by removing them to another country against the other parent's will. Id. at 1079. Allowing courts to solely examine objective evidence of acclimatization would tempt parents to relocate their children to new countries.[3] See Id. at 1078–79 (explaining that, without intent to abandon an old residence, any period of time spent elsewhere can constitute a temporary arrangement in the grand scheme of life). See *Cohen v. Cohen*, 858 F.3d 1150 at

---

[3] *Monasky v. Taglieri*, 140 S.Ct. 719 (2020), the Supreme Court held that a child's habitual residence depends on where the child regularly resides. However, the inquiry to determine residence is based on the context of a case— a totality of circumstances standard. "[W]hat remains for the court to do in applying that standard ... is to answer a factual question: Was the child at home in the particular country at issue?" The Supreme Court found that the District Court accurately determined that the wife was a habitual resident of Italy, like the husband. The Court ultimately held that the child was also found to be a habitual resident of Italy, thus affirming the lower courts' decisions.

46

1154 (2017) (holding that habitual residence is to be determined based on the child's perspective while giving some deference to parental intent); *Sorenson v. Sorenson*, 559 F.3d 871, 874 (8th Cir. 2009) (holding that evidence of the child's acclimation was relevant, in addition to evidence of parental intent, in determining habitual residence); *Gitter v. Gitter*, 396 F.3d 124, 132–33 (2d Cir. 2005) (determining that parental intent must be examined in order to better understand objective evidence of the child's perspective); *Silverman v. Silverman*, 338 F.3d 886, 898 (8th Cir. 2003) (holding that the lower court should have examined both the settled purpose of the move from the children's perspective **as well as both parents' intentions at the time of the move** to Israel); *Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir. 1995) (examining both the child's perspective regarding settled purpose of the family's move and the parent's current intentions regarding habitual residence). See *Sorenson*, 559 F.3d at 874 (examining both evidence of the child's acclimation and the shared intent of the parents to determine habitual residence); *Gitter*, 396 F.3d at 132–33 (reasoning that parental intent can be used to aid in understanding the child's perspective); *Silverman*, 338 F.3d at 898 (holding that the settled purpose of a move should be examined both from the shared intent of the parents as well as the children's perspective). *Gitter*, 396 F.3d at 132. The decision states that because children lack the psychological ability to determine their place of residency, courts should only give weight to the intent of the parents. Id. at 133. As an example of indicia of acclimatization, the court offered an example of a child who spent fifteen years abroad in the same state. Id. at 132. The court reasoned that, even if the child's parents intended to eventually return to the original state, the child's habitual residence would still be abroad. Id. at 133. Similarly, the Third Circuit has held that the inquiry should balance evidence of the child's acclimatization **with shared parental intents**. In *Feder v. Evans-Feder*, the court held a child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization and which the child considers to have a **degree of settled purpose.** Further, the analysis must **also consider the parents' current intentions** regarding the child's habitual residence.

47

In the case at bar, the parties' shared intentions of the temporary nature of the move to New Jersey as evidenced by their agreements for the children to return to Belgium on July 10, 2019 should be of paramount consideration by this Court in determining the habitual residence of the children and clearly supports the return of the children to Belgium under the Hague Convention.

5. Breach of Petitioner's Custody Rights

For purposes of the Hague Convention, the custody rights of the parents are determined by the law of the origin country. *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 275 (3d Cir. 2007)). According to Petitioner, Respondent's wrongful retention violated his custody rights under Belgium law, which holds that both parents have joint custody unless there is a court order to the contrary. Here, there is no court order that terminated Petitioner's joint custody rights. Petitioner has been unable to exercise these rights completely since July 10, 2019, when the children were retained in the United States without his consent. Therefore, Petitioner has shown by a preponderance of the evidence that his custody rights were breached by the children's wrongful retention in the United States.

6. Petitioner was Exercising His Custody Rights

It is not a high burden for a parent to show they were exercising their custody rights, rather it only requires that the parent "kept or sought to keep some[] sort of regular contact with the child." *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 277 (3d Cir. 2007) (citing *Baxter v. Baxter*, 423 F.3d 363, 370 (3d Cir. 2005). Here, Petitioner acted on his custody rights by seeing the children in the United States whenever he was permitted and allowed by work to do so. It is no small issue for the Petitioner to travel from Belgium to New Jersey, while he continued to work full-time in Belgium. Based on the facts as stated in Petitioner's testimony at the prior plenary hearing and his Declaration, it is clear the Petitioner was sufficiently exercising his custody rights

at the time of the children's retention in the United States. Therefore, Petitioner has made out a *prima facie* case that Respondent wrongfully retained the children in the United States in violation of the Hague Convention.


7. <u>Respondent's Affirmative Defenses</u>

In her brief, Respondent asserted several of the affirmative defenses recognized by the Hague Convention. These affirmative defenses included: (1) that the children have been here for over a year and they are well settled in their home and school in New Jersey, where they are excelling socially and academically; (2) that the children are of sufficient maturity and have articulated their desire to stay in the United States and do not want to return to Belgium.

8. <u>The "Well-Settled" Exception</u>

Pursuant to Article 12 of the Hague Convention, which contains the "well-settled" exception, if a child has been wrongfully removed and "at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, *a period of less than one year* has elapsed from the date of the wrongful removal **or retention**," **the Court shall order the return of the child.** Hague Convention, Article 12 (emphasis added). However, the Court may choose not to return the child, "where the proceedings have been commenced after the expiration of the period of one year referred to in the preceding [sentence]," **and** it is demonstrated that "the child is now settled in its new environment." *Id*. The one-year period articulated in the exception is not subject to equitable tolling. *Lozano v. Montoya Alvarez*, 134 S.Ct. 1224, 1231 (2014).

Here, Petitioner originally filed this emergency petition on April 21, 2020. The wrongful retention began on July 10, 2019, and his emergency petition was therefore filed less than a year

later. Therefore, the children's wrongful retention does not fall into the year or more required for Respondent to invoke Article 12's "well-settled" exception and it does not apply to this case.

### 9. The "Wishes of the Child" Exception

The "wishes of the child" exception, does not apply to this case either. Under the "wishes of the child" exception, a court may "refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention, Article 13.

"The Convention does not set an age at which a child is automatically considered to be sufficiently mature, rather the determination is to be made on a case-by-case basis." *Tsai-Yi Yang*, 499 F.3d at 279. **In *Tsai-Yi Yang*, the District Court found, and the Court of Appeals affirmed, that a ten-year-old child was not of sufficient age or maturity for her views to be appropriately considered.** *Id.* The District Court based this determination on the fact that the ten-year-old child testified generally that she preferred to stay in the United States, rather than particularized objections to returning to Canada. *Id.* Though the ten-year-old child did express some objections to returning to Canada, they were "not necessarily sufficient" to meet the exception. *Id.*

Furthermore, in the case at bar, the parties' son, who is six years old, is even younger than the ten-year-old child in *Tsai-Yi Yang* who was found not to be old or mature enough for the exception to apply. *Id.* This Court must find that the children are not of a sufficient age or maturity for Article 13's "wishes of the child" exception to apply.

### 10. Petitioner Exercising Custody Rights

Pursuant to Article 13(a) of the Hague Convention, the Court need not return the child if Petitioner "was not actually exercising [his] custody rights at the time of removal or retention."

Case 2:20-cv-04720-MCA-MAH    Document 110    Filed 04/25/22    Page 51 of 62 PageID:
1731
Case 2:20-cv-04720-MCA-MAH    Document 107    Filed 04/25/22    Page 51 of 62 PageID: 1669

Respondent must meet a high standard for this exception, as "[e]ssentially, nothing short of clear and unequivocal abandonment will prove that the petitioner failed to exercise his or her custodial rights." *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 277 (3d Cir. 2007)).

Here, Respondent does not sufficiently argue in any manner that the Petitioner was not exercising his custody rights at the time of removal or retention.

Petitioner made substantial efforts to see the children, traveling frequently from Belgium to the United States. Therefore, the Respondent has not set forth sufficient facts to support the application of the exception articulated in Article 13(a) of the Hague Convention.

11. The "Grave Risk of Harm" Exception

Pursuant to Article 13(b) of the Hague Convention, the Court need not return the minor child if "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Respondent must show the "grave risk of harm" exception by clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A). This exception applies in two circumstances: (1) when the return of the minor child puts him or her in "imminent danger," because the minor child is returning to "a zone of war, famine, or disease"; and (2) when returning the minor child would subject him or her to "serious abuse or neglect," where the country of habitual residence is incapable or unwilling to adequately protect the minor child. *Baxter*, 423 F.3d at 373. There is no clear and convincing evidence that the children would suffer a grave risk of physical or psychological harm should they be returned to Belgium.

The children are not at risk of serious abuse or neglect if they return to Belgium. Almost all of Respondent's arguments are focused on custody and the best interest of the child. Though Respondent may argue what is in the children's best interests, the actions that gave rise to this case

are exactly what the Hague Convention is trying to prevent, *i.e.*, international forum shopping to determine custody disputes. *See Karpenko*, <u>619 F.3d at 263</u>. This Court is not the appropriate forum for the parties to decide which parent should have custody of the children or in which country the children's interests would best be served. Therefore, this Court must act in line with the Hague Convention and order that the children be returned to Belgium. *See Saltos v. Severino*, (D.N.J. July 25, 2018), Civil Action No.: 18-8704, (JLL).

For the foregoing reasons, this Court should hold that Petitioner has satisfied his burden of proving, by a preponderance of the evidence, that Respondent has wrongfully retained the children in New Jersey in violation of the Hague Convention.

**The Belgium Courts' Findings Do Not Apply to This Court As Regards A Decision under the Hague Convention, As They Did Not Take Subject Matter Jurisdiction Under the Hague Convention or 22 U.S.C. §9003(a), Did not Make Any Ruling Under the Hague Convention, Did Not Rule on the Petitioner's Hague Convention Application and Chose To Stay Their Proceedings and Defer to a Decision by the Courts of the United States**

The Belgium Courts specifically chose not to take subject matter jurisdiction under the Hague Convention to determine whether the children should be returned to Belgium and did not make a determination on the Petitioner's Hague Convention Application. The Belgian Court's specifically chose to defer to the United States Courts to make a decision regarding the return of the children to Belgium as the children were now in the United States.

The issue of habitual residence and the return of the children to Belgium must be determined by this Court in the context of the totality of the facts of the Petition,[4] which includes an agreement by the

---

[4] *Monasky v. Taglieri*, 140 S.Ct. 719 (2020), the Supreme Court held that a child's habitual residence depends on where the child regularly resides. However, the inquiry to determine residence is based on the context of a case— a totality of circumstances standard.

parties as to their shared intent, the Hague Convention, the Petitioner's Hague Convention Application and the applicable law previously stated herein.

**B.    RESPONDENT'S STATEMENT**

As applicable to the case *sub judice*, the standards and burdens of proof are as follows:

i.    Jurisdiction of the Courts: "The courts of the States and the United States district courts shall have concurrent original jurisdiction of actions arising under the Convention." 22 U.S.C.A. § 9003(a).

ii.    Petitions: "Any person seeking to initiate judicial proceedings under the Convention for the return of a child or for arrangements for organizing or securing the effective exercise of rights of access to a child may do so by commencing a civil action by filing a petition for the relief sought in any court which has jurisdiction of such action and which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed." U.S.C.A. § 9003(b). "[T]he term 'commencement of proceedings', as used in article 12 of the Convention, means, with respect to the return of a child located in the United States, the filing of a petition in accordance with subsection (b) of this section." U.S.C.A. § 9003(f)(3).

iii.    Petitioner's Case in Chief:

Case 2:20-cv-04720-MCA-MAH    Document 110    Filed 04/25/22    Page 54 of 62 PageID:
1734
Case 2:20-cv-04720-MCA-MAH    Document 107    Filed 04/25/22    Page 54 of 62 PageID: 1672

Petitioner has the burden of proof to establish by a **preponderance of the evidence** that
the children have been wrongfully removed or retained within the meaning of the Convention. 22
U.S.C.A. § 9003(e)(1)(A).

To establish a *prima facie* case of wrongful removal or retention, Petitioner must prove:
"(1) the child was 'habitually resident' in the petitioner's country of residence at the time of
removal, (2) the removal was in breach of the petitioner's custody rights under the law of his home
state, and (3) the petitioner had been exercising those rights at the time of removal." *Bader v.
Kramer*, 484 F.3d 666, 668 (4th Cir. 2007) ("Bader II"). Once a petitioner has made out a *prima
facie* case of wrongful removal or retention, "return of the child is required unless the respondent
establishes one of four defenses." *Id.*

With respect to the first element, "[u]nder the Hague Convention, the petitioner bears the
initial burden of proving by preponderance of the evidence that the child was habitually resident
in a State signatory to the Convention and was wrongfully removed to a different State as defined
by Article 3." *Karpenko v. Leendertz*, 619 F.3d 259, 263 (3d Cir. 2010). The "determination of a
child's habitual residence immediately before the alleged wrongful removal or retention is
therefore a threshold question in deciding a case under the Hague Convention." *Feder v. Evans-
Feder*, 63 F.3d 217, 222 (3d Cir. 1995).

"Federal courts have developed a two-part framework to assist in the habitual residence
analysis." *Maxwell v. Maxwell*, 588 F.3d 245, 251 (4th Cir. 2009). First, the court must determine
"whether the parents shared a settled intention to abandon the former country of residence." *Id.*
(citing *Mozes v. Mozes*, 239 F.3d 1067, 1075 (9th Cir. 2001)). Second, the court determines
"whether there was 'an actual change in geography' coupled with the 'passage of an appreciable

period of time, one sufficient for acclimatization by the [child] to the new environment.'" *Id.* (quoting *Papakosmas v. Papakosmas*, 483 F.3d 617, 622 (9th Cir. 2007)).

Such elements have recently been reframed by the United States Supreme Court in the case of *Monasky v. Taglieri*, 140 S. Ct. 719, 726 (2020), which emphasized the perspective of the child in making a determination of habitual residence. The *Monasky* decision held that the habitual residence does not depend on "an actual agreement between a child's parents" but rather requires "a fact-sensitive" and "fact-driven inquiry" that is "sensitive to the unique circumstances of the case and informed by common sense." *Id.* at 726-27 (internal quotation marks and citations omitted). The Court detailed that "[t]he place where a child is at home, at the time of removal or retention, ranks as the child's habitual residence" and "[f]or older children capable of acclimating to their surroundings, courts have long recognized, facts indicating acclimatization will be highly relevant." *Id.* at 727.

The holding in *Monasky* echos much of this Circuit's law wherein the acclimatization of the child takes precedence where a child is

> of an age at which it is cognizant of his or her surroundings, but also of an age at which it is able to develop a certain routine and acquire a sense of environmental normalcy. A four-year old child . . . certainly has this ability. A child of such age is not only aware of those around him, but is able to form meaningful connections with the people and places he encounters each day.

[*Whiting v. Krassner*, 391 F.3d 540, 550-51 (3d Cir. 2004).]

Indeed, this Circuit has previously recognized that the acclimatization element is key "when determining the habitual residence of an older child in order to prevent such child's environmental normalcy from being disrupted." *Id.* at 551; *see also Karkkainen v. Kovalchuk*, 445 F.3d 280, 296 (3d Cir. 2006). One of the Hague Convention's primary objectives is to "ensure stability in a child's family and social environment," *Karkkainen*, 445 F.3d at 291.

"This approach considers a child's experience in and contacts with her surroundings[.]" *Id.* at 292. It "considers whether a child has made a country her home before the date of her removal or retention." *Id.* Habitual residence is "'the place where [the child] has been physically present for an amount of time sufficient for acclimatization and which has a degree of settled purpose from the child's perspective.'" *Innes v. Carrascosa*, 391 N.J. Super. 453, 484 (App. Div. 2007) (quoting *Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir. 1995)) (emphasis added); *see also Baxter v. Baxter*, 423 F.3d 363, 369 (3d Cir.2005); *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 271 (3d Cir. 2007). "[A] determination of whether any particular place satisfies this standard must focus on the child[.]" *Feder*, 63 F.3d at 224 (emphasis added).

"[A]cademic activities are among 'the most central . . . in a child's life' and therefore highly suggestive of acclimatization." *Karkkainen*, 445 F.3d at 293 (quoting *Feder*, 63 F.3d at 224). Courts have held "school attendance, social engagements, and lessons" as well as "participation in sports programs and excursions in [the child's] new country" to be evidence in favor of acclimatization. *Id.* at 293-91. Other indicia of acclimatization include obtaining state sponsored medical insurance (*see Feder*, 63 F.3d at 219), making accommodations for medical treatment (*see Feder*, 63 F.3d at 224 (quoting *In re Bates*, No. CA 122-89, High Court of Justice, Family Div'l Ct. Royal Courts of Justice, United Kingdom (1989)), and going to doctors in New Jersey (*see Roszkowski*, 274 N.J. Super. at 627).

There cannot be a mechanical application of a period of time necessary to find acclimatization as cases are fact sensitive, but a period as short as three months has been deemed sufficient for a finding of acclimatization and designation of habitual residence. *See Karkkainen*, 445 F.3d at 291 (period of less than three months); *In re Bates*, No. CA 122-89 (period of four months); *Feder*, 63 F.3d at 224 (period of close to six months); *Roszkowski*, 274 N.J. Super. at

56

626-27 (period of six months). Additionally, a court cannot place "undue emphasis on the fact that the majority of [a child's] years had been spent" in a prior location while "ignoring" the period of time lived in the location immediately preceding an alleged wrongful removal or retention. *Feder*, 63 F.3d at 224 (holding that Australia was the four-year-old child's habitual residence after six months of living there despite that he had resided in the United States for over three years); *see also Karkkainen*, 445 F.3d 280 (holding that the United States was the eleven-year-old child's habitual residence after three months of living there despite that she had resided in Finland for the prior six years of her life); *Roszkowski*, 274 N.J. Super. at 627 (holding that the United States was the four-year-old child's habitual residence after six months of living there despite that he had resided in Poland for the first three years and three months of his life).

In answering the question of whether habitual residence of the children has changed, the Court should consider not only the extent to which the evidence suggests that the children acclimatized to the new country (here, the United States), but also the extent to which the evidence suggests abandonment of the original country of habitual residence (here, Belgium). It "'seem[s] implicit in the concept of acquiring a new 'habitual' residence that the previous 'habitual' residence has been left behind or discarded.'" *Whiting v. Krassner*, 391 F.3d 540, 550 (3d Cir. 2004). The Court should assess whether the children would likely perceive that they arrived in the United States with "the settled purpose to leave" the prior country of habitual residence behind and make a new habitual residence in the new country. *Rodriguez v. Lujan Fernandez*, No. 3:19-CV-00872, 2020 WL 6566036, * (M.D. Tenn. Nov. 9, 2020). A child acquires a new habitual residence when, focusing exclusively on the child's experience, they are present in a new country long enough to allow acclimatization, and that presence has a degree of settled purpose. *Id.* at *702. (citing *Robert v. Tesson*, 507 F3d 981, 996, 998 (6th Cir. 2007)).

With respect to the parental intent, a lesser part of the total analysis, same should be considered as part of the inquiry "because the child's knowledge of these intentions is likely to color its attitude to the contacts it is making." *Karkkainen*, 445 F.3d at 292. Notably, shared parental intent for a stay in a location limited period can be sufficient to establish such location as the child's habitual residence. *See Feder*, 63 F.3d at 223 (quoting *In re Bates*, No. CA 122-89, High Court of Justice, Family Div'l Ct. Royal Courts of Justice, United Kingdom (1989) (holding that New York had become the child's habitual residence where the father agreed for the child to remain there for a minimum of four months with her mother from January 1989 at least through his return in April 1989)); *Whiting*, 391 F.3d at 547 (holding that an agreement for the parties' child to move to Canada with her mother for a period of two years evidenced an intent to abandon New York as the child's habitual residence even if the intent was for the child to return to New York after those two years had elapsed); *Feder*, 63 F.3d at 222 (holding that the mother's intention to return to the Unites States and for the relocation to Australia to be temporary in nature was irrelevant to the finding that Australia had become the child's habitual residence).

As detailed in *Feder*, 63 F.3d at 223:

> All that the law requires is a settled purpose. That is not to say that the propositus intends to stay where he is indefinitely. Indeed his purpose while settled may be for a limited period. Education, business or profession, employment, health, family or merely love of the place spring to mind as common reasons for a choice of regular abode . . . . All that is necessary is that the purpose of living where one has a sufficient degree of continuity to be properly described as settled.
>
> [(internal quotation marks and citations omitted); *see also Whiting*, 391 F.3d at 547 (same).]

Where an "agreed-upon stay" is to be "of a limited duration," that fact "in no way hinders the finding of a change in habitual residence. Rather, . . . the parties' settled purpose in moving

58

may be for a limited period of time." *Whiting*, 391 F.3d at 547. Indeed, a party's "future intentions" for the child to reside elsewhere is "irrelevant" to the inquiry as to the child's habitual residence. *Feder*, 63 F.3d at 222. While shared parental intent can support a finding of acclimatization by a child, "[h]abitual residence is intended to be a description of a factual state of affairs, and a child can lose its habitual attachment to a place even without a parent's consent." *Karkkainen*, 445 F.3d at 295 (internal quotation marks and citations omitted).

Respondent contends that the Petitioner cannot meet his burden because the children's habitual residence as of the date of alleged wrongful retention on July 10, 2019 was the United States.

### iv. Respondent's Affirmative Defenses:

Should the Court find that the Petitioner has met his initial burden, in the alternative, Respondent relies upon any one of the following defenses:

#### a. *Intolerable Situation*

Respondent has the burden of proof under 22 U.S.C.A. § 9003(e)(2) to prove by **clear and convincing evidence** that "[t]here is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, art. 13(b).

#### b. *Well Settled Exception*

Respondent has the burden of proof under 22 U.S.C.A. § 9003(e)(2) by a **preponderance of the evidence** that the children are "now settled in [their] new environment." Hague Convention, art. 12. A court is not bound to order the return of a child if the respondent demonstrates that (a) the proceedings were commenced more than one year after the date of the wrongful removal or retention, and (b) the child is now settled in its new environment.

59

c.    *Consent or Acquiescence*

Respondent has the burden of proof under 22 U.S.C.A. § 9003(e)(2) by a **preponderance of the evidence** that Petitioner "consented to or subsequently acquiesced in the removal or retention." Hague Convention, art. 13(a).

d.    *Mature Child Objection Exception*

Respondent has the burden of proof under 22 U.S.C.A. § 9003(e)(2) by a **preponderance of the evidence** that the child(ren) "objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention, art. 13. Specifically, Respondent must show that the children have "attained an age and degree of maturity at which it is appropriate to take account of [their] views," and that they "object[] to being returned." *Rodriguez v. Yanez*, 817 F.3d 466, 474 (5th Cir. 2016) (internal quotation marks omitted) (quoting *Vasconcelos v. Batista*, 512 Fed. App'x 403, 405-08 (5th Cir. 2013)). "[A] mature child's views on return can be 'conclusive.'" *Custodio*, 842 F.3d at 1091. "[I]n other words, a district court can decline to order return of a wrongfully retained or removed child on that ground alone." *Haimdas*, 720 F. Supp. 2d at 204; *Blondin v. Dubois*, 238 F.3d 153, 166 (2d Cir. 2001) ("a court may refuse repatriation solely on the basis of a considered objection to returning by a sufficiently mature child").

Where, as here, there is a case of siblings, returning a younger sibling alone would create psychological turmoil, would be "cruel," "further fracture the family unit" and be manifestly misguided, in light of the principle that the sibling relationship should be protected, and that children's relationships with their siblings are the type of intimate human relationships that are afforded a substantial measure of sanctuary from unjustified interference by the state. *Application of Blondin v. Dubois*, 78 F. Supp. 2d 283, 291 (S.D.N.Y. 2000), aff'd sub nom. *Blondin v. Dubois*,

238 F.3d 153, 290, n.9 (2d Cir. 2001); *Broca v. Giron*, No. 11 CV 5818 SJ JMA, 2013 WL 867276, at *9 (E.D.N.Y. Mar. 7, 2013), aff'd, 530 F. App'x 46 (2d Cir. 2013). Courts have routinely "declined to separate siblings, finding that the sibling relationship should be protected even if only one of the children can properly raise an affirmative defense under the Hague Convention." *Ermini v. Vittori*, No. 12 CIV. 6100 LTS, 2013 WL 1703590, at *17 (S.D.N.Y. Apr. 19, 2013), aff'd as amended, 758 F.3d 153 (2d Cir. 2014).

    v.    <u>Counsel Fees:</u>

      As part of his Petition, Petitioner has requested counsel fees under 22 U.S.C. § 9007. "Article 26 of the Hague Convention provides that a court 'may' award 'necessary expenses' to a prevailing petitioner," and then "§ 11607(b)(3) shifts the burden onto a losing respondent in a return action to show why an award of 'necessary expenses' would be 'clearly inappropriate.'" *Ozaltin v. Ozaltin*, 708 F.3d 355, 375 (2d Cir. 2013) (quoting 42 U.S.C. § 11607(b)(3)). As such, an award of fees is both permissive and rebuttable.

      Consideration of "the financial situation of the respondent, particularly where a large award of expenses could potentially impair the respondent's ability to provide for the child" is appropriate when determining if an award of counsel fees would be "clearly inappropriate." *Cillikova v. Cillik*, No. CV152823MCALDW, 2016 WL 541134, at *5 (D.N.J. Feb. 9, 2016); *see also De La Vera v. Holguin*, No. CIV.A. 14-4372 MAS, 2014 WL 4979854, at *13 (D.N.J. Oct. 3, 2014) ("Respondent's financial circumstances and inability to pay" made an award of counsel fees and clearly inappropriate). Moreover, an award of counsel fees would be "clearly inappropriate" where a respondent had "a reasonable basis" for removing or retaining the child(ren) or where, "contrary to the spirit of the Hague Convention, the [petitioner] may have engaged in forum shopping with respect to certain aspects of this suit." *Ozaltin*, 708 F.3d at 375.

11.    **LISTING OF MOTIONS *IN LIMINE***

Respondent has moved *in limine* for the Court to conduct an *in camera* interview the parties' minor child, who is now 12 years old.  Petitioner opposes same.

**GREEN & ASSOCIATES, LLC**
*Attorneys for Petitioner*

Dated: April 25, 2022        By:        s/Michael S. Green
                                                         MICHAEL S. GREEN

**A.Y. STRAUSS, LLC**
*Attorneys for Respondent*

Dated: April 25, 2022        By:        s/KORY ANN FERRO
                                                         KORY ANN FERRO

**DARIO, ALBERT, METZ,
EYERMAN, CANDA, CONCANNON,
ORTIZ & KROUSE**
*Attorneys for Respondent*

Dated: April 25, 2022        By:
                                                         SHELLEY ALBERT

**SO ORDERED**

*s/Michael A. Hammer*
Michael A. Hammer, U.S.M.J.

Date:    4/25/2022