## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CHRISTOPHE SOULIER, | Civil Action No.: 2:20-cv-04720-MCA-MAH |
| *Petitioner,* | Civil Action |
| v. | |
| AKIKO MATSUMOTO, | |
| *Respondent.* | |

## RESPONDENT'S PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

**A.Y. STRAUSS, LLC**
Kory Ann Ferro, Esq.
101 Eisenhower Parkway, Suite 412
Roseland, New Jersey 07068
Tel.: (973) 287-5007
Fax: (973) 226-4104
E-Mail: kferro@aystrauss.com

**DARIO, ALBERT, METZ, EYERMAN, CANDA, CONCANNON, ORTIZ & KROUSE**
Shelley Albert, Esq.
345 Union Street
Hackensack, New Jersey 07601
Tel.: (201) 968-5800
Fax: (201) 968-5801
E-Mail: shelley@damelegal.com

*Attorneys for Respondent Akiko Matsumoto*

# TABLE OF CONTENTS

I.  FINDINGS OF FACT ...................................................................................6

    A.    Procedural History ........................................................................6

    B.    Petitioner's Background................................................................7

    C.    Respondent's Background .............................................................8

    D.    Background of the Parties Relationship as an International Couple.......................9

    E.    Background of the Parties' Children................................................11

    F.    The Parties Life as Ex-Patriates in Belgium ..........................................12

    G.    Petitioner's Search for Employment Outside of Belgium and the Parties' Agreement to Move to New Jersey ........................................15

    H.    Relocation to and Acclimatization to New Jersey ................................23

    I.    Petitioner is in a Far Superior Financial Position Over Respondent ...................38

II. CONCLUSIONS OF LAW ........................................................................38

    A.    This Court has original jurisdiction under 22 U.S.C. § 9003(a)...........................38

    B.    Petitioner has failed to establish by a preponderance of the evidence that the children were wrongfully retained within the meaning of the Convention because the children were habitual residents of New Jersey as of July 10, 2019 ............................38

        1.    An evaluation of habitual residence requires an analysis of the totality of the circumstances as viewed from the child's perspective ...................................................38

            a.    The children were acclimatized to New Jersey as of July 10, 2019................................................39

            b.    The children were old enough to acclimatize as of July 10, 2019................................................43

            c.    The children were residing in New Jersey long enough to acclimatize ..........................................44

d.      Where the children lived for the majority of their
life prior to a relocation is immaterial as the pertinent
inquiry is the period immediately preceding an
alleged wrongful retention ............................................................45

e.      Where the children may have been headed in the
future is also immaterial as the pertinent inquiry is
the period immediately preceding an alleged
wrongful retention........................................................................46

2.      The parties had a shared intent to abandon Belgium ................................47

3.      Even if the parties did not have a shared intent to abandon
Belgium, they presented a unified intention to the children
that impacted the children's understanding of their new home
and signaled to the children to acclimatize to New Jersey .......................51

4.      Even if Petitioner only intended for the children to spend a
year in New Jersey, such a period of time is, as was the case
here, sufficient for children to acclimatize and transfer their
habitual residence........................................................................54

C.      Even if Petitioner Met His Burden, Which He Did Not,
Respondent Has Met Her Burden to Demonstrate her Applicable
Affirmative Defenses ............................................................................57

1.      The Children Would Face an Intolerable Situation
Were They Forcibly Returned to Belgium.................................................57

2.      The Children Are Well Settled in New Jersey...........................................58

3.      Petitioner Consented and/or Acquiesced to the
Children Residing in New Jersey.............................................................58

4.      The Parties' Daughter, A.L.S., Objects to Returning
to Belgium, she is Mature Enough to Take Her View
into Account, and the Children Must Not be Separated ...........................59

D.      To the Extent Petitioner Continues to Seek Counsel Fees, He is Not
Entitled to Any as (1) He Should Not Prevail on His Petition; and
(2) Should He Prevail, It Would be Clearly Inappropriate to Award
Fees Based Upon the Financial Positions of the Parties and the
Reasonable Basis Upon Which Respondent Acted in this Matter........................60

III.  CONCUSION ............................................................................................62

# TABLE OF AUTHORITIES

Cases

*Application of Blondin v. Dubois*, 78 F. Supp. 2d 283, 291 (S.D.N.Y. 2000) ............................................ 61

*Bader v. Kramer*, 484 F.3d 666, 668 (4th Cir. 2007) ("Bader II") .............................................................. 37

*Blondin v. Dubois*, 238 F.3d 153, 166 (2d Cir. 2001) ....................................................................... 60, 61

*Broca v. Giron*, No. 11 CV 5818 SJ JMA, 2013 WL 867276, at *9 (E.D.N.Y. Mar. 7, 2013) ................. 61

*Cillikova v. Cillik*, No. CV152823MCALDW, 2016 WL 541134, at *5 (D.N.J. Feb. 9, 2016) ................ 62

*De La Vera v. Holguin*, No. CIV.A. 14-4372 MAS, 2014 WL 4979854, at *13 (D.N.J. Oct. 3, 2014) ..... 62

*Ermini v. Vittori*, No. 12 CIV. 6100 LTS, 2013 WL 1703590, at *17 (S.D.N.Y. Apr. 19, 2013) .............. 61

*Feder v. Evans-Feder*, 63 F.3d 217, 222 (3d Cir. 1995) .................................................................. passim

*Haimdas*, 720 F. Supp. 2d at 204 .......................................................................................................... 60

*Innes v. Carrascosa*, 391 N.J. Super. 453, 484 (App. Div. 2007) .......................................................... 39

*Karkkainen v. Kovalchuk*, 445 F.3d 280, 292 (3d Cir. 2006) .......................................................... passim

*Karpenko v. Leendertz*, 619 F.3d 259, 263 (3d Cir. 2010) ................................................................... 37

*Maxwell v. Maxwell*, 588 F.3d 245, 251 (4th Cir. 2009) ................................................................. 38, 47

*Monasky v. Taglieri*, 140 S. Ct. 719, 727 (2020) ........................................................................... 38, 47

*Ozaltin v. Ozaltin*, 708 F.3d 355, 375 (2d Cir. 2013) ..................................................................... 62, 63

*Papakosmas v. Papakosmas*, 483 F.3d 617, 622 (9th Cir. 2007) ........................................................ 38

*Rodriguez v. Lujan Fernandez*, No. 3:19-CV-00872, 2020 WL 6566036 .............................................. 52

*Roszkowski*, 274 N.J. Super. at 627 ............................................................................... 40, 44, 45

*Whiting v. Krassner*, 391 F.3d 540, 551 (3d Cir. 2004) .................................................................. passim

Statutes

22 U.S.C. § 9007 ..................................................................................................................................... 62

**22 U.S.C.A. § 9003(a)** ........................................................................................................................... 37

22 U.S.C.A. § 9003(e)(1)(A) ................................................................................................................... 37

22 U.S.C.A. § 9003(e)(2) .................................................................................................................. 58, 59

42 U.S.C. § 11607(b)(3) .......................................................................................................................... 62

*Custodio*, 842 F.3d at 1091 ..................................................................................................................... 60

*Rodriguez v. Yanez*, 817 F.3d 466, 474 (5th Cir. 2016) ......................................................................... 60

*Vasconcelos v. Batista*, 512 Fed. App'x 403, 405-08 (5th Cir. 2013) ................................................... 60

## I. __FINDINGS OF FACT__

### A.   Procedural History

1.   Respondent filed a non-dissolution Complaint in Bergen County (1) seeking joint legal custody; (2) naming her as the Parent of Primary Residence and Petitioner as the Parent of Alternate Residence; (3) establishing a parenting time schedule; (4) ordering that the children remain in New Jersey for purposes of schooling; and (5) establishing a child support award.  Stip. Facts, ¶ 2(lxv).

2.   On May 31, 2019, Petitioner filed a unilateral emergent application in Belgium seeking a divorce on an expedited timeframe, which was denied on June 3, 2019, but granted on appeal on June 6, 2019.  Stip. Facts, ¶ 2(lxvi).

3.   Respondent was served with Petitioner's Belgian divorce papers on June 27, 2019.  Stip. Facts, ¶ 2(lxvii).

4.   On July 10, 2019, Petitioner filed a Motion to Dismiss Respondent's non-dissolution Complaint in Bergen County on the basis of lack of jurisdiction. Stip. Facts, ¶ 2(lxviii).

5.   On July 11, 2019, Petitioner filed a Hague Convention notice application with the Belgian authorities.  P-4a.

6.   On July 15, 2019, the French Speaking Court of First Instance of Brussels, Family Court issued a Judgement suspending its decision regarding issues related to the parties' children pending resolution by the Courts of New Jersey.  Stip. Facts, ¶ 2(lxix).

7.   On August 1-2, 2019, the Bergen County Court conducted a plenary hearing and dismissed Respondent's complaint based upon a declination of jurisdiction under New Jersey's Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA").  The Bergen County Court declined Petitioner's request for the children's immediate return to Belgium.  The Bergen County Court declined to stay its decision pending any appeal.  Stip. Facts, ¶ 2(lxx).

8.   Respondent filed a Notice of Appeal of the Bergen County Court's decision declining jurisdiction based on the UCCJEA on August 8, 2019.  Stip. Facts, ¶ 2(lxxi).

9.   On September 4, 2019, the Brussels Court of Appeals issued a Final Judgment affirming the lower court's decision declining jurisdiction over

the children pending resolution of the Appeal in New Jersey.  Stip. Facts, ¶ 2(lxxii).

10.    On November 7, 2019, Petitioner filed a Hague Convention application in Bergen County via Order to Show Cause, which was denied on November 14, 2019.  Stip. Facts, ¶ 2(lxxiii).

11.    Petitioner filed a Motion for Reconsideration on November 25, 2019, which was denied on January 30, 2020. Stip. Facts, ¶ 2(lxxiv).

12.    The parties were officially divorced in Belgium.  Stip. Facts, ¶ 2(lxxv).

13.    Petitioner filed with the United States District Court for the District of New Jersey the instant Hague Convention petition on April 21, 2020.  Stip. Facts, ¶ 2(lxxvi).

14.    On April 29, 2020, the New Jersey Appellate Division issued a *Sua Sponte* Order staying Respondent's Appeal pending resolution of this matter.  Stip. Facts, ¶ 2(lxxvii).

15.    On May 11, 2020, the Respondent filed a Motion to Dismiss the Petitioner's Hague Convention Petition in the United States District Court for the District of New Jersey based on lack of subject matter jurisdiction, which was denied by this Court on December 4, 2020.  Stip. Facts, ¶ 2(lxxviii).

**B.    Petitioner's Background**

1.    Petitioner is a citizen of Sweden and France.   Joint Final Pre-Trial Conference Order (Doc. No. 110), Stipulated Facts ("Stip. Facts"), ¶ 2(i); Tr. 2T50:13-147.[1]

2.    Petitioner is not a citizen of Belgium, the parties never discussed Petitioner applying for Belgian citizenship, and he never applied for Belgian citizenship.  Tr. 1T118:17-19; Tr. 2T50:11-51:1.

3.    Petitioner was born in Sweden and raised in France.  Stip. Facts, ¶ 2(ii).

4.    Petitioner moved to Stockholm, Sweden at the age of 19 to study and work there for eight years.  Tr. 1T15:2-5.

5.    Petitioner attended graduate studies in Sweden as well as graduate studies at the University of Michigan. Stip. Facts, ¶ 2(iii).

---

[1] 1T refers to the April 27, 2022 Transcript of Trial Proceedings; 2T refers to the April 28, 2022 Transcript of Trial Proceedings; and  3T refers to the April 29, 2022 Transcript of Trial Proceedings.

6.      Petitioner graduated with a master's degree from Stockholm School of Economics in Sweden in 1998.  Stip. Facts, ¶ 2(iv).

7.      After graduation from the Stockholm School of Economics, Petitioner worked in Paris at his parents' clinic as a business manager.  Tr. 2T7:10-8:2.

8.      Petitioner pursued a master's degree in the United States from 2000-2002 so that he could have a degree from an American university and so that he could be closer to Respondent.  Tr. 2T8:3-9:14.

9.      Petitioner graduated with a Master of Business Administration from the University of Michigan in 2002.  Stip. Facts, ¶ 2(v); Tr. 2T9:12-14.

10.     At the end of his master's program, Petitioner began searching for employment with American companies focusing in the healthcare industry. He secured employment with Johnson & Johnson ("J&J"), but, even though J&J is headquartered in New Jersey, Petitioner was recruited to work in Europe.  The parties agreed on a placement in Brussels because they both spoke French.  Tr. 2T9:15-11:3.

11.     Petitioner moved to Brussels, Belgium in 2002 and began his career working for J&J, where he continues to now work through a wholly-owned subsidiary called Janssen Pharmaceuticals.  Stip. Facts, ¶ 2(vi).

12.     Petitioner had never before lived in Belgium.  Tr. 2T11:4-6.

13.     Petitioner's current position is as a finance director working for Janssen Pharmaceutical where he is involved in supporting the vaccine division in the Research & Development space.  He has been "extremely involved" in supporting the development of J&J's Coronavirus vaccine.  Tr. 1T14:21-25; Tr. 1T25:23-26:12.

14.     Petitioner travels often for his employment including multiple trips per year to the United States.  Tr. 1T26:22-28:18.  He traveled so frequently during the parties' marriage that he was not around to help Respondent during her miscarriages or take her to her appointments.  Tr. 2T23:3-12.

C.      **Respondent's Background**

1.      Respondent is a citizen of the United States.   Stip. Facts, ¶ 2(vii); Tr. 2T23:15-16.

2.      Respondent applied to become a naturalized United States citizen before moving to Belgium because she felt her ties to the United States were very

strong and she did not want to leave the United States for Belgium without being a United States citizen. She obtained her United States citizenship in 2003. Tr. 2T23:17-24:2; Tr. 2T49:10-50:5.

3. Although born as a Japanese citizenship, once Respondent became a naturalized United States citizen she was not permitted to maintain dual nationalities with Japan so she allowed her Japanese passport to explore in 2012. Tr. 2T24:17-24:14.

4. Respondent is not a citizen of Belgium. Tr. 1T118:20-22. She never applied for Belgian citizenship because the parties were not going to stay in Belgium permanently. Tr. 2T48:9-14.

5. The parties inquired at the embassy as to the steps for Respondent becoming a French citizen, but she never applied because they were not living in France and were planning on leaving Belgium. Tr. 2T48:15-49:9.

6. Respondent was born in Japan and moved to New Jersey at the age of 5 and was subsequently raised in Montvale, New Jersey. Stip. Facts, ¶ 2(viii); Tr. 1T21:22-22:6. She began and completed grade school in the Montvale public school system and graduated from Pascack Hills High School. Tr. 2T4:6-20.

7. Respondent attended undergraduate studies at The College of New Jersey ("TCNJ") and graduate studies at Harvard University. Stip. Facts, ¶ 2(ix); Tr. 1T:22:7-16; Tr. 2T4:21-25.

8. Respondent focused on deaf education because she has a brother who is deaf and she wanted to bring that personal experience into teaching. Tr. 2T5:1-8.

9. Respondent graduated from TCNJ in 2000. Stip. Facts, ¶ 2(x); Tr. 2T5:9-10.

10. Respondent was a Teacher of the Deaf in New Jersey from 2000-2002. Stip. Facts, ¶ 2(xi); Tr. 2T5:11-18.

11. Respondent graduated from Harvard in 2003. Stip. Facts, ¶ 2(xii). Respondent attended Harvard to pursue graduate studies in the Language in Literacy program because she had witnessed, firsthand, the literacy struggles for the deaf and hard of hearing. Tr. 2T5:19-6:2.

## D.   Background of the Parties Relationship as an International Couple

1. The parties met and began a relationship in Paris, France in June 1998. Stip. Facts, ¶ 2(xiii); Tr. 2T6:14-20.

2.      When the parties met, Respondent was spending six months as an exchange student in Paris, France. Petitioner was living in Stockholm, Sweden finishing his degree, but was in Paris for the World Cup.  1T19:14-20; Tr. 2T6:3-7:2.

3.      The parties engaged in a long-distance relationship from 1998 until 2003. Tr. 1T19:18-20:1; Tr. 2T7:3-10; Tr. 2T9:1-11; Tr. 2T11:18-23.

4.      The parties were engaged in 2003.  Stip. Facts, ¶ 2(xv).

5.      The parties were engaged in Boston, Massachusetts where Respondent was studying at Harvard.  1T19:22-20:1.

6.      Respondent moved to Brussels, Belgium to join Petitioner in 2003, and the parties resided there together until 2004.  Stip. Facts, ¶ 2(xiv).

7.      Respondent had never before lived in Belgium. Tr. 2T11:7-8.  It was a difficult transition for Respondent because she did not know anyone and was starting a new employment position.  Tr. 2T11:24-12:6.

8.      When the parties moved in together in Belgium in 2003, they discussed that Belgium was a jumping off point for Petitioner's career with the expectation that they would move on from Brussels thereafter and return to the United States.  Tr. 2T12:7-18.

9.      The parties were married on July 2, 2004 in Brussels, Belgium.  Stip. Facts, ¶ 2(xvi); Tr. 2T13:5-10.

10.     The parties had a religious ceremony and celebration of their marriage on July 3, 2004 in Paris, Italy because neither of them had family in Belgium. Tr. 2T13:7-18.

11.     Respondent did not change her maiden name upon her marriage to Petitioner because, in part, all of her United States documents (driver's license, passport, teaching certificates, bank accounts, credit cards, etc.) were held in her maiden name.  Tr. 2T14:18-16:15

12.     The parties resided together in Rome, Italy from 2004-2005 for 12 months. Stip. Facts, ¶ 2(xvii); Tr. 2T14:12-17; Tr. 2T16-17:5.

13.     The parties were surprised when the Rome position ended so quickly and they moved back to Brussels, Belgium in the summer of 2005 by happenstance because a new division was created in J&J called the European distribution organization in which Petitioner secured a new position. Tr. 2T18:16-19:19.

14.  Upon their move back to Brussels, the parties again discussed a Belgium as being a temporary home for them. Respondent expected that they would remain in Belgium for three to five years beginning in 2005. The parties always talked about relocating back to the United States and Petitioner was always on the lookout for jobs. Tr. 2T19:22-20:10; 2T21:20-22:4.

15.  The parties resided together in Brussels, Belgium from 2005 until August 20, 2018. Stip. Facts, ¶ 2(xviii).

16.  The parties remained in Belgium longer than Respondent's anticipated three to five year stint because they started a family with the birth of their daughter in 2009 followed by fertility issues, miscarriages in 2011 and 2013, and bed rest during Respondent's pregnancy with the parties' son in 2015. Tr. 2T17:8-19; Tr. 2T20:14-21:12; Tr. 2T22:9-23:12.

**E.    Background of the Parties' Children**

1.  The parties' daughter, A.L.S., was born in Brussels, Belgium on December 5, 2009. Stip. Facts, ¶ 2(xix); Tr. 2T17:24-25.

2.  The parties' son, A.H.S., was born in Brussels, Belgium on October 5, 2015. Stip. Facts, ¶ 2(xx); Tr. 2T18:1-2.

3.  The parties' children are citizens of the United States and France, which citizenships were obtained through applications submitted through the respective countries' embassies submitted by the parties on the same day. Tr. 1T119:1-5; Tr. 2T52:25-53:20.

4.  Despite being born in Belgium, the parties' children are not citizens of Belgium and the parties never sought to obtain Belgian citizenship for the children because they never intended to permanently live in Belgium. Tr. 1T:118:23-25; Tr. 1T119:10-12; Tr. 2T52:10-24.

5.  The children's last name was hyphenated as Soulier-Matsumoto because the parties anticipated that Respondent would likely have to travel alone with the children and sharing the last name showed a familial relationship. Tr. 2T18:3-14.

6.  While residing together in Belgium, Petitioner's long working hours and frequent travel meant that he was often not around to help care for the children. In addition to travel for work, Petitioner traveled for pleasure attending soccer tournaments by himself for weeks at a time in places like Brazil and Russia. Even when Petitioner was present, he was not engaged in their routines. Respondent was the primary caretaker of the children at

all times and frequently traveled and vacationed with the children without Petitioner.  Tr. 2T769:25-75:8; Tr. 2T82:11-85:5.

7.    The primary language spoken in the parties' home was English.  Tr. 2T77:21-78:21.

## F.    The Parties Life as Ex-Patriates in Belgium

1.    The parties resided together in Belgium as expatriates with other people who were foreign to Belgium and living there temporarily.  The parties' friends were from all over the world, were mostly English speaking, and came and went when their work assignments in Belgium expired.  Tr. 2T54:10-56:16.

2.    The parties' children grew up as "third-culture kids" having parents not from the place they were living and being transplanted outside of their parents' home countries where they had the most connections. Tr. 2T56:17-57:5.

3.    The parties never looked at Belgium as a "permanent home." Tr. 2T146:16-17.

4.    The parties have no family residing in Belgium.  Stip. Facts, ¶ 2(xxvi); Tr. 2T23:3-12; Tr. 2T85:6-24.

5.    The parties and their children spent the majority of holidays and school breaks in France and in New Jersey.  Stip. Facts, ¶ 2(xxvii); Tr. 1T162:4-14; Tr. 1T210:5-15; Tr. 2T79:9-85:5.

6.    Respondent and the children spent approximately one month each summer and one week each December in New Jersey at Respondent's family's home.  Petitioner accompanied them for some, but not all of such trips.  Tr. 2T79:15-80:21.

7.    Petitioner stayed at Respondent's parents' home in Montvale, New Jersey "hundreds of times" when he was in New Jersey for work and when he would vacation with the family in New Jersey.  Tr. 1T79:18-80:2.

8.    The parties never purchased any real estate in Belgium.   The parties moved within Brussels and co-signed a 9-year lease for a house effective on November 1, 2016.  Stip. Facts, ¶ 2(xxviii).

9.    The parties decided to rent rather than purchase because they knew they would not remain in Belgium permanently.  Tr. 2T53:25-54:9; Tr. 2T61:4-22.

10.   The parties' 10-year rental in Belgium from 2006-2016 was in an expatriate community.  Tr. 2T61:23-62:9.

11.   The parties' relocation within Brussels in November of 2016 was precipitated by Respondent feeling unsafe due to her being outside alone with the children during a manhunt for terrorists who perpetrated terrorist attacks at the Brussels airport and in the subway. Tr. 2T62:10-64:5.

12.   The parties entered into a 9-year lease because, as Petitioner explained to Respondent, the longer-term leases were easier to break at certain intervals. Petitioner even warned Respondent not to alert the landlord of their plans to move out of Belgium.  Tr. 2T64:20-65:17.

13.   When the parties moved to their new rental in November 2016, they did not unpack all of their belongings because they expected to be moving out of Belgium in the near future.  Tr. 2T66:1-67:8.  As detailed below, Petitioner applied for numerous positions outside of Belgium from November 2016 through May 2018 and, had Petitioner accepted the position in Japan, the parties would have broken the 9-year lease.

14.   Petitioner bought out his company car for Respondent's use in 2010 and Petitioner was responsible for and took care of the car's maintenance.  When Respondent and the children departed for New Jersey in August of 2018, the vehicle Respondent had been utilizing in Belgium was not functional and had not been functional for approximately six months.  Petitioner had the car repaired after Respondent and the children moved to New Jersey and gave it to his father to use.  Tr. 1T146:21-147:14; Tr. 1T148:16-149:1; Tr. 2T68:20-22.

15.   Petitioner never bought a vehicle for his own use in Belgium because he was provided a company car by J&J.  Tr. 1T147:20-148:13; Tr. 2T68:17-19.

16.   The parties filed joint non-resident tax returns in Belgium (including for the tax year 2017) "benefitting from a specific regime that is available for foreigners that work in Belgium" that requires you to be a foreigner with a link to a country other than Belgium.  Tr. 1T171:18-172:1; Tr. 2T51:2-52:9.

17.   Respondent continued to file tax returns in the United States while living in Belgium.  Tr. 1T172:9-14; Tr. 2T50:9-10.

18.   Respondent voted in United States elections while residing in Belgium.  Tr. 2T50:6-8.

19.    Respondent never obtained a Belgian (or any other European) teaching certificate and worked in Belgium utilizing her New Jersey and Massachusetts teaching certificates.  Tr. 2T15:12-16:1.

20.    Respondent never obtained a Belgian (or any other European) driver's license and drove in Belgium utilizing her New Jersey driver's license.  Tr. 2T15:3-11.

21.    While residing in Belgium, Respondent maintained a United States bank account at Commerce Bank n/k/a TD Bank and a United States credit card. Tr. 2T16:2-10; Tr. 2T157:21-158:2.

22.    Respondent maintained her United States license, certificates, bank account, and credit card because she understood that she and Petitioner would not remain in Belgium permanently, but would be moving together to the United States.  Tr. 2T16:11-15; Tr. 2T158:3-7.

23.    While residing in Belgium, Respondent worked first for the St. John's International School from 2003 until 2004, then for CHS (Community Health Services) from 2006 until 2008, and for the International School of Brussels ("ISB") from December 2006 until June 2018.  Stip. Facts, ¶ 2(xxi); Tr. 2T13:19-14:3; Tr. 2T69:1-18.

24.    ISB, where Respondent was employed for the majority of the time, served the expatriate community and the language of instruction was English.  Tr. 2T69:13-18.

25.    Respondent was unable to teach the deaf and hard of hearing in Belgium because she did not have Belgian teaching certificates and did not know the sign language system there.  Tr. 2T14:4-11.

26.    The parties' daughter started her education at the ISB for six (6) years from 2012 through 2018 where she attended from the age of two and a half through second grade.  The parties decided to have their children educated in English with an "international curriculum" to enable them to transition to an American school.  Tr. 1T24:9-25:4; Tr. 1T152:6-10; Tr. 2T75:9-76:5.

27.    When first selecting a school, the parties never considered placing A.L.S. in a local Belgian school.  Tr. 2T77:5-19.

28.    The parties' daughter began dance in a local gym in Brussels, Belgium from the age of 4 until 6, she then began dance through ISB until June 2018. Beginning in kindergarten, the parties' daughter engaged in after school activities offered through and held at the ISB such as piano, rock climbing, yoga, gymnastics, programming, and arts and crafts.  The parties' daughter

engaged in horseback riding, skiing, and sailing on vacations in France. Stip. Facts, ¶ 2(xxiii); Tr. 1T28:21-29:14.

29.    The parties' son attended a local nursery (French-speaking) in Brussels for 2 school years before leaving for the United States in August of 2018.  Stip. Facts, ¶ 2(xxiv); Tr. 1T25:18-22.

30.    A.H.S. refused to speak in French at the daycare electing, instead, to respond in English.  Tr. 2T78:22-79:8.

31.    The parties' children had been attended by a local pediatrician in Brussels, Belgium since their birth until August of 2018.  Stip. Facts, ¶ 2(xxiv); Tr. 2T27:12-23; Tr. 2T29:1-30:8.

**G.    Petitioner's Search for Employment Outside of Belgium and the Parties' Agreement to Move to New Jersey**

1.    Petitioner's employment in finance at J&J is "a relatively movable set of skills" and positions are "typically in cycles of three to four years of work" in any one position, so Petitioner was asked to consider new positions or discussed career opportunities at J&J.  Tr. 1T32:2-13.

2.    Petitioner testified that "J&J has over 120,000 employees around the world, and I think the finance function has several thousand of employees, so, yes, there other finance jobs within Johnson & Johnson" and the "headquarters are in New Brunswick."  Tr. 1T175:9-15.

3.    Prior to A.L.S.'s birth in 2009, the parties came close to relocating to Uppsala, Sweden and Respondent resigned her employment position in anticipation of the move.  Tr. 2T96:23-97:13.

4.    Once A.H.S. was born in October 2015, the parties discussed moving out of Brussels, Belgium beginning in 2016 and they constantly discussed job opportunities outside of Belgium.  Tr. 2T85:25-89:22.

5.    During Petitioner's job search beginning in 2016, the parties had specific discussions about where in New Jersey they would move and whether they could live in northern New Jersey with the J&J offices being located in central New Jersey.  Tr. 2T87:11-88:4.

6.    From 2016 through 2018, Petitioner applied for 16 positions with J&J outside of Belgium, of which 9 were in the United States and 6 were in New Jersey specifically.  Petitioner also applied for 1 additional position outside of Belgium through a headhunter during the same time period.  Stip. Facts, ¶ 2(xxix); Tr. 1T176:21-178:16.

14

7.      On March 4, 2016, Petitioner applied for a position with J&J in England. R-89, JNJ000016.[2]

8.      On May 13, 2016, Petitioner applied for positions with J&J with two (2) in New Jersey, one (1) in England, and one (1) in Massachusetts.  R-89, JNJ000020.

9.      On June 7, 2016, Petitioner forwarded an email to Respondent regarding a potential job opportunity with J&J in Tokyo, Japan.  R-1.

10.     On June 28, 2016, Petitioner forwarded an email to Respondent regarding a potential job opportunity with Lonza in Basel, Switzerland.  R-2.

11.     On July 18, 2016, Petitioner applied for a position with J&J in New Jersey. R-89, JNJ000021.

12.     On July 19, 2016, Petitioner forwarded an email to Respondent regarding a potential job opportunity with J&J in Singapore.  R-3.

13.     On October 8, 2016, Petitioner forwarded an email to Respondent regarding a potential job opportunity with J&J in the United States.  R-4.

14.     On October 19, 2016, Petitioner forwarded an email to Respondent regarding a potential job opportunity with J&J in Skillman, New Jersey and Petitioner stated "I understand this would also fit your wishes" regarding the location of the position being in New Jersey.  R-5; Tr. 2T91:23-92:17.

15.     On November 7, 2016, Petitioner applied for a position with J&J in New Jersey.  R-89, JNJ000022.

16.     On November 7, 2016, Petitioner blind copied Respondent on an email with his boss regarding his application for a potential job opportunity with J&J in Skillman, New Jersey.  In his forwarded email, Petitioner stated "As for my working authorization status in the USA, I wanted to stress that my wife and kids (2) are US citizens and I could eventually get my permanent status through Family."  R-6.

17.     The parties consulted at the American embassy about Petitioner's ability to work in the United States being married to an American citizen and the process related thereto.  Tr. 2T92:18-93:18.

18.     On December 9, 2016, Petitioner applied for a position with J&J in New Jersey.  R-89, JNJ000023.

---

[2] Citations with "R-" refer to Respondent's exhibits entered into evidence in this matter.

19.   On January 11, 2017, Petitioner forwarded an email to Respondent regarding potential job opportunities with J&J in Canada and New Jersey. R-7.

20.   On January 23, 2017, Petitioner applied for a position with J&J in Ontario, Cananda.  R-89, JNJ000024.

21.   On February 1, 2017, Petitioner applied for a position with J&J in the United States.  R-89, JNJ000025.

22.   On February 15, 2017, Petitioner forwarded an email to Respondent regarding a potential job opportunity with J&J in Singapore.  R-8.

23.   On February 23, 2017, Petitioner forwarded an email to Respondent regarding a potential job opportunity with J&J in Asia.  R-9.

24.   In 2017, Petitioner applied for a position with J&J in Tokyo, Japan.  In preparation for same, the parties traveled to Tokyo in April 2017, were in negotiations for an apartment there, enrolled their daughter at the English-speaking Tokyo International School, and Respondent resigned her position at the ISB.  Stip. Facts, ¶ 2(xxx); R-16 through R-21; R-23 through R-33; Tr. 1T33:3-20; Tr. 1T135:3-136:9; Tr. 1T137:8-11; Tr. 2T98:1-104:23.

25.   On March 8, 2017, Respondent sent an email to ISB stating "we remain undecided regarding the re-enrolment form for [A.L.S.] (currently n 1R)." R-18.

26.   While Respondent did disclose to ISB that they were considering a move to Japan, the parties could not hide that fact as the Tokyo International School requested records directly from ISB and ISB had to administer a test for A.L.S. as part of the application process for her to attend the Tokyo International School.  Tr. 2T100:11-101:24.

27.   On May 1, 2017, Petitioner blind copied Respondent on an email with his direct boss wherein Petitioner stated that, with respect to the pending position in Tokyo, Japan, the stalling was "causing unreasonable hardships and stress" including his "wife's inability to inform her employer within a reasonable time frame and within constraints of Belgian laws to put her in a tenuous situation."  Respondent believed, and had been informed by ISB, that she was within constraints of Belgian law with respect to giving her resignation.  R-25; Tr. 2T106:25-107:11; Tr. 2T110:22-111:3.

28.   On May 1, 2017, Petitioner applied for a position with J&J in Zug, Switzerland.  R-89, JNJ000026.

29.     In May 2017, Respondent's employer, ISB, was pressuring her for updates regarding the family's potential move to Tokyo.  R-26; R-27; Tr. 104:11-23; Tr. 2R111:4-10.

30.     On May 17, 2017, Respondent sent an email to Petitioner advising that she had handed in her letter of resignation to ISB, but the letter would be held for "a bit before handing into hr."  Petitioner responded "Sounds like you did the right thing."  Following such email, the parties specifically discussed the pressure Respondent was under from the ISB.  R-29; Tr. 2T111:11-112:9.

31.     On May 18, 2017, Petitioner sent a draft of an email to his direct boss to Respondent in which Petitioner detailed "My wife had no choice but to resign from her job yesterday as she was in breach of her employment contract (and her employer was threatening legal action)."  Respondent believed, and had been informed by ISB, that she would be in breach of her employment contract if she did not submit her resignation R-30; Tr. 2T112:20-113:23.

32.     On May 19, 2017, only two (2) days after handing in her resignation to ISB, Respondent was forwarded an email by Petitioner with the subject line "We are a go!" and stating "HR approval came today,  You can sent your plans accordingly."  Respondent understood from this email that they would be moving to Japan.  R-31; Tr. 2T112:10-19.

33.     On May 22, 2017, Petitioner forwarded an email to Respondent providing his flight information for Petitioner to go to Japan from June 11-17, 2017.  R-32.

34.     In May 2017, the parties had a "goodbye dinner" at a friend's house in anticipation of their move to Japan.  Tr. 2T108:25-109:9.

35.     On May 29, 2017, Petitioner and Respondent engaged in an email exchange wherein Respondent expressed her desire to move forward with the position in Tokyo, Japan and stated that Petitioner's applications for positions in Zug, Switzerland and Paris, France may not come to fruition.  Petitioner sends Respondent a link for the "American Section" of the Lycée International and stated that it "looks also good for [A.L.S.]."  R-10.

36.     In or about June 2017, Petitioner rejected the contract for the J&J Tokyo position. Stip. Facts, ¶ 2(xxxi); Tr. 1T38:3-5; Tr. 1T39:16-19.

37.     On June 1, 2017, Petitioner forwarded an email to Respondent, which email was sent to Petitioner on May 31, 2017 and attached the Offer of Employment for the position in Tokyo, Japan.  R-33.

38.   Petitioner declined the position in Tokyo, Japan without speaking to Respondent first.  Respondent was shocked and that Petitioner's decision would have a huge impact on the family since Respondent had resigned from the ISB, which, in turn, impacted A.L.S.'s education. Tr. 2T102:14-104:5; Tr. 2T117:8-119:3.

39.   Had Petitioner accepted the position in Tokyo, Japan, the parties would have broken the 9-year lease contract for their residence in Belgium.   Tr. 2T65:18-25.

40.   Since Respondent had resigned from the ISB, the parties' daughter was permitted to remain at the ISB free of charge only through January 2018. Stip. Facts, ¶ 2(xxxiii); Tr. 1T39:24-40:1; Tr. 2T114:6-22.

41.   On June 15, 2017, Petitioner applied for a position with J&J in Haute-de-Seine, France.  R-89, JNJ000027.

42.   On July 31, 2017, Petitioner forwarded an email to Respondent regarding a potential job opportunity with J&J in California.  R-11.

43.   On August 2, 2017, Respondent sent an email to Petitioner providing advice regarding how to obtain the J&J position in California and stating: "Remember, even though Americans are hard working, they will respect that you also put the needs of your family first and foremost.  Sell the point that we are ready to move back to USA after being abroad for 15 years for you and 14 for me since you finished your Mba.  Akira is getting older so we take our moves seriously to make sure she has a good education."  R-12.

44.   The parties discussed that a relocation to California, while not New Jersey, was a great opportunity to be back in the United States.  Tr. 2T93:19-95:10.

45.   On August 6, 2017, Petitioner forwarded an email to Respondent regarding his progress respecting the potential job opportunity with J&J in California. R-13.

46.   On August 7, 2017, Petitioner applied for a position with J&J in California. R-89, JNJ000028.

47.   On August 7, 2017, Petitioner sent an email to Respondent regarding the location of the potential job opportunity with J&J in California and his upcoming interview for same.  R-14.

48.   Respondent saw an attorney in September 2017 regarding a postnuptial agreement that Petitioner made her sign that divided marital assets, itemized their individual belongings, etc.  Petitioner presented the postnuptial

agreement to Respondent because Petitioner was purchasing his family's clinic worth three million euros and he did not want Respondent to be a part of that investment or for such investment to be subject to American taxes. Tr. 2T151:3-153:10.

49.  Respondent was able to secure a temporary position at ISB for the 2017-2018 school year enabling the parties' daughter to attend free of charge for the entire 2017-2018 school year only.  Stip. Facts, ¶ 2(xxxiii); Tr. 1T40:2-7 Tr. 2T114:23-115:18.

50.  On December 10, 2017, Petitioner forwarded an email to Respondent in which he detailed that he was "working on a New Jersey alternative" for purposes of his employment.  R-15.

51.  Despite interviewing for a position, Respondent was unable to secure a position at ISB for the 2018-2019 school year because ISB viewed Respondent as a "flight risk" and, as such, the parties' daughter could no longer attend the ISB for the 2018-2019 school year without charge.  Stip. Facts, ¶ 2(xxxiv) Tr. 1T40:10-41:17; Tr. 2T115:19-117:5; Tr. 119:5-23.

52.  Petitioner testified that they could not afford to send their children to the ISB for the 2018-2019 school year.  Tr. 1T149:14-18; Tr. 1T151:8-152:13.

53.  The parties considered several schools in Brussels, Belgium for their children to attend in the 2018-2019 school year.  Stip. Facts, ¶ 2(xxxv); Tr. 1T42:16-23; Tr. 2T119:22-121:6.

54.  On March 11, 2018, Respondent sent a Power Point presentation to Petitioner, which they also reviewed together in person, detailing the school choices for their daughter, A.L.S., for the upcoming 2018-2019 school year. In such slide show, Respondent laid out the pros and cons of staying in Belgium versus moving to the United States.  Same made clear that, even were the parties to remain in Belgium, it would only be for another year ("Another year to develop French"; "Clean up the house and prepare for the move"; and "[A.L.S.] has to make 2 adjustments (Belgian school to US school)").  It was also evident that a move to the United States was meant to be a transition to a new home ("Akiko may look for part-time work / studies / look for work for next school year and have time to set this up"; "Akiko can look for housing and schools for Alex"; "Akiko can help settle family during the 2018-2019 school year"; "Away from C but this should be considered a period of transition"). R-34; Tr. 2T122:18-127:21.

55.  At the time of the Power Point presentation, Respondent believed that they were "already halfway out the door of Belgium" because they "had less ties to Belgium at that point, so [they] were eventually leaving Belgium within a short period of time."  Tr. 2T125:1-9.

56.    The parties ultimately applied for their children to attend the Lycée Français, an international French school in Brussels, Belgium. They did not apply for any other schools. Stip. Facts, ¶ 2(xxxvi); Tr. 1T42:24-43:15; Tr. 2T120:17-121:6.

57.    The Lycée Français is a public French school that is part of and administrated by the French schooling system. Tr. 1T43:23-44:8.

58.    In 2018, A.L.S. was not able to keep up with the native bilingual French speakers. She had been moved down at ISB to a lower level and the Lycée Français advised that A.L.S. was not eligible for the bilingual French/English program because her French was not strong enough. Tr. 2T76:6-77:4; Tr. 2T121:7-18.

59.    On May 2, 2018, Respondent sent an email to Petitioner because it looked like A.L.S. would not secure placement at the Lycée Français. In such email, Respondent detailed the reasons for a transition to Montvale, New Jersey in which she expressed that she could move to New Jersey with the children and "look to secure a job" while Petitioner downsized, got "rid of all [their] extra stuff," give "the landlords the proper notice," and move to a "cheaper, smaller apartment" as a "short-term, 1 year rental." Respondent also expressed that Petitioner would "actively pursue a job in NJ/PA" and he "could even move before landing a job in the States, and look while already on location." Respondent expressed that such plan was appropriate because it would allow the children to face less transitions that it was discussed and agreed by the parties that they "would one day return to the US." Responded explained that the timing was good because the children had no school and Respondent had no job to tie the family down to Brussels. Respondent stated: "It seems like a waste of our time and resources to start new schools/jobs, when we may be moving on next year." R-35; Tr. 2T130:16-131:10.

60.    On May 20, 2018, Petitioner applied for a position with J&J in England. R-89, JNJ000029.

61.    On May 29, 2018, Petitioner applied for a position with J&J in New Jersey. R-89, JNJ000030.

62.    Petitioner did not apply for any roles outside of Belgium following his May 29, 2018 application. He has not applied for any roles in the United States once Respondent and the children moved to New Jersey in August of 2018 through the present. Tr. 1T181:6-182:13; R-89.

63.    The Lycée Français did not have availability for the parties' daughter for the 2018-2019 school year, while there was availability for the parties' son

for that coming school year.  Stip. Facts, ¶ 2(xxxvii); Tr. 1T44:17-45:13; Tr. 2T121:10-122:3.

64.     Once the Lycée Français confirmed that there was no availability for A.L.S., A.L.S. had no schooling options in Belgium for the 2018-2019 school year because all of the schools were full.  Tr. 1T44:17-45:13; Tr. 2T131:11-15.

65.     The parties agreed that the children would attend school in Montvale, New Jersey for the 2018-2019 school year and that their daughter would be enrolled in the Montvale public school system for third grade.  Stip. Facts, ¶ 2(xxxviii); Tr 1T60:10-22; Tr. 1T115:17-24.

66.     Petitioner cooperated and assisted with the parties' daughter's enrollment in the Montvale public school system for her 3rd grade year.  Stip. Facts, ¶ 2(xxxix); Tr. 2T135:10-136:2.

67.     Petitioner took A.L.S. to get a vaccination in France required for her to attend school in New Jersey.  Tr. 1T126:17-127:7; Tr. 2T135:20-21.

68.     Petitioner testified that he "encouraged [A.L.S.] to really embrace" her time in the United States.  1T97:23-24.

69.     On June 4, 2018, Respondent forwarded an email to Petitioner confirming that the registration paperwork got A.L.S. had been received by Memorial Elementary School in Montvale, New Jersey.  Petitioner responded "Happy for [A.L.S.]."  R-37; Tr. 2T136:3-137:17.

70.     On June 11, 2018, Petitioner forwarded an email to Respondent from the Lycée Français confirming that A.L.S. could not attend there for the 2018-2019 school year.  Petitioner stated "An option is to find another Francophone school in Brussels for a year (sic!) Or put an option for both of them next year and hat you and the kids spend a year in NJ.  We can then assess the situation and if I have a job in NJ or a good perspective of coming to NJ, you all stay in NJ or if we want to come back to Brussels…"  R-36; Tr. 2T132:5-133:20.

71.     Respondent believed that she and Petitioner had reached an agreement that Petitioner would seek employment in the United States to join she and the children here.  Tr. 2T127:13-128:15; Tr. 2T132:5-133:20.

72.     A.L.S. testified that she does not really remember the summer before she came to the United States.  She was probably in France, but she does not remember if she enjoyed her time there.  Tr. 1T202:23-203:6.

73.     Before departing for New Jersey, Respondent deregistered herself and the children at the city hall for the commune in Brussels in which they were

residing.  Respondent did this because she understood it to be mandatory from her and Petitioner's prior departure from and return to Belgium when they resided in Italy.  She also understood it to be mandatory to cease the receipt of the state-provided health insurance and child stipend.  Respondent relied upon the personnel at the city hall to complete the paperwork and understood the deregistration on a "temporary" basis simply meant they were not erased from the system. Tr. 2T137:20-139:9; Tr. 2T272:18-23.

74.    Respondent advised Petitioner that she had completed the deregistration on the same day she completed the process.   Petitioner expressed his unhappiness because he wanted to continue to receive the child stipend even though the children would not be living in Belgium.  Tr. 2T139:10-141:4.

75.    Respondent packed all of the clothes, toys, and books she and the children would require for their relocation to Belgium.  She packed more than she would have for a regular visit.  Tr. 141:6-13.

76.    Respondent did not pack items they parties would not require in New Jersey such as clothes and personal belongings the children grew out of, the crib A.H.S. had grown out of, furniture that belonged to Petitioner's family, IKEA furniture that could not make the journey, and items such as bedding that they already had at Respondent's parents' home.  Tr. 2T141:14-142:5.

77.    Respondent believed as she packed that the parties had a shared expectation to abandon Belgium with a preference for relocating permanently to New Jersey.  To that end, Respondent packed approximately ten (10) boxes of items she wished to come to New Jersey and left them in the front hallway of the residence in Brussels.  She told Petitioner she wanted the boxes and her piano shipped to New Jersey, but Petitioner expressed that J&J would pay to ship their belongings as part of a relocation package.  The parties also discussed returning Petitioner's family items to his family, getting rid of the IKEA furniture, and decluttering in preparation for moving to New Jersey. Tr. 142:6-148:9.

78.    In August 2018, A.L.S. had a going away party with her friends and their parents.  Tr. 2T248:24-249:5.

## H.    Relocation to and Acclimatization to New Jersey

1.    When Respondent and the children left for New Jersey, Respondent expressed that it had been a very stressful year or two, but she was committed to the marriage. Tr. 2T149:16-151:2.

2.    Petitioner drove Respondent and the children to the airport on August 20, 2018 for their flight to New Jersey.  Stip. Facts, ¶ 2(xl); Tr. 1T127:8-18; Tr. 2T137:18-19 Tr. 2T148:11-13.

3.      On August 20, 2018, Petitioner provided a written consent for Respondent to travel abroad with their children to New Jersey.  Stip. Facts, ¶ 2(xli); J-1.

4.      Petitioner recognized that J-1 was a "travel authorization" required when "a parent travels with the children without" the other parent because he understood that Respondent could "be stopped at the airport" without such a document provided "for purposes of travel."   Tr. 1T55:15-20; Tr. 1T56:21-57:18; Tr. 2T148:11-149:15.

5.      Upon their arrival on August 21, 2018, Respondent and the children stayed with Respondent's parents in their Montvale, New Jersey home, which is where Respondent lived with her parents as a child after the age of five. Stip. Facts, ¶ 2(xlii); R-39; Tr. 2T153:11-14.

6.      The children initially shared a bedroom, but will now have their own rooms because of their current ages and Respondent will sleep in the basement. Tr. 2T153:15-22.

7.      The parties did not consider renting a place for Respondent and the children for the 2018-2019 school year because they did not have the financial means and Respondent's parents' support enabled Respondent to go on job interviews and begin to work.  The parties also anticipated and discussed purchasing a home in New Jersey together.  Tr. 2T153:23-155:7.

8.      Respondent enrolled the children in a substantial amount of activities in New Jersey during 2018-2019 because it was a way to make new friends, learn new skills, and "root themselves in New Jersey" because the parties had discussed and understood that New Jersey was their new home. Petitioner knew about the children's activities (as detailed below) and was supportive of the children engaging in same (including listening to A.L.S.'s student government election speech, attending A.L.S.'s softball games/practices, paying for half of the summer activities, and picking the children up from French camp).  Tr. 2T185:20-188:10.

9.      The children adjusted fairly quickly to life in New Jersey because Respondent's parents' home was familiar from their biannual visits and they already had some friends from those visits, including the children of Respondent's childhood friends.  Tr. 2T197:11-20.

10.     A.L.S. began third grade at Memorial Elementary School in Montvale, New Jersey in September 2018.  Tr. 2T174:20-25.

11.     As to when she first came to New Jersey, A.L.S. testified: "So the first day I remember the most.  So I was pretty like scared, but like I remember Vishna, she came up to me and she's like, oh, hi, and she like grabbed me

by the arm, and then so I kind of just always had a friend.  So then I got introduced to all her other friends, and then they kind of -- had friends from the beginning of the year."  Tr. 1T203:8-16.

12.     Respondent routinely facilitated and initiated FaceTime communications between Petitioner and the children to keep Petitioner up to date on the children's growth, progress, and activities and to connect the children with their father.  Tr. 1T76:16-17.

13.     Respondent borrowed a car in New Jersey during the school year 2018-2019, first from her parents and then from a friend living abroad while she saved up to purchase a vehicle for herself.  Stip. Facts, ¶ 2(xliii); Tr. 2T158:8-24.

14.     Respondent paid for car insurance in New Jersey and maintenance on the vehicle she borrowed from her friend.  Tr. 1T64:8-17.

15.     In September 2018, Respondent registered to vote locally in New Jersey.  Tr. 2T158:16-20.

16.     In September 2018, Respondent applied for health insurance for her and the children through New Jersey Family Care, which she received in January 2019 retroactive to September 1, 2018.  Stip. Facts, ¶ 2(li); R-52; Tr. 2T166:17-172:3.

17.     Petitioner was well aware of, and supported, Respondent's application for and receipt of health insurance through New Jersey Family Care.  Respondent even sent Petitioner a link regarding same prior to her application.  R-51; Tr. 2T166:17-172:3.

18.     The parties' children have always received (even when residing in Belgium), and continue to receive, dental care in New Jersey with Stephen Hung of Lemoine Dental Group in Fort Lee.  The parties' children received dental care with Dr. Hung because of the family ties to this dentist's office where Respondent's mother worked for many years.  Prior to August 2018, the children received treatment with Dr. Hung annually when they visited New Jersey each summer.  Stip. Facts, ¶ 2(liii); Tr. 2T172:18-173:13.

19.     The children's first dentist appointment after their relocation to New Jersey occurred with Dr Hung in September 2018.  Tr. 2T172:18-173:13

20.     Petitioner was aware of the children's continued dental treatment in New Jersey as Respondent kept him fully-informed of the children's appointments.  R-65.

21.     The parties' daughter began dance at Northern Valley Dance Academy in Norwood, New Jersey in September 2018.  These dance lessons were taken together with a Belgian friend and next-door neighbor in Brussels who was temporarily in the United States for a year simultaneously with the parties' daughter.  A.L.S. attended dance once a week.  Stip. Facts, ¶ 2(liv); Tr. 2T180:21-181:3.

22.     Petitioner was aware of A.L.S.'s participation in dance as Respondent kept him fully-informed of the children's activities and sent him pictures and videos on a regular basis.  R-66; R-72; R-73; R-77; Tr. 1T166:10-168:25; Tr. 1T168:10-15.

23.     The parties' daughter began chorus through Memorial Elementary School in Montvale, New Jersey in September 2018.  A.L.S. attended chorus once per week.  Stip. Facts, ¶ 2(lv); Tr. 2T181:4-12.

24.     Petitioner was aware of A.L.S.'s participation in chorus as Respondent kept him fully-informed of the children's activities and sent him pictures and videos on a regular basis.  Respondent sent him a video of A.L.S.'s winter chorus concert performance.  R-55; R-67; R-72; R-73; Tr. 1T168:6-9; Tr. 1T168:10-15.

25.     Respondent sought reciprocity for her Massachusetts teaching certificate in New Jersey beginning in September 2018.  Stip. Facts, ¶ 2(xlviii); Tr. 158:25-159:16.

26.     Petitioner was aware that Respondent was working to obtain reciprocity of her teaching certificates in New Jersey and he was supportive of her endeavor.  Tr. 1T65:25-66:4; Tr. 1T159:5-22; Tr. 2T159:17-21.

27.     Petitioner visited Respondent and the children in New Jersey on October 12-28, 2018; February 15-19, 2019; and May 16-27, 2019.  Stip. Facts, ¶ 2(xliv); Tr. 1T78:15-79:4. During Petitioner's visits, they engaged in activities in Montvale, New Jersey or traveled around together for activities with the children.  Tr. 1T78:35-79:4.

28.     While Petitioner was in New Jersey for specific work-related activities, he visited Respondent and the children during the 2018-2019 year.  Stip. Facts, ¶ 2(xlv).

29.     Petitioner's visits to New Jersey were planned around his professional obligations and, while in New Jersey, he would stay during the week at a hotel close to the J&J New Jersey offices where he was attending meetings or other events that required his presence there.  Tr. 1T79:5-10; Tr. 1T128:15-129:6; Tr. 2T200:6-16.

30.    During Petitioner's visits, the parties discussed where they would live together in New Jersey.  Respondent specifically inquired as to whether they could remain in Montvale and Petitioner could commute down to Raritan.  Tr. 2T147:12-148:8.

31.    During Petitioner's October 2018 visit, the family attended wedding in Connecticut and visited New York, New York and Philadelphia, Pennsylvania together.  R-75; Tr. 2T197:18-199:11.

32.    Petitioner specifically recalled attending Annie's wedding in Connecticut in October 2018 and "spending time with Annie's family."  Tr. 1T129:10-130:16

33.    At the wedding in October 2018, Petitioner spoke to the bride's sister, Rachel Avenick, about "their plans as a couple to Move to New Jersey" and that "it was the plan for Christophe to join [Respondent and the children] after he found a job, transferred to J & J's headquarters office in New Jersey."  Petitioner specifically told Ms. Avenick that he was moving to New Jersey and that "he had a plan to apply for a job and to rejoin his family."  Tr. 2T280:2-282:22.

34.    The parties' daughter, on her own initiation, ran for student government in October 2018 and was elected as one of two class representatives for which she had to make two posters and give a speech.  Tr. 1T163:8-165:6; Tr. 2T179:23-180:17.

35.    Petitioner was aware of A.L.S.'s participation in student government at her school in Montvale, New Jersey because Respondent kept him fully-informed of the children's activities and A.L.S. even practiced her speech for Petitioner.  Tr. 1T163:8-165:6.

36.    The parties' daughter began piano lessons at the Woodside Music Studio in Park Ridge, New Jersey in October 2018. A.L.S. attended piano once per week.  Stip. Facts, ¶ 2(lvi); Tr. 2T181:13-17.

37.    Petitioner was aware of A.L.S.'s participation in piano as Respondent kept him fully-informed of the children's activities and sent him pictures and videos on a regular basis.  R-63; R-64; R-65; R-72; R-73; Tr. 1T168:10-15.

38.    The parties' daughter participated in an art workshop in October 2018, which Respondent informed Petitioner about.  R-68.

39.    The parties' children began to see a pediatrician in New Jersey, Daniel Schwartz of Broadway Pediatric in Westwood, New Jersey in October 2018.  Stip. Facts, ¶ 2(lii); Tr. 2T172:5-17.

40.  Petitioner was aware of Respondent obtaining a new pediatrician for the children in New Jersey as Respondent kept him fully-informed of the children's appointments.  Tr. 2T173:14-20.

41.  The parties' son attended Am-Tree Developmental Nursery School ("Am-Tree") beginning October 2018.  Stip. Facts, ¶ 2(lxi); Tr. 2T183:13-25.

42.  Petitioner was aware of A.H.S.'s enrollment in Am-Tree as Respondent kept him fully-informed of the children's activities.  Additionally, Petitioner visited and approved of Am-Tree in October 2018 before the selection was finalized.  Petitioner "didn't have any reasons not to support" A.H.S. attending Am-Tree.  R-60; R-61; R-62; Tr. 1T65:5-6; Tr. 1T157:10-15; Tr. 1T158:2-18; Tr. 2T184:1-19.

43.  Respondent began applying for employment in New Jersey in October 2018.  Stip. Facts, ¶ 2(xlix); R-40 through R-45; Tr. 2T160:22-160:7.

44.  When applying for positions in the Fall of 2018, it was clear that Respondent believed New Jersey to be the new home for her and her family. She expressed that she "recently moved back to New Jersey after many years of living abroad and [was] seeking opportunities to work again with students who are deaf and hard of hearing," that she was "back home in the United States." R-41.

45.  Respondent accepted a position as a 1:1 assistant with Bergen County Special Services on November 18, 2018 and expressed that the position was "a good way to enter back into the field."  R-42.

46.  On December 14, 2018, Respondent declined an interview for a teacher of the deaf position at Lake Drive School having already accepted the 1:1 assistant position.  However, Respondent clearly expressed her understanding that she would remain living and working in New Jersey in the future as she advised "Since I will only be contracted to work in [the 1:1 assistant] position for the rest of this school year, I will begin to search again for full-time teacher of the deaf positions for next fall" for the 2019-2020 school year.  R-43.

47.  Respondent and the children visited Petitioner and his family in Belgium and France from December 22-30, 2018.  Stip. Facts, ¶ 2(xlvi); R-75; Tr. 1T68:5-10; Tr. 2T200:17-201:1.

48.  During such trip, Petitioner testified that there were discussions about them "coming back next summer" and that "they would clearly come back in the summer of 2019."  Petitioner also stated that the children "would spend also the summer with their cousins and friends back in Europe."  Tr. 1T68:14-19.  This was consistent with Respondent's statements in her May 2, 2018

27

email sent before she and the children moved to New Jersey that, as part of the relocation: "We can spend our holidays in France (opposite what we do now)." R-35.

49.  On December 30, 2018, Petitioner provided a written consent for Respondent to travel abroad with their children to New Jersey. Stip. Facts, ¶ 2(xlvii); J-1.

50.  Petitioner again recognized that J-1 was to enable Respondent to "travel back to the United States without be accompanied by the father of the children." Tr. 1T70:3-5.

51.  Respondent requested the travel authorization the morning of her and the children's departure for New Jersey. She understood that she needed the travel authorization for customs officials at the airport. Petitioner requested a return date of July 10, 2019 to which Respondent agreed because she understood, based upon the discussion of the parties that morning, that she was agreeing to a return date for summer vacation only. She did not understand the date to be a permanent move back to Belgium as Petitioner was continuing to actively represent that he was coming to join them in New Jersey. Tr. 204:12-208:2.

52.  Respondent did not have a return ticket to Belgium in December 2018 because she did not have the funds to pay for a round trip ticket, Petitioner told her the flight was her responsibility, and she used her father's airline miles to book the return flight to New Jersey after the Christmas holiday. Tr. 2T208:3-12; Tr. 2T239:4-240:5.

53.  On January 8, 2019, Respondent forwarded Petitioner an email with the 2019-2020 Montvale school calendar. Petitioner never objected to the 2019-2020 school calendar. R-77; Tr. 2T209:11-210:4.

54.  Respondent began a position as a 1:1 assistant with Bergen County Special Services on January 14, 2019. Stip. Facts, ¶ 2(l); R-48; Tr. 2T160:8-21.

55.  Petitioner accepted the position as a 1:1 assistant as a way to get her foot in the door because she had been abroad for so long and with the hopes of getting a role more suited to her background and experience. Tr. 2T161:10-162:3.

56.  Petitioner was aware that Respondent had been applying for employment beginning in the Fall of 2018 and that she received an employment position starting in January 2019 because Respondent kept him updated on all of her progress and actions in New Jersey. Petitioner was supportive of Respondent seeking employment in New Jersey and encouraged her that the

1:1 assistant position was a step in the right direction.  R-77; Tr. 1T64:25-65:15; Tr. 1T159:5-22; Tr. 2T165:10-21.

57.   Respondent had taken steps to obtain reciprocity for her Massachusetts teaching certificate and to obtain employment in New Jersey because she worked throughout the entirety of the marriage to help contribute and because she believed the family was moving to New Jersey and setting up their lives here.  Tr. 2T165:22-166:6.

58.   The parties' daughter, A.L.S., began before and aftercare through the Montvale Child Care Program on January 14, 2019.  Petitioner was informed of same and was copied on the registration emails.  Petitioner was supportive of A.L.S. attending the program, because it enabled Respondent to go back to work.  R-54' Tr. 2T175:1-23.

59.   The parties' daughter engaged in ski lessons in January 2019 through the Montvale Ski Club.  A.L.S. attended four (4) ski lessons.  Stip. Facts, ¶ 2(lvii); Tr. 2T181:18-20.

60.   Petitioner was aware of A.L.S.'s participation in ski lessons as Respondent kept him fully-informed of the children's and sent him pictures and videos on a regular basis.  R-56; R-69; R-70; R-72; R-73; Tr. 1T168:10-15.

61.   On February 12, 2019, the parties engaged in a text message conversation in which Petitioner advised Respondent that he was speaking with a tax profession "to get some intel on what a move to US would mean" and stating that he was in discussions with J&J about engaging in a "reverse commute" where he would maintain his current position, but physically work in New Jersey.  Petitioner stated that J&J "know my family is over there" and he had "been pushing for a solution."  R-78; Tr. 2T210:5-212:9.

62.   Following the February 12, 2019 text message exchange, the parties engaged in additional discussions regarding Petitioner engaging in a "reverse commute."  Respondent encouraged Petitioner to do it so that he could be in New Jersey to enable the J&J New Jersey personnel to get to know him to get his foot in the door.  Tr. 2T210:5-212:9.

63.   During Petitioner's February 2019 visit to New Jersey, the family visited New York, New York together.  R-75; Tr. 2T199:12-19.

64.   The parties' daughter participated in softball through the Montvale Rec in the Spring 2019. A.L.S. participated in softball practiced once per week and games once per week. Stip. Facts, ¶ 2(lviii); Tr. 2T181:21-24.

65.    A.L.S also participated in softball in 5th grade (Spring 2021) as well as a summer league.  Tr. 3T31:5-16.

66.    A.L.S. attended all softball games, practices, and impromptu non-mandatory practices consistently and Akiko checked Akira in consistently. Tr. 3T30:14-24.

67.    Justin Ryan Marrotte, who coached A.L.S. in softball in 3rd grade beginning in March 2019 (Tr. 3T27:20-29:6), described his experience with A.L.S. as follows: "It was always very positive.  She interacted very well with the other -- with the other players on the team.  She was very teachable, just very mature for her age at that level, and she was very -- she was very interested in learning, and she had a great attitude.  Never really had a poor attitude from her once."  Tr. 3T29:9-14.  Mr. Marrotte stated that A.L.S. was a "well-adjusted child" and she "transitioned very well from not knowing much to accepting what we were -- what directive or what -- what we were trying to teach in that moment."  Tr. 3T29:16-21.  Mr. Marrotte further testified: "My daughter to speak from my daughter's perspective, she liked Akira a lot, and the feedback from the other girls about Akira and their interactions with her as well was very positive."  Tr. 3T30:6-9.  His daughter is still friendly with Akira, "speaks very positive about her" and wanted her to play softball this season.  Tr. 3T32:12-22; 3T32:6-11.

68.    Petitioner was aware of A.L.S.'s participation in softball as Respondent kept him fully-informed of the children's activities and sent him pictures and videos on a regular basis.  Petitioner was copied on the softball emails. Petitioner also attended A.L.S.'s softball games and practices when he visited New Jersey in 2019.   R-57; R-71; R-72; R-73; Tr. 1T168:1-5; Tr. 3T31:18-32:5; Tr. 1T168:10-25; Tr. 2T186:7-10.

69.    In March of 2019, Petitioner attended an open house at the Lycée Français without informing Respondent.  Tr. 1T46:23-47:13.

70.    When Petitioner advised Respondent of his inquiries at the Lycée Français, she was surprised and voiced her objection and desire to remain in America. Tr. 1T47:17-23.

71.    On March 22, 2019, Petitioner advised Respondent that he submitted a "pre-inscription" for the parties' children to attend the Lycée Français for the 2019-2020 school year to which Respondent expressed her objection. Stip. Facts, ¶ 2(lxii); Tr. 2T214:5-216:17.

72.    Respondent specifically stated in her March 31, 2019 email to Petitioner: "When we spike in January and February, we spoke about how you would be asking your bosses here in NJ about the possibility of working in NJ during the next school year.  Now in March, you spoke suddenly about

having [A.L.S.] enter into the French Lycée in Brussels.  I was surprised to hear the sudden change in plans."  Respondent then detailed the tumultuous upheaval caused by Petitioner and all of his proposals regarding relocations.  Respondent expressed that it was not best for A.L.S. to be uprooted suddenly to attend a school in Belgium taught in French.  R-79.

73.    On March 29, 2019, Respondent's employer, Bergen County Special Services, emailed Respondent regarding a maternity leave replacement position for preschool in Midland Park, New Jersey for which Respondent expressed her interest.  R-36.

74.    Respondent filed federal tax returns for the calendar year 2019 utilizing her Montvale, New Jersey address.  Tr. 2T166:7-15.

75.    On April 10, 2019, the parties engaged in an email exchange in which Respondent asserted that she and the children should remain in New Jersey and Petitioner asserted that they should return to Belgium while he continued to pursue employment in the United States. Stip. Facts, ¶ 2(lxiii); Tr. 2T214:5-216:17.

76.    Respondent specifically stated in her April 10, 2019 email to Petitioner: "We were a 'mobile' family which meant that we decided as a couple that we were open t the ideal of moving out of Belgium for your career opportunities.  We had agreed that we would consider these moves and had discussed eventually settling down in the U.S.  This would make sense for [A.L.S.] to have her education in English so that we could choose international schools in English abroad and be able to transition her easily to a U.S. school system.  Up until recently, you spoke about working in the U.S.  Our long term goal was to keep [A.L.S.] in an English speaking school so I do not think it is a good idea to change this plan just for next year.  You do not know how long you will be working in Belgium."  R-80.

77.    On April 10, 2019, Petitioner responded to Respondent via email stating: "Even if the upcoming Brussels spell was only to last a year, it would strengthen [A.L.S.'s] academic French language.  You could look at that scenario as a year 'abroad' as an exchange student[.]"  Petitioner went on to state: "Overall, I remain open to eventually moving to the US as a Family.  I will pursue that goal[.]"  Respondent understood that, were she and the children to return to Belgium, it was on a short term basis to once again leave Belgium.  R-80; Tr. 2T223:9-224:9.

78.    On April 11, 2019, Respondent's employer, Bergen County Special Services, emailed Respondent regarding the maternity leave replacement that was expected to last until December 2019.  As a clear reflection of Respondent's expectations to remain in New Jersey, her employer wrote "I

do realize on a personal note that you are looking for a long term full time permanent teaching position." R-47.

79. Petitioner was fully-informed of this new job possibility for Respondent. Tr. 1T65:10-66:25.

80. Following admission of the parties' children to the Lycée Français, Petitioner advised, on April 18, 2019, Respondent that he had paid a deposit for the children's attendance at the Lycée Français for the 2019-2020 school year in order to secure their spot, to which Respondent again expressed her objection. Stip. Facts, ¶ 2(lxiv).

81. Petitioner's April 18, 2019 email to Respondent forwarded a lengthy exchange he had with the Lycée Français that Petitioner engaged in unilaterally and on which Petitioner did not copy Respondent. R-81; Tr. 2T214:5-216:17.

82. On April 19, 2019, Respondent advised Petitioner via email that she did not agree to enrolling A.L.S. in the Lycée Français and that she would inform the school accordingly. R-82.

83. On April 19, 2019, Petitioner responded to Respondent stating that he already paid for the children's spots at the Lycée Français and did not want to lose the money. R-83.

84. Petitioner testified: "I trust my wife's opinion when it comes to overall education[.]" Tr. 1T151:6-7.

85. Respondent's father was diagnosed with cancer in or around Easter 2019 and began chemo treatments and radiotherapy. Tr. 2T155:19-156:4.

86. Petitioner knew of Respondent's father's medical condition and Respondent specifically told Petitioner that she wanted to remain in New Jersey, in part, because of her father's serious medical ailment. Tr. 2T277:4-11.

87. The parties were unable to reach a resolution regarding the children's schooling for the 2019-2020 year. Tr. 224:10-14.

88. In accordance with Respondent's plan to use the 1:1 assistant position as a jumping off point to other positions for which she was more qualified, Respondent began her position as Long-Term Substitute Teacher at the HIP-Godwin Program in Midland Park, New Jersey on May 6, 2019, which lasted until June 30, 2020. R-49; R-50; Tr. 2T162:4-25.

89. During Petitioner's May 2019 visit to New Jersey, the family visited Philadelphia, Pennsylvania, Diggerland in New Jersey, Hershey Park, and the Crayola Factory.  R-75; Tr. 2T199:20-200:5.

90. The parties' daughter, A.L.S., excelled academically at Memorial Elementary School in Montvale, New Jersey during the 2018-2019 school year.  A.L.S.'s teacher expressed that A.L.S. was a "helpful, kind, and easygoing student who work[ed]well with all of her classmates.  She [was] progressing nicely in all subject matters. [. . .]  Her spelling and time management skills have improved significantly[.]"  During the December 2018 parent-teacher conference, A.L.S.'s teacher advised Respondent that A.L.S. began the year six (6) months behind, but was fully caught up as of December.  R-53; Tr. 2T176:7-177:3; see also R-74.

91. Petitioner was aware A.L.S.'s did well in school during the 2018-2019 school year in Montvale, New Jersey.  Tr. 1T1-11.

92. The parties' daughter, A.L.S., adjusted well socially making friends that she maintains to this day.  She engaged in play dates and attended birthday parties.  She was even the sole  kid invited to see the Lion King on Broadway for her friend's birthday.    R-53; R-67; R-71; R-84; R-85; Tr. 1T197:17-23; Tr. 1T203:8-16; Tr. 2T177:25-177:3; Tr. 2T177:24-179:16; Tr. 3T30:6-9; Tr. 3T32:12-22; Tr. 3T32:6-11.

93. Petitioner was aware of A.L.S.'s developing friendships through conversations with his daughter as well as Respondent keeping him fully-informed of the children's playdates and other activities with friends including sending him pictures and videos on a regular basis.  R-71; R-72; R-73; R-74; R-77; R-84; R-85; Tr. 1T168:10-15; Tr. 1T169:12-17.

94. The parties' son, A.H.S., excelled socially and academically at Am-Tree Developmental Nursery School in Montvale, New Jersey during the 2018-2019 school year.  A.H.S. went to birthday parties and went to play dates  He made friends at Am-Tree some of whom he remains friends with to this day.  Tr. 2T197:8 -198:9.

95. A.H.S.'s teacher, Jessica Raymond (Tr. 3T23:3-13), described A.H.S. as follows: "He was always very well-behaved.  He liked to play sports.  I remember he would play soccer outside when we would be on the playground during our outside time." Tr. 3T22:23-25. He was "very happy, and like I said, well-behaved.  Very polite, too." Tr. 3T24:10-12. A.H.S. was a "well-adjusted kid" Tr. 3T25:2-4.

96. Ms. Raymond also met A.L.S. at pick up and described A.L.S. as "very friendly.  She would always tell us riddles, and yes, just very friendly." Tr. 3T23:14-24:3.

97.    Ms. Raymond described Respondent as "always very, very sweet, very polite.  She was one of the parents that I would speak to more often because she would come to pick up, she would spend a little time during the pickup, if Alex would still be like in the middle of playing and whatnot."  3T24:19-25:1.

98.    Alex continued at Am-Tree for summer camp three (3) days per week in the summer of 2019 for which the parties equally shared in the expense.  R-85; Tr. 2T185:6-19.

99.    Petitioner was aware of A.H.S. performing well at Am-Tree and developing friendships through conversations with his son as well as Respondent keeping him fully-informed of the children's playdates and other activities with friends including sending him pictures and videos on a regular basis. R-62; R-72; R-73; R-77; R-85; Tr. 1T168:10-15.

100.    The children's socialization also occurred through trips in the United States.  As detailed above, the family went on excursions together in and around New Jersey.  Respondent also took the children on outings by herself such as going to parks, to visit museums, and for hikes.  Respondent and the children also went on excursions with friends, such as camping, or to visit friends, such as a trip to Virginia.  Tr. 2T195:21-197:5

101.    Respondent filed her complaint in the family division to keep the children in New Jersey for purposes of schooling.  She did so that Petitioner would listen to her and take her position seriously.  She did not tell Petitioner because she was afraid of his reaction and he makes her uncomfortable.  Tr. 224:15-226:3.

102.    In reaction and retaliation for her filing regarding the children's schooling, Petitioner filed for divorce.  Respondent did not file for divorce because she was not concerned about the marriage, she just wanted a resolution regarding the children's schooling.  The parties are now divorced.  Tr. 2T224:15-227:21.

103.    Both children had memberships to Lifetime Fitness in Montvale to utilize the indoor and outdoor pools in the Summer of 2019 for which the parties equally shared in the expense.  Tr. 2T183:4-11; Tr. 2T185:6-19.

104.    On June 21, 2019, the parties and their children engaged in a FaceTime video call in which: (1) when Petitioner spoke to the children in French, they responded in English; (2) A.L.S. told Petitioner about her friends, play dates, and activities in which she was participating; and (3) A.L.S. described where one of her friends lived as being really close to "my house" (minute 3:58). R-84.

105.    On July 2, 2019, the parties and their children engaged in a FaceTime video call in which: (1) when Petitioner spoke to A.L.S. in French, she responded in English and asked the meaning of words she did not understand; (2) A.L.S. told Petitioner about her friends, play dates, and activities in which she was participating, including pony-riding camp, French camp, and an upcoming camping trip with friends on a farm (in which she describes in detail her friend's dogs); (3) A.L.S. talked to Petitioner about A.H.S.'s attendance at summer camp at Am-Tree; (4) A.L.S. describes the former family residence in Belgium to Petitioner as "your house, our house, old house" (minute 5:47); (5) Petitioner expresses that he is "happy about the [summer] activities," but he tells A.L.S. "you're supposed to be here for the summer" to which A.L.S. has no response and changes the subject to ask Petitioner what he has been doing (starting at minute 6:57). R-85.

106.    In July 2018, Respondent, who had been saving her money, purchased a vehicle in New Jersey, which she registered and insured in New Jersey.  Tr. 2T158:14-24.

107.    The parties' daughter attended the French Institute Alliance Française in Montclair, New Jersey in July 2019 for which the parties equally shared the expense.  Stip. Facts, ¶ 2(lx); Tr. 2T181:25-183:2; Tr. 2T185:6-19.

108.    The parties' son attended the French Institute Alliance Française in Montclair, New Jersey in July 2019 for which the parties equally shared the expense.  R-58; Tr. 2T184:20-185:5; Tr. 2T185:6-19.

109.    Petitioner was aware of the children's participation in French camp as Respondent kept him fully-informed of the children's activities, Petitioner paid for half of same, and Petitioner picked the children up from the camp. R-58; R-84; R-85; Tr. 2T186:11-12.

110.    The parties' daughter participated in soccer through the Montvale Rec in August 2019 for a camp, for which the parties equally shared the expense. Stip. Facts, ¶ 2(lix); Tr. 2T185:6-19.

111.    The parties' son participated in soccer through the Montvale Rec in August 2019 for a camp, for which the parties equally shared the expense.  Tr. 2T184:20-185:5; Tr. 2T185:6-19.

112.    The parties' daughter attended pony-riding camp at the Saddle River Equestrian Camp in Chestnut Ridge, New York in August 2019.  R-59; Tr. 2T181:25-183:3.

113.    Petitioner was aware of A.L.S.'s participation in pony-riding camp as Respondent kept him fully-informed of the children's activities and Petitioner paid for half of same.  R-59; R-84; R-85.

114.    Respondent's father passed away in December 2020.  Tr. 2T155:25-156:4.

115.    Respondent and the children continue to reside in Respondent's parents' home with her mother because of both cost and the mutual support she and her mother provide for one another especially since Respondent's father's passing.  Tr. 2T155:8-156:14.

116.    Respondent continues her employment with Bergen County Special Services as a teacher of the deaf for a preschool class on a tenure track.  Tr. 2T163:1-10.

117.    A.L.S. continues her participation in student government.  Tr. 2T180:18-20.

118.    The parties' daughter, A.L.S., is now in sixth grade at Fieldstone Middle School through the Montvale school system.  She testified that likes her school and her favorite subjects are influenced by who is the best teacher.  She endured the Covid-19 pandemic restrictions in the second half of fourth grade and the first half of fifth grade.  Tr. 1T198:6-201:16; Tr. 2T176:2-6.

119.    A.L.S. further testified that she has good friends in New Jersey including Vishna and Violet who live in her neighborhood.  A.L.S. described where her friends live in comparison to what she termed "my street."  Tr. 1T201:18-202:11.

120.    A.L.S. testified that she had friends in Belgium and they "used to send notes, but we haven't done notes recently."  Tr. 1T202:12-22.

121.    A.L.S. testified that she is currently playing club soccer on a team called the Vikings with practices on Tuesdays and Thursdays and games on the weekends.  She also is acting in her school play, The Little Mermaid, which has rehearsal on Mondays, Wednesdays, and Fridays.  She also takes voice lessons online and attended summer camp, which she enjoyed.  She used to do dance and softball, but does not have time for those activities now and she did piano, but that stopped because of the pandemic.  Her favorite activities are soccer and musicals.  Tr. 1T203:19-204:24; Tr. 1T205:23-206:3; Tr. 209:21-210:4.

122.    A.L.S. expressed objections to returning to Belgium because she cannot read and write French well compared to other students and her "main language is English."  She also stated: "I have all my friends here, but they're probably like, you know, moving on.  I moved on, too, though."  Tr. 1T210:16-211:15.

**I.      Petitioner is in a Far Superior Financial Position Over Respondent.**

1.      Petitioner testified that his income has different components, he can afford $90,000 per year in tuition for the children, his assets were tied to a specific asset that was not liquid in 2018, he has an apartment in Paris that he renovated and can rent out, his personal wealth will become liquid later this year, he has received higher bonuses. Tr. 1T152:21-154:6.  He "was the main provider."  Tr. 1T160:12-13.

2.      Respondent is a schoolteacher with Bergen County Special Services as a teacher of the deaf for a preschool class.  She is on a tenure track, but is not yet tenured.  Tr. 2T163:1-10.

**II.    CONCLUSIONS OF LAW**

**A.      This Court has original jurisdiction under 22 U.S.C. § 9003(a){** TA \l "**22 U.S.C.A. § 9003(a)**" \s "22 U.S.C.A. § 9003(a)" \c 2 **}.**

**B.      Petitioner has failed to establish by a preponderance of the evidence that the children were wrongfully retained within the meaning of the Convention because the children were habitual residents of New Jersey as of July 10, 2019.** 22 U.S.C. § 9003(e)(1)(A){ TA \l "22 U.S.C.A. § 9003(e)(1)(A)" \s "22 U.S.C.A. § 9003(e)(1)(A)" \c 2 }; *Bader v. Kramer*, 484 F.3d 666, 668 (4th Cir. 2007) ("Bader II"){ TA \l "*Bader v. Kramer*, 484 F.3d 666, 668 (4th Cir. 2007) (\"Bader II\")" \s "Bader v. Kramer, 484 F.3d 666, 668 (4th Cir. 2007) (\"Bader II\")" \c 1 }; *Karpenko v. Leendertz*, 619 F.3d 259, 263 (3d Cir. 2010){ TA \l "*Karpenko v. Leendertz*, 619 F.3d 259, 263 (3d Cir. 2010)" \s "Karpenko v. Leendertz, 619 F.3d 259, 263 (3d Cir. 2010)" \c 1 } ("Under the Hague Convention, the petitioner bears the initial burden of proving by preponderance of the evidence that the child was habitually resident in a State signatory to the Convention and was wrongfully removed to a different State as defined by Article 3."); *Feder v. Evans-Feder*, 63 F.3d 217, 222 (3d Cir.

1995){ TA \l "*Feder v. Evans-Feder*, 63 F.3d 217, 222 (3d Cir. 1995)" \s "Feder v. Evans-Feder, 63 F.3d 217, 222 (3d Cir. 1995)" \c 1 } (The "determination of a child's habitual residence immediately before the alleged wrongful removal or retention is therefore a threshold question in deciding a case under the Hague Convention.").

1.    **An evaluation of habitual residence requires an analysis of the totality of the circumstances as viewed from the child's perspective.** *Maxwell v. Maxwell*, 588 F.3d 245, 251 (4th Cir. 2009){ TA \l "*Maxwell v. Maxwell*, 588 F.3d 245, 251 (4th Cir. 2009)" \s "Maxwell v. Maxwell, 588 F.3d 245, 251 (4th Cir. 2009)" \c 1 } (The court must determine "whether there was 'an actual change in geography' coupled with the 'passage of an appreciable period of time, one sufficient for acclimatization by the [child] to the new environment.'" (quoting *Papakosmas v. Papakosmas*, 483 F.3d 617, 622 (9th Cir. 2007){ TA \l "*Papakosmas v. Papakosmas*, 483 F.3d 617, 622 (9th Cir. 2007)" \s "Papakosmas v. Papakosmas, 483 F.3d 617, 622 (9th Cir. 2007)" \c 1 }); *Monasky v. Taglieri*, 140 S. Ct. 719, 727 (2020){ TA \l "*Monasky v. Taglieri*, 140 S. Ct. 719, 727 (2020)" \s "Monasky v. Taglieri, 140 S. Ct. 719, 727 (2020)" \c 1 } ("The place where a child is at home, at the time of removal or retention, ranks as the child's habitual residence" and "[f]or older children capable of acclimating to their surroundings, courts have long recognized, facts indicating acclimatization will be highly relevant."); *Karkkainen v. Kovalchuk*, 445 F.3d 280, 292 (3d Cir. 2006){ TA \l "*Karkkainen v. Kovalchuk*, 445 F.3d 280, 292 (3d Cir. 2006)" \s "Karkkainen v. Kovalchuk, 445 F.3d 280, 292 (3d Cir. 2006)" \c 1 } ("This approach considers

a child's experience in and contacts with her surroundings[.]" It "considers whether a child has made a country her home before the date of her removal or retention."); *Whiting v. Krassner*, 391 F.3d 540, 551 (3d Cir. 2004){ TA \l "*Whiting v. Krassner*, 391 F.3d 540, 551 (3d Cir. 2004)" \s "Whiting v. Krassner, 391 F.3d 540, 551 (3d Cir. 2004)" \c 1 }; *Innes v. Carrascosa*, 391 N.J. Super. 453, 484 (App. Div. 2007){ TA \l "*Innes v. Carrascosa*, 391 N.J. Super. 453, 484 (App. Div. 2007)" \s "Innes v. Carrascosa, 391 N.J. Super. 453, 484 (App. Div. 2007)" \c 1 } (Habitual residence is "'the place where [the child] has been physically present for an amount of time sufficient for acclimatization and which has a degree of settled purpose from the child's perspective.'" (quoting *Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir. 1995)); *Feder*, 63 F.3d at 224{ TA \s "Feder v. Evans-Feder, 63 F.3d 217, 222 (3d Cir. 1995)" } ("[A] determination of whether any particular place satisfies this standard must focus on the child[.]").

    a.    **The children were acclimatized to New Jersey as of July 10, 2019.** *Karkkainen*, 445 F.3d at 293{ TA \s "Karkkainen v. Kovalchuk, 445 F.3d 280, 292 (3d Cir. 2006)" } ("[A]cademic activities are among 'the most central . . . in a child's life' and therefore highly suggestive of acclimatization." Courts have held "school attendance, social engagements, and lessons" as well as "participation in sports programs and excursions in [the child's] new country" to be evidence in favor of acclimatization. (quoting *Feder*, 63 F.3d at 224){ TA \s "Feder v. Evans-Feder, 63 F.3d 217, 222 (3d Cir. 1995)" });

*Feder*, 63 F.3d at 219{ TA \s "Feder v. Evans-Feder, 63 F.3d 217, 222 (3d Cir. 1995)" } (Other indicia of acclimatization include obtaining state sponsored medical insurance and making accommodations for medical treatment.); *Roszkowski v. Roszkowska*, 274 N.J. Super. 620, 627 (Ch. Div. 1993){ TA \l "*Roszkowski*, 274 N.J. Super. at 627" \s "Roszkowski, 274 N.J. Super. at 627" \c 1 } (Going to doctors is an indicator of acclimatization).

**FACTS:**

i.      The children attended school in New Jersey in 2018-2019 and the parties planned for their attendance to continue into 2019-2020 as evidenced by Respondent sending Petitioner the next year's school calendar.  See Proposed Findings of Fact ("Proposed Findings") at ¶¶ I(H)(10)-(11); I(H)(41); I(H)(53).

ii.     The parties' daughter, A.L.S., ran for student government a month into the school year and succeeded in becoming one of two class representatives.   A.L.S. is still involved in student government. See Proposed Findings at ¶ I(H)(34).

iii.    The parties engaged in copious activities in New Jersey making friends and integrating.  Beginning in September 2018 A.L.S. participated in dance, piano, chorus, student government, an art workshop, aftercare skiing, softball, French camp, pony-riding camp, soccer, and a local gym

membership. The parties' son, A.H.S. participated in soccer, French camp, summer camp, and a local gym membership. See Proposed Findings at ¶¶ I(H)(8); I(H)(21); I(H)(23); I(H)(34); I(H)(36); I(H)(38); I(H)(58)-(59); I(H)(64)-(67); I(H)(103); I(H)(107)-(112).

iv.    The children acclimatized quickly in New Jersey making friends fast and integrating into society in New Jersey. A.L.S. testified that she made a best friend on her first day of school who remains her friend to this day. They went on playdates, attended birthday parties – including A.L.S. being the only friend invited to see the Lion King on Broadway, went on excursions and trips as a family and with friends. See Proposed Findings at ¶¶ I(H)(8)-(9); I(H)(11); I(H)(27); I(H)(31); I(H)(89); I(H)(92); I(H)(94)-(98); I(H)(100).

v.     The children excelled academically. The parties' daughter was completely caught up academically by December 2018 despite starting the year six (6) months behind. See Proposed Findings at ¶¶ I(H)(90); I(H)(94)-(98).

vi.    The children's teachers and coaches recognized how well the children were doing and how easily they fit in and made friends. A.L.S.'s third grade teacher described A.L.S. as "helpful, kind, and easygoing" and "progressing nicely in all subject matters." The parties' daughter's softball coach

described A.L.S. as well adjusted with a great attitude, "very mature for her age at that level," and interacting well and making friends with all her teammates.  The parties' son's daycare teacher described A.H.S. as "very well behaved," "very polite," "very happy," and a "well-adjusted kid."  <u>See</u> Proposed Findings at ¶¶ I(H)(9) (11) (67) (90) (92) (94)-(97).

vii.    The children obtained medical treatment in New Jersey via New Jersey health insurance, a new pediatrician, and continued care with their New Jersey dentist.  <u>See</u> Proposed Findings at ¶¶ I(H)(16); I(H)(18)-(19); I(H)(39).

viii.   The shift of the children's habitual residence to New Jersey is clear in their daughter A.L.S.'s statements during the June 21 and July 2, 2019 video calls with her parents wherein she (1) responded to Petitioner solely in English when he spoke to her in French; (2) spoke enthusiastically about her friends, activities, and events; (3) described where her friends lived in Montvale relation to "my house" thereby demonstrating that she viewed her grandparents' Montvale home to be her home; (4) described the prior family residence to Petitioner as "your house, our house, old house" evidencing that she no longer viewed the Belgium house as her home, but rather as her dad's house or their old house; and (5) when Petitioner

raised the idea of the children being in Europe for the summer, A.L.S. had no response and changed the subject demonstrating that she had no knowledge of a planned return.  <u>See</u> Proposed Findings at ¶¶ 104-105.

ix.   In her testimony, A.L.S. described her home in Montvale as "my street" and spoke at length about her friends, school, and activities here.  She also testified that she does not want to return to Belgium because her friends are here and her friends in Belgium have moved on and so has she.  <u>See</u> Proposed Findings at ¶¶ 119-122.

**b.   The children were old enough to acclimatize as of July 10, 2019.**

*Whiting v. Krassner*, 391 F.3d 540, 550-51 (3d Cir. 2004){ TA \s "Whiting v. Krassner, 391 F.3d 540, 551 (3d Cir. 2004)" } (Acclimatization is key where a child is "of an age at which it is cognizant of his or her surroundings, but also of an age at which it is able to develop a certain routine and acquire a sense of environmental normalcy.  A four-year old child . . .  certainly has this ability.  A child of such age is not only aware of those around him, but is able to form meaningful connections with the people and places he encounters each day.").

**<u>FACTS</u>:**

43

      i.       The parties' son, A.H.S., was three years and ten months old in July 2019 (with his fourth birthday approaching in October 2019.  He was four years and seven months old in April 2020 when Petitioner filed the instant matter.  The parties' daughter, A.L.S., was nine years and seven months old in July 2019 (having turned nine in December 2018).  She was ten years and five months old in April 2020 when Petitioner filed the instant matter.  <u>See</u> Proposed Findings at ¶¶ I(E)(1)-(2).

      ii.     Based upon the fact set in support of II(B)(1)(a) above, the children were mature enough at those ages to "develop a certain routine and acquire a sense of environmental normalcy" and "to form meaningful connections with the people and places he encounters each day."

**c.**     **The children were residing in New Jersey long enough to acclimatize.**  *Karkkainen*, 445 F.3d at 291{ TA \s "Karkkainen v. Kovalchuk, 445 F.3d 280, 292 (3d Cir. 2006)" } (period of less than three months sufficient for acclimatization); *In re Bates*, No. CA 122-89 (period of four months sufficient for acclimatization); *Feder*, 63 F.3d at 224{ TA \s "Feder v. Evans-Feder, 63 F.3d 217, 222 (3d Cir. 1995)" } (period of close to six months sufficient for acclimatization); *Roszkowski*, 274 N.J. Super. at 626-27{ TA \s "Roszkowski, 274 N.J. Super. at 627" } (period of six months sufficient for acclimatization).

**FACTS:** It is undisputed that Petitioner agreed that Respondent and the children would live in New Jersey for the entirety of the 2018-2019 school year from August 2018 through July 2019. A period of a year in the life a child given the connections they made during that period, is certainly a sufficient period to acclimatize. <u>See</u> Proposed Findings at ¶¶ I(G)(65)-(70).

d.   **Where the children lived for the majority of their life prior to a relocation is immaterial as the pertinent inquiry is the period immediately preceding an alleged wrongful retention.** A court cannot place "undue emphasis on the fact that the majority of [a child's] years had been spent" in a prior location while "ignoring" the period of time lived in the location immediately preceding an alleged wrongful removal or retention. *Feder*, 63 F.3d at 224{ TA \s "Feder v. Evans-Feder, 63 F.3d 217, 222 (3d Cir. 1995)" } (holding that Australia was the four-year-old child's habitual residence after six months of living there despite that he had resided in the United States for over three years); *see also Karkkainen*, 445 F.3d 280{ TA \s "Karkkainen v. Kovalchuk, 445 F.3d 280, 292 (3d Cir. 2006)" } (holding that the United States was the eleven-year-old child's habitual residence after three months of living there despite that she had resided in Finland for the prior six years of her life); *Roszkowski*, 274 N.J. Super. at 627{ TA \s "Roszkowski, 274 N.J. Super. at 627" } (holding that the United States was the four-year-old child's habitual

45

residence after six months of living there despite that he had resided in Poland for the first three years and three months of his life).

**FACTS:** While Petitioner may argue, and Respondent does not dispute, that the children spent the majority of their lives in Belgium (see Proposed Findings at ¶¶ I(D)(15); I(E)(1)-(2); I(F)(26); I(F)(28)-(29); I(F)(31)), same is immaterial to the determination of habitual residence as the analysis must analyze the time immediately preceding the alleged wrongful retention.

e.    **Where the children may have been headed in the future is also immaterial as the pertinent inquiry is the period immediately preceding an alleged wrongful retention.** *See Feder*, 63 F.3d at 222{ TA \s "Feder v. Evans-Feder, 63 F.3d 217, 222 (3d Cir. 1995)" } (A party's "future intentions" for the child to reside elsewhere is "irrelevant" to the inquiry as to the child's habitual residence.).

**FACTS:** The parties disagree about their future intent – although the evidence demonstrates, as set forth herein, that the parties shared an intent, but Petitioner misrepresented his intent. Respondent asserts that the parties had agreed to leave Belgium permanently and that she would stay in New Jersey with the children until Petitioner made his next move. Petitioner claims that Respondent and the children were supposed to return to Belgium in July 2019 to live there for maybe another year and he would continue thereafter to seek employment in the United States. See Proposed Findings at ¶¶

I(H)(71)-72); I(H)(75)-(77); I(H)(80)-(83).  These disputed facts are not relevant to the analysis, which must examine where the children where habitually resident as of July 10, 2019, which, the evidence has shown was New Jersey and not Belgium.

2.      **The parties had a shared intent to abandon Belgium.**  *Maxwell v. Maxwell*, 588 F.3d 245, 251 (4th Cir. 2009){ TA \s "Maxwell v. Maxwell, 588 F.3d 245, 251 (4th Cir. 2009)" } (The court must determine "whether the parents shared a settled intention to abandon the former country of residence."); *Monasky v. Taglieri*, 140 S. Ct. 719, 726-27 (2020){ TA \s "Monasky v. Taglieri, 140 S. Ct. 719, 727 (2020)" } (The habitual residence does <u>not</u> depend on "an actual agreement between a child's parents" but rather requires "a fact-sensitive" and "fact-driven inquiry" that is "sensitive to the unique circumstances of the case and informed by common sense." (internal quotation marks and citations omitted)).

**<u>FACTS:</u>**

i.      The parties were an international couple who lived as ex-patriates in Belgium never truly integrating themselves into local culture or society and never intending to remain their permanently.  They were not from Belgium, they never sought citizenship in Belgium, they never sought Belgian citizenship for their children despite being born there, they have no family in Belgium.  They never purchased property in Belgium, but instead rented in ex-patriate communities and, when they moved to a new rental in 2016, they did not unpack

all of their belongings and Petitioner warned Respondent not to alert the landlord of their intention to move out of Belgium. Their friends were primarily other non-Belgian, English-speaking ex-patriates. The only car they purchased in Belgium they let fall into disrepair, they spent holidays and breaks outside of Belgium, and they filed tax returns in Belgium as "non-residents." Petitioner worked for an American company in Belgium traveling frequently outside of Belgium. Respondent worked for an international school taught in English on an America-based curriculum designed for the ex-patriate community. The parties primarily spoke English at home. They also agreed that their children's formal schooling would be in English and, to that end, their daughter attended the same school in which Respondent worked. Even the parties' daughter's activities were primarily with other ex-patriate children through her international school or with Petitioner's family outside of Belgium. Although the parties' son was in a French-speaking daycare, he refused to speak to the staff in French and, instead, responded in English. <u>See</u> Proposed Findings at ¶¶ I(B)(1)-(14); I(C)(1)-(11); I(D)(1)-(16); I(E)(1)-(7); I(F)(1)-(30).

ii. Petitioner's position was a movable set of skills and his position at J&J were generally in cycles of three to four years of work before moving to a new position. As such, the parties routinely discussed Belgium being a temporary jumping off point for Petitioner's career.

The parties came close and made preparation to leave Belgium for Sweden in 2009.  They were then delayed from moving by having children and fertility issues, including two miscarriages.  Then, in 2016, the parties made it their goal to leave Belgium.  To that end, Petitioner applied for 16 positions outside of Belgium from March 2016 through May 2018, the majority of which (9) were in the United States and more than a third of which (6) were specifically in New Jersey.  In addition to those jobs to which Petitioner applied, he routinely forwarded or blind copied emails to Respondent respecting positions outside of Belgium and expressed in those emails the parties' preference for and immigration status to relocate to the United States.  The parties even went to the American consulate to explore the immigration process for Petitioner.  The parties had specific discussions during this period regarding New Jersey and where they would move to within the state.  The parties took all of the steps necessary in the spring of 2017 to leave Belgium for Japan (in spite of a 9-year lease).  See Proposed Findings at ¶¶ I(D)(8); I(D)(14); I(D)(16); I(F)(9); I(F)(12); I(G)(1)-(78).

iii.    Knowing that Belgium was temporary, Respondent always maintained her ties to the United States.  She maintained her United States driver's license, teaching certificates, bank account, and credit card.  She continued to file United States federal income tax returns and vote in United States elections.  She even kept her

maiden name upon her marriage to Petitioner because all of her United States documents were in her maiden name.  See Proposed Findings at ¶¶ I(C)(11); I(F)(16)-(22).

iv.  In the spring of 2018, the parties mutually agreed that Respondent and the children would move to the United States.  The stated goal in various email correspondence from Respondent was to settle the family in New Jersey as their new home.  Petitioner represented that he would seek employment in New Jersey to join his family there and that they could stay in New Jersey if he had a job there or a good perspective of employment there.  Based on the parties agreement to leave Belgium, Respondent packed everything she and the children would need and packed those belongings she wanted to keep in boxes that she left in the hall to be shipped to New Jersey. The parties discussed downsizing, returning furniture and antiques to Petitioner's family, and J&J funding the moving of their remaining belongings as part of a relocation package.  The parties also had a going away party for their daughter.  Petitioner cooperated in their daughter's enrollment in school in New Jersey and drove Respondent and the children to the airport on August 20, 2018 and provided a travel authorization for customs.  See Proposed Findings at ¶¶ I(G)(54); I(G)(59); I(G)(64)-78); I(H)(1)-(4).

v.  After Respondent came to New Jersey with the children, she made substantial efforts, as the parties had discussed and agreed, to

acclimatize herself and the children in New Jersey.  Petitioner knew and approved of all such actions and encouraged his children in this regard.  Petitioner represented to friends that he would be seeking employment and joining Respondent and the children in New Jersey.  He took three lengthy trips to New Jersey to visit his family during which he worked at J&J's New Jersey offices and explored the tri-state area with his family on the weekends.  The parties continued to discuss New Jersey as their future throughout 2018-2019 including where in New Jersey they would buy a house and if Petitioner could commute to Raritan from Montvale.  As late as February 2019, Petitioner continued to (falsely, as he actually applied to not a single position in New Jersey) represent to Respondent that he was making efforts to come to New Jersey.  These actions and representations by Petitioner thereby solidified his prior representations that he would be coming to New Jersey as the family's new home and confirm the parties' shared intent.  See Proposed Findings at ¶¶ I(G)(62); I(G)(68); I(H)(7)-(68); I(H)(72)-(74); I(H)(78)-(79); I(H)(88)-(100); I(H)(103)-(113).

3.    **Even if the parties did not have a shared intent to abandon Belgium, they presented a unified intention to the children that impacted the children's understanding of their new home and signaled to the children to acclimatize to New Jersey.**  *Karkkainen*, 445 F.3d at 292{ TA \s "Karkkainen v. Kovalchuk, 445 F.3d 280, 292 (3d Cir. 2006)" } (With respect to

the parental intent, a lesser part of the total analysis, same should be considered as part of the inquiry "because the child's knowledge of these intentions is likely to color its attitude to the contacts it is making."); *Whiting v. Krassner*, 391 F.3d 540, 550 (3d Cir. 2004){ TA \s "Whiting v. Krassner, 391 F.3d 540, 551 (3d Cir. 2004)" } (It "'seem[s] implicit in the concept of acquiring a new 'habitual' residence that the previous 'habitual' residence has been left behind or discarded.'")  *Rodriguez v. Lujan Fernandez*, No. 3:19-CV-00872, 2020 WL 6566036{ TA \l "*Rodriguez v. Lujan Fernandez*, No. 3:19-CV-00872, 2020 WL 6566036" \s "Rodriguez v. Lujan Fernandez, No. 3:19-CV-00872, 2020 WL 6566036" \c 1 } (M.D. Tenn. Nov. 9, 2020) (The Court should assess whether the children would likely perceive that they arrived in the United States with "the settled purpose to leave" the prior country of habitual residence behind and make a new habitual residence in the new country.).

## **FACTS:**

1.  Before departing Belgium for New Jersey, Petitioner was fully engaged and involved in the relocation of Respondent and the children thereby signaling to the children that New Jersey would be their new home.  The parties were in agreement about the relocation and the children's attendance at school.  Petitioner cooperated in their daughter's enrollment in school including taking her for a vaccine in France.  Petitioner expressed his happiness that their daughter was enrolled in school in Montvale and encouraged her to

embrace New Jersey.  Petitioner drove Respondent and the children to the airport to depart for New Jersey.  The parties threw a going away party for their daughter before leaving Belgium.  Respondent packed more belongings than she would have for a vacation and packed and stacked boxes in the hallway to be shipped to New Jersey that the children would have seen.  See Proposed Findings at ¶¶ I(G)(65)-(69); I(G)(75)-(78); I(H)(2).

2.   Upon their arrival in New Jersey, the children moved in with their grandparents in a familiar environment.  Their daughter began school and Respondent enrolled her in substantial activities.  Their son began daycare and also participated in various activities.  The children began seeing a new pediatrician and continued seeing their dentist in New Jersey.  The children observed Petitioner's approval and encouragement of their integration in New Jersey through routine FaceTime communications.  Petitioner also paid half of their summer 2019 activities, came to their activities such as softball and French camp whenever he was visiting, and supported them in their New Jersey acclimatization, such as listening to their daughter's student government speech and visiting daycares for their son before one was selected.   See Proposed Findings at ¶¶ I(H)(6)-(68); I(H)(72)-(74); I(H)(78)-(79); I(H)(88)-(100); I(H)(103)-(113).

3.   The children also observed Petitioner being able to work in New Jersey during his three lengthy visits during the 2018-2019 school

53

year.  On his visits, Petitioner also helped the children acclimatize to their new country by exploring New Jersey and the surrounding states during his visits.  All of Petitioner's actions signaled to the children that New Jersey was their new home.  <u>See</u> Proposed Findings at ¶¶ I(H)(27)-(33); I(H)(63); I(H)(89).

4.    In addition, the children observed Respondent taking steps to root herself in New Jersey including updating her teaching certificates, getting a job, obtaining New Jersey health insurance, voting in New Jersey, filing New Jersey tax returns, and purchasing a car.  As such, Respondent's actions, undertaken with Petitioner's knowledge and consent also affirmed to the children that New Jersey was their new home.   <u>See</u> Proposed Findings at ¶¶  I(H)(13)-(16);  I(H)(25); I(H)(43)-(46);    I(H)(54)-(57);    I(H)(73)-(74);    I(H)(78)-(79); I(H)(88); I(H)(106).

5.    The children also saw their grandfather become sick in New Jersey and how their mother, Respondent, needed to be there to help, which further solidified that they would not be returning to Belgium.  <u>See</u> Proposed Findings at ¶¶ I(H)(85)-(86).

4.    **Even if Petitioner only intended for the children to spend a year in New Jersey, such a period of time is, as was the case here, sufficient for children to acclimatize and transfer their habitual residence.**  Shared parental intent for a stay in a location limited period can be sufficient to establish such location as the child's habitual residence. *See Feder*, 63 F.3d

54

at 223{ TA \s "Feder v. Evans-Feder, 63 F.3d 217, 222 (3d Cir. 1995)" } (quoting *In re Bates*, No. CA 122-89, High Court of Justice, Family Div'l Ct. Royal Courts of Justice, United Kingdom (1989)) (holding that New York had become the child's habitual residence where the father agreed for the child to remain there for a minimum of four months with her mother from January 1989 at least through his return in April 1989)); *Whiting*, 391 F.3d at 547{ TA \s "Whiting v. Krassner, 391 F.3d 540, 551 (3d Cir. 2004)" } (holding that an agreement for the parties' child to move to Canada with her mother for a period of two years evidenced an intent to abandon New York as the child's habitual residence even if the intent was for the child to return to New York after those two years had elapsed); *Feder*, 63 F.3d at 222{ TA \s "Feder v. Evans-Feder, 63 F.3d 217, 222 (3d Cir. 1995)" } (holding that the mother's intention to return to the Unites States and for the relocation to Australia to be temporary in nature was irrelevant to the finding that Australia had become the child's habitual residence).  While shared parental intent can support a finding of acclimatization by a child, "[h]abitual residence is intended to be a description of a factual state of affairs, and a child can lose its habitual attachment to a place even without a parent's consent." *Karkkainen*, 445 F.3d at 295{ TA \s "Karkkainen v. Kovalchuk, 445 F.3d 280, 292 (3d Cir. 2006)" } (internal quotation marks and citations omitted); *see also Feder*, 63 F.3d at 223{ TA \s "Feder v. Evans-Feder, 63 F.3d 217, 222 (3d Cir. 1995)" } ("All that the law requires is a settled purpose.  That is not to say that the propositus intends to stay where he is indefinitely.  Indeed his

purpose while settled may be for a limited period. . . . All that is necessary is that the purpose of living where one has a sufficient degree of continuity to be properly described as settled.); *Whiting*, 391 F.3d at 547{ TA \s "Whiting v. Krassner, 391 F.3d 540, 551 (3d Cir. 2004)" } (Where an "agreed-upon stay" is to be "of a limited duration," that fact "in no way hinders the finding of a change in habitual residence.  Rather, . . . the parties' settled purpose in moving may be for a limited period of time."); *Feder*, 63 F.3d at 222{ TA \s "Feder v. Evans-Feder, 63 F.3d 217, 222 (3d Cir. 1995)" } (A party's "future intentions" for the child to reside elsewhere is "irrelevant" to the inquiry as to the child's habitual residence."

**<u>FACTS</u>:**

x.      It is undisputed that Petitioner agreed that Respondent and the children would live in New Jersey for the entirety of the 2018-2019 school year from August 2018 through July 2019.  <u>See</u> Proposed Findings at ¶¶ I(G)(65)-(70).

xi.     The children acclimatized quickly in New Jersey making friends fast and integrating into society in New Jersey.  The parties' daughter was completely caught up academically by December 2018 despite starting the year six (6) months behind.  Her third grade teacher described A.L.S. as "helpful, kind, and easygoing" and "progressing nicely in all subject matters."  The parties' daughter's softball coach described A.L.S. as well adjusted with a great attitude, "very mature for her age at that level," and interacting well and making friends

56

with all her teammates.  The parties' son's daycare teacher described A.H.S. as "very well behaved," "very polite," "very happy," and a "well-adjusted kid."  <u>See</u> Proposed Findings at ¶¶ I(H)(9) (11) (67) (90) (92) (94)-(97).

xii.  The shift of the children's habitual residence to New Jersey is clear in their daughter A.L.S.'s statements during the June 21 and July 2, 2019 video calls with her parents wherein she (1) responded to Petitioner solely in English when he spoke to her in French; (2) spoke enthusiastically about her friends, activities, and events; (3) described where her friends lived in Montvale relation to "my house" thereby demonstrating that she viewed her grandparents' Montvale home to be her home; (4) described the prior family residence to Petitioner as "your house, our house, old house" evidencing that she no longer viewed the Belgium house as her home, but rather as her dad's house or their old house; and (5) when Petitioner raised the idea of the children being in Europe for the summer, A.L.S. had no response and changed the subject demonstrating that she had no knowledge of a planned return.  <u>See</u> Proposed Findings at ¶¶ 104-105.

**C.**  **Even if Petitioner Met His Burden, Which He Did Not, Respondent Has Met Her Burden to Demonstrate her Applicable Affirmative Defenses.**

**1.**  **The Children Would Face an Intolerable Situation Were They Forcibly Returned to Belgium.**  Respondent has the burden of proof under 22 U.S.C.

§ 9003(e)(2){ TA \l "22 U.S.C.A. § 9003(e)(2)" \s "22 U.S.C.A. § 9003(e)(2)" \c 2 } to prove by clear and convincing evidence that "[t]here is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."   Hague Convention, art. 13(b).

**FACTS:**  Petitioner was an absentee father when the family resided together in Belgium.  He worked long hours, was rarely home before the children were in bed, was not involved in the children's daily routine, and traveled often for work.  When Petitioner was not traveling for work, he elected to travel, without his family, to attend to his own personal business or for his own pleasure being gone for weeks at a time for the World Cup.  He even missed family vacations due to his own personal travel and was absent when Respondent had her miscarriages.  Respondent was, is, and always has been the children's primary (and almost sole) caretaker responsible for their daily routine, school, food, activities, playdates, doctor's appointments, grooming, etc.  Since the parties are now divorced, Respondent has no ability to work and therefore reside in Belgium.  Forcing the children to Belgium would separate them from their mother and primary caretaker with little recourse for her to be with them.  As Petitioner remains employed as a high-powered executive, the children would return to be raised by a stranger as Petitioner would undoubtedly require a nanny to raise the children while he worked.  See Proposed Findings at ¶¶ I(B)(13)-(14); I(E)(6); I(F)(6).

2.     **The Children Are Well Settled in New Jersey.**  Respondent has the burden of proof under 22 U.S.C. § 9003(e)(2){ TA \s "22 U.S.C.A. § 9003(e)(2)" } by a preponderance of the evidence that the children are "now settled in [their] new environment." Hague Convention, art. 12.  A court is not bound to order the return of a child if the respondent demonstrates that (a) the proceedings were commenced more than one year after the date of the wrongful removal or retention, and (b) the child is now settled in its new environment.

**FACTS:**  See Facts set forth in Section (II)(B) above.  See also Proposed Findings at ¶¶ I(H)(115)-(122).

3.     **Petitioner Consented and/or Acquiesced to the Children Residing in New Jersey.**  Respondent has the burden of proof under 22 U.S.C. § 9003(e)(2){ TA \s "22 U.S.C.A. § 9003(e)(2)" } by a preponderance of the evidence that Petitioner "consented to or subsequently acquiesced in the removal or retention." Hague Convention, art. 13(a).

**FACTS:**  See Facts set forth in Section (II)(B) above.

4.     **The Parties' Daughter, A.L.S., Objects to Returning to Belgium, she is Mature Enough to Take Her View into Account, and the Children Must Not be Separated.**  Respondent has the burden of proof under 22 U.S.C. § 9003(e)(2){ TA \s "22 U.S.C.A. § 9003(e)(2)" } by a preponderance of the evidence that the child(ren) "objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention, art. 13.  Specifically, Respondent must show

that the children have "attained an age and degree of maturity at which it is appropriate to take account of [their] views," and that they "object[] to being returned." *Rodriguez v. Yanez*, 817 F.3d 466, 474 (5th Cir. 2016){ TA \l "*Rodriguez v. Yanez*, 817 F.3d 466, 474 (5th Cir. 2016)" \s "Rodriguez v. Yanez, 817 F.3d 466, 474 (5th Cir. 2016)" \c 2 } (internal quotation marks omitted) (quoting *Vasconcelos v. Batista*, 512 Fed. App'x 403, 405-08 (5th Cir. 2013){ TA \l "*Vasconcelos v. Batista*, 512 Fed. App'x 403, 405-08 (5th Cir. 2013)" \s "Vasconcelos v. Batista, 512 Fed. App'x 403, 405-08 (5th Cir. 2013)" \c 2 }). "[A] mature child's views on return can be 'conclusive.'" *Custodio v. Samillan*, 842 F.3d 1084, 1091 (8th Cir. 2016){ TA \l "*Custodio*, 842 F.3d at 1091" \s "Custodio, 842 F.3d at 1091" \c 2 }.  "[I]n other words, a district court can decline to order return of a wrongfully retained or removed child on that ground alone." *Haimdas v. Haimdas*, 720 F. Supp. 2d 183, 204 (E.D.N.Y. 2010){ TA \l "*Haimdas*, 720 F. Supp. 2d at 204" \s "Haimdas, 720 F. Supp. 2d at 204" \c 1 }; *Blondin v. Dubois*, 238 F.3d 153, 166 (2d Cir. 2001){ TA \l "*Blondin v. Dubois*, 238 F.3d 153, 166 (2d Cir. 2001)" \s "Blondin v. Dubois, 238 F.3d 153, 166 (2d Cir. 2001)" \c 1 } ("a court may refuse repatriation solely on the basis of a considered objection to returning by a sufficiently mature child"). Where, as here, there is a case of siblings, returning a younger sibling alone would create psychological turmoil, would be "cruel," "further fracture the family unit" and be manifestly misguided, in light of the principle that the sibling relationship should be protected, and that children's relationships with their siblings are the type

of intimate human relationships that are afforded a substantial measure of sanctuary from unjustified interference by the state. *Application of Blondin v. Dubois*, 78 F. Supp. 2d 283, 291 (S.D.N.Y. 2000){ TA \l "*Application of Blondin v. Dubois*, 78 F. Supp. 2d 283, 291 (S.D.N.Y. 2000)" \s "Application of Blondin v. Dubois, 78 F. Supp. 2d 283, 291 (S.D.N.Y. 2000)" \c 1 }, aff'd sub nom. *Blondin v. Dubois*, 238 F.3d 153, 290, n.9 (2d Cir. 2001){ TA \s "Blondin v. Dubois, 238 F.3d 153, 166 (2d Cir. 2001)" }; *Broca v. Giron*, No. 11 CV 5818 SJ JMA, 2013 WL 867276, at *9 (E.D.N.Y. Mar. 7, 2013){ TA \l "*Broca v. Giron*, No. 11 CV 5818 SJ JMA, 2013 WL 867276, at *9 (E.D.N.Y. Mar. 7, 2013)" \s "Broca v. Giron, No. 11 CV 5818 SJ JMA, 2013 WL 867276, at *9 (E.D.N.Y. Mar. 7, 2013)" \c 1 }, aff'd, 530 F. App'x 46 (2d Cir. 2013). Courts have routinely "declined to separate siblings, finding that the sibling relationship should be protected even if only one of the children can properly raise an affirmative defense under the Hague Convention." *Ermini v. Vittori*, No. 12 CIV. 6100 LTS, 2013 WL 1703590, at *17 (S.D.N.Y. Apr. 19, 2013){ TA \l "*Ermini v. Vittori*, No. 12 CIV. 6100 LTS, 2013 WL 1703590, at *17 (S.D.N.Y. Apr. 19, 2013)" \s "Ermini v. Vittori, No. 12 CIV. 6100 LTS, 2013 WL 1703590, at *17 (S.D.N.Y. Apr. 19, 2013)" \c 1 }, aff'd as amended, 758 F.3d 153 (2d Cir. 2014).

**FACTS:** <u>See</u> Facts set forth in Section (II)(B) above.

D.   **To the Extent Petitioner Continues to Seek Counsel Fees, He is Not Entitled to Any as (1) He Should Not Prevail on His Petition; and (2) Should He Prevail, It Would be Clearly Inappropriate to Award Fees Based Upon the Financial**

**Positions of the Parties and the Reasonable Basis Upon Which Respondent Acted in this Matter.**  As part of his Petition, Petitioner has requested counsel fees under 22 U.S.C. § 9007{ TA \l "22 U.S.C. § 9007" \s "22 U.S.C. § 9007" \c 2 }.  "Article 26 of the Hague Convention provides that a court 'may' award 'necessary expenses' to a prevailing petitioner," and then "§ 11607(b)(3) shifts the burden onto a losing respondent in a return action to show why an award of 'necessary expenses' would be 'clearly inappropriate.'"  *Ozaltin v. Ozaltin*, 708 F.3d 355, 375 (2d Cir. 2013){ TA \l "*Ozaltin v. Ozaltin*, 708 F.3d 355, 375 (2d Cir. 2013)" \s "Ozaltin v. Ozaltin, 708 F.3d 355, 375 (2d Cir. 2013)" \c 1 } (quoting 42 U.S.C. § 11607(b)(3){ TA \l "42 U.S.C. § 11607(b)(3)" \s "42 U.S.C. § 11607(b)(3)" \c 2 }).  As such, an award of fees is both permissive and rebuttable.  Consideration of "the financial situation of the respondent, particularly where a large award of expenses could potentially impair the respondent's ability to provide for the child" is appropriate when determining if an award of counsel fees would be "clearly inappropriate."  *Cillikova v. Cillik*, No. CV152823MCALDW, 2016 WL 541134, at *5 (D.N.J. Feb. 9, 2016){ TA \l "*Cillikova v. Cillik*, No. CV152823MCALDW, 2016 WL 541134, at *5 (D.N.J. Feb. 9, 2016)" \s "Cillikova v. Cillik, No. CV152823MCALDW, 2016 WL 541134, at *5 (D.N.J. Feb. 9, 2016)" \c 1 }; *see also De La Vera v. Holguin*, No. CIV.A. 14-4372 MAS, 2014 WL 4979854, at *13 (D.N.J. Oct. 3, 2014){ TA \l "*De La Vera v. Holguin*, No. CIV.A. 14-4372 MAS, 2014 WL 4979854, at *13 (D.N.J. Oct. 3, 2014)" \s "De La Vera v. Holguin, No. CIV.A. 14-4372 MAS, 2014 WL 4979854, at *13 (D.N.J. Oct. 3, 2014)" \c 1 } ("Respondent's financial circumstances and inability to pay" made an award of counsel fees and clearly inappropriate).  Moreover, an

award of counsel fees would be "clearly inappropriate" where a respondent had "a reasonable basis" for removing or retaining the child(ren) or where, "contrary to the spirit of the Hague Convention, the [petitioner] may have engaged in forum shopping with respect to certain aspects of this suit." *Ozaltin*, 708 F.3d at 375{ TA \s "Ozaltin v. Ozaltin, 708 F.3d 355, 375 (2d Cir. 2013)" }.

**FACTS:** <u>See</u> Facts set forth in Section (II)(B) above regarding why Petitioner's case fails and why Respondent acted with a reasonable basis. As to the parties' income, Petitioner is a high-powered financial executive at J&J with a multi-faceted income package. He owns an apartment and a medical clinic in Paris. He can afford $90,000 per year in school tuition and he was the family's "main provider." In contrast, Respondent is a school teacher who has supported the children without Petitioner's financial assistance for the last almost four years. <u>See</u> Proposed Findings at ¶¶ I(I)(1)-(2).

## III.   CONCLUSION

For all of these reasons, Petitioner's Hague Convention Petition must be denied. Petitioner failed to meet his burden of proof that the children were habitual residents of Belgium as of July 10, 2019 after they had been living in and integrating into society in New Jersey, with his knowledge and consent, for almost an entire year. The facts and evidence demonstrate that, under the totality of the circumstances, the children were not wrongfully retained in New Jersey because their habitual residence had shifted to the United States, and New Jersey in particular, as of July 10, 2019.

**A.Y. STRAUSS, LLC**
*Attorneys for Respondent*

By:  _/s/Kory Ann Ferro_____

Dated: May 25, 2022            KORY ANN FERRO


**DARIO, ALBERT, METZ,
EYERMAN, CANDA, CONCANNON,
ORTIZ & KROUSE**
*Attorneys for Respondent*

By:  _/s/ Shelley Albert_____

Dated: May 25, 2022            SHELLEY ALBERT