<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **CHRISTOPHE SOULIER,**<br><br>*Petitioner*,<br>**v.**<br><br>**AKIKO MATSUMOTO**<br><br>*Respondent.* | **Civil Action No. 20-4720**<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

**ARLEO, UNITED STATES DISTRICT JUDGE**

**I.  INTRODUCTION**

In 1998, Petitioner Christophe Soulier ("Soulier" or "Petitioner"), a French and Swedish national, met Respondent Akiko Matsumoto ("Matsumoto" or "Respondent"), a United States and Japanese national, while she was studying in Paris.  In 2004, the two married in Brussels, Belgium, and except for a year living in Rome, the couple had lived continuously in Belgium, started a family there, and until 2018, called Brussels their home.  Like many young families, both parents worked, the children, A.L.S. and A.H.S., attended school, and the family spent its free time attending the children's activities, visiting relatives in nearby France, and developing a circle of new neighbors and friends in their multi-cultural Belgian community.

In August 2018, after a planned relocation to Japan for a career opportunity for Petitioner fell through at the last minute, and the parents were not able to register their children in their desired Brussels private school thereafter, Respondent suggested and Petitioner agreed to move the children to Montvale, New Jersey—the town where Respondent grew up, and where the

1

children could attend school for free for the year and live with Respondent's parents.  At his wife's insistence, Petitioner agreed to spend the 2018-2019 school year living alone in Brussels and visiting his family as often as he could.  Both parents agreed that if Petitioner could secure permanent employment in New Jersey that year, the family would relocate to the United States.  Unfortunately, Petitioner was unable to do so.

Respondent refused to return to Belgium with the children at the end of the school year and instead filed for custody in New Jersey state court.  Petitioner then filed this action seeking return of the children to Belgium pursuant to the 1980 Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention").  Compl. ¶ 1, ECF No. 1.  The Covid-19 pandemic made it difficult and often impossible for Petitioner to even visit his children in New Jersey during 2020 and 2021 and to move forward expeditiously with this action.

From April 27-29, 2022, the Court conducted a three-day bench trial, during which the parties were afforded a full opportunity to be heard, examine and cross-examine witnesses, present evidence bearing on the issues, and argue the law and evidence.  The principal contested issues are (1) whether Respondent had "wrongfully retained" A.L.S. and A.H.S. in New Jersey as of July 10, 2019 without Petitioner's consent; (2) if she had, whether the United States or Belgium was the children's "habitual residence" immediately prior to the date of wrongful retention; and (3) if the habitual residence was Belgium, whether Respondent has any affirmative defenses.  The Court makes the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a) and finds that Respondent wrongfully retained the children in New Jersey in July 2019.  For the reasons set forth below, Soulier's Petition is granted.

## II.   FINDINGS OF FACT

Having considered and weighed the testimony and evidence presented by the parties, the Court makes the following findings of fact.

### A.   The Parties

1. Petitioner was born in Sweden and raised in France, and is a citizen of both Sweden and France.  ECF No. 110, Joint Final Pre-Trial Conference Order, Stipulated Facts ("Stip. Facts") ¶¶ i-ii.

2. Respondent was born in Japan as a Japanese citizen, but moved to New Jersey at the age of five and was subsequently raised in Montvale, New Jersey.  T2 23:15-24:2;[1] Stip. Facts ¶ viii.  Respondent became a naturalized United States citizen in 2003 before moving to Brussels.  T2 23:17-24:2, 49:10-50:5.  Once she became a United States citizen, she was not permitted to maintain dual nationality with Japan, so she allowed her Japanese passport to expire in 2012.  T2 23:24-24:8.

### B.   The Parties' Early Relationship

3. The parties met while Respondent was spending six months as an exchange student in Paris, France.  T1 19:14-17.  Petitioner was living in Stockholm, Sweden finishing his graduate degree at Stockholm School of Economics at the time.  Stip. Facts ¶¶ iii-iv; T2 6:20-7:2.  The parties began a long-distance relationship in 1998.  Stip. Facts ¶ xiii; T1 19:18-22.

4. Respondent graduated from The College of New Jersey in 2000.  Stip. Facts ¶ x.  She was a Teacher of the Deaf in New Jersey from 2000 to 2002. Stip. Facts ¶ xi.  Respondent

---

[1] The Court refers to the trial transcript from April 27, 2022 as "T1," from April 28, 2022 as "T2," and from April 29, 2022 as "T3."

attended graduate studies at Harvard University, where she graduated in 2003.  Stip. Facts ¶¶ ix, xii.

5. Petitioner attended graduate studies at the University of Michigan, where he graduated with a master's degree in 2002.  Stip. Facts ¶¶ iii, v.  At the end of his master's program, he began searching for employment with American healthcare companies.  T2 9:19-24.  He secured employment with Johnson & Johnson ("J&J") and was recruited to work in Europe.  T2 10:3-6.  The parties agreed on a placement in Brussels, Belgium because they both spoke French.  T2 10:17-11:3.  Petitioner moved to Brussels in 2002 and began his career with J&J.  Stip. Facts ¶ vi.

6. Respondent moved to Brussels, Belgium to join Petitioner in 2003, and the parties resided there together until 2004.  Stip. Facts ¶ xiv.  The parties were married in Brussels on July 2, 2004.  Stip. Facts ¶ xvi.

7. The parties resided together in Rome, Italy from 2004 to 2005 for twelve months.  Stip. Facts ¶ xvii.

8. The parties moved back to Brussels in the summer of 2005 when Petitioner accepted a different position at J&J in a newly formed European division.  T2 18:16-19:14.

**C. The Parties' Children**

9.  The parties' daughter, A.L.S., was born in Brussels, Belgium on December 5, 2009.  Stip. Facts ¶ xix.

10. The parties' son, A.H.S., was born in Brussels, Belgium on October 5, 2015.  Stip. Facts ¶ xx.

11. The children are citizens of the United States and France, and thus, the European Union.  T1 62:6-64:3.  The children are not citizens of Belgium, and the parties never sought to

obtain Belgian citizenship for the children.  T1 118:23-119:12; T2 52:10-21.  Petitioner also never sought Belgian citizenship because as a European Union citizen, he had full freedom to move and be treated equally to Belgian citizens.  T1 62:13-63:13.  Similarly, as the wife and mother of European Union citizens, Respondent had full access to Belgium healthcare, social services, and employment, making it unnecessary to seek citizenship in Belgium.  Id.

12. While in Brussels, the children spoke both French and English.  The parties agreed to a "one person, one language" principle, whereby Respondent would speak to the children primarily in English and Petitioner would speak to the children primarily in French.  T1 136:10-21; R-83.

**D.  The Parties' Life in Belgium**

13. The parties had a ten-year rental home in Belgium from 2006 to 2016.  T1 21:15-18.

14. The parties relocated to a larger home in Belgium in 2016 after co-signing a nine-year lease effective November 1, 2016.  Stip. Facts ¶ xxviii.  Although Petitioner had reservations about moving out of the center of Brussels, he did so in order to accommodate Respondent. T2 64:7-19.  The new home was closer to Respondent's and A.L.S.'s school and A.H.S.'s daycare and was on a quiet street outside the center of Brussels.  Id.; T1 23:22-24:3.

15. The parties filed joint tax returns in Belgium (including for the 2017 tax year) "benefitting from a specific regime that is available for foreigners that work in Belgium" that requires a filer to be a foreigner with a link to a country other than Belgium.  T1 171:18-172:8; T2 51:2-52:9.  Respondent also continued to file tax returns in the United States and vote in United States elections while living in Belgium.  T1 172:9-14; T2 50:6-10.

16. While residing in Belgium, Respondent worked for the St. John's International School from 2003 until 2004, for Community Health Services from 2006 until 2008, and for the International School of Brussels ("ISB") from December 2006 until June 2018.  Stip. Facts ¶ xxi.

17. A.L.S. attended a local French-speaking nursery in Brussels for two years and then started her education at ISB for six years from 2012 through 2018.  Stip. Facts ¶ xxii.  ISB educated students with an "international curriculum."  T1 24:15-25:4.  A.L.S. attended ISB for free because Respondent worked at the school; otherwise, the school would have cost roughly $45,000 per year.  T1 24:6-25:15.

18. A.H.S. attended a local French-speaking nursery in Brussels for two school years before leaving for the United States in August of 2018.  Stip. Facts ¶ xxiv.

19. The parties and their children spent much of their free time and school breaks in France, either in Paris where the children's aunts and uncles lived, at Petitioner's family beach home in Normandy, or at the family country home in Brittany, where the children spent time with their grandparents, aunts, uncles, and cousins.  T1 30:5-16, 31:5-33:2.

20.  The family also regularly visited New Jersey for a month in the summer and during winter break, where Respondent's family lives.  Stip. Facts ¶ xxvii; T2 79:9-80:21.  Petitioner accompanied them for some, but not all of such trips.  T2 82:11-20.

21. A.L.S. began taking dance classes at a local gym in Brussels from the age of four until six and then danced through ISB until June 2018.  Stip. Facts ¶ xxiii.  Beginning in kindergarten, A.L.S. engaged in after-school activities offered through and held at ISB such as piano, rock climbing, yoga, gymnastics, programming, and arts and crafts.  Id.  A.L.S. engaged in horseback riding, skiing, and sailing on vacations in France.  Id.

22. The children were under the care of a local pediatrician in Brussels since their birth until August of 2018.  Stip. Facts ¶ xxv.  The children spoke French to their pediatrician.  T2 46:15-16.

**E.  Petitioner's Employment**

23. J&J, where Petitioner works, has over 120,000 employees around the world and is headquartered in New Brunswick, New Jersey.  T1 175:9-15.

24. From 2016 to 2018, Petitioner informed J&J that he would be interested in working in New Jersey, and he searched for jobs there.  See, e.g., R-5, R-6, R-89.

25. However, Petitioner also considered and applied for several jobs outside of New Jersey, including jobs in England, Japan, Switzerland, France, Singapore, Canada, and other areas of the United States.  Stip. Facts ¶ xxix; T1 175:21-177:22.  Petitioner believed any attempts at securing a job in the United States had failed in part because a high-ranking J&J finance executive seemed to have a negative perception of Petitioner and blocked him from getting promoted or hired there.  T1 80:6-14.

26. Petitioner is currently a finance director for Janssen Pharmaceuticals, a Belgian-based subsidiary of J&J.  T1 14:21-25.

**F.  The Parties Almost Move to Tokyo, Japan**

27. In 2017, with Respondent's full support, Petitioner applied for a position with J&J in Tokyo, Japan.  Stip. Facts ¶ xxx.  The parties had planned to stay in Tokyo for two to three years and then return to Belgium.  T1 37:12-38:5.  Petitioner was familiar with the very high cost of living in Japan and thus actively negotiated with his supervisors about a potential compensation package in Japan and informed Respondent that if they could not get the proper package, then they could not afford to make the move.  T1 33:21-34:10.

28. The parties traveled to Tokyo in April 2017, began negotiations to lease an apartment there, and enrolled their daughter at the English-speaking Tokyo International School.  Stip. Facts ¶ xxx.  Japan was a desirable location for Respondent since she was born there, had relatives there, and was fluent in Japanese.  T1 33:16-20, 122:3-11; T2 264:21-24.

29. In May 2017, Respondent's employer, ISB, pressured Respondent for updates regarding the family's potential move to Tokyo, R-26; R-27; T2 104:11-23, and on May 17, 2017, Respondent resigned.   T2 111:8-16.   Respondent's resignation before the Tokyo employment contract was fully negotiated became a source of tension between Petitioner and Respondent.  T1 49:7-50:9, 51:13-23.

30. Around June 2017, Petitioner ultimately rejected the contract for the J&J Tokyo position. Stip. Facts ¶ xxxi.  The official package offered for the position was insufficient to cover the parties' costs of living in Japan.  T1 36:12-37:2.  This greatly disappointed Respondent. T1 49:7-50:9, 51:13-23; T2 117:8-119:23.

31. Since Respondent had resigned from ISB, A.L.S. was permitted to remain at ISB free of charge only through January 2018.  Stip. Facts ¶ xxxii.

32. Respondent was able to secure a temporary position at ISB for the 2017-2018 school year, enabling the parties' daughter to attend free of charge for the entire 2017-2018 school year only.  Stip. Facts ¶ xxxiii.

33. Despite interviewing for a position, Respondent was unable to secure a position at ISB for the 2018-2019 school year, and thus A.L.S. could no longer attend ISB for the 2018-2019 school year without charge.  Stip. Facts ¶ xxxiv.  The parties could not afford at that time to send their children to ISB for the 2018-2019 school year.  T1 149:8-18, 151:8-152:13.

34. The parties considered several schools in Brussels for their children to attend in the 2018-2019 school year.  Stip. Facts ¶ xxxv.  The parties ultimately applied for their children to attend the Lycée Français, an international French school in Brussels.  Stip. Facts ¶ xxxvi.  However, the Lycée Français did not have availability for A.L.S. for the 2018-2019 school year in the parties' desired English/French program, though there was availability for A.H.S. for that coming year.  Stip. Facts ¶ xxxvii; T1 44:17-45:13; T2 121:19-122:3.

35. Once the Lycée Français confirmed that there was no availability for A.L.S., A.L.S. had no schooling options in Belgium for the 2018-2019 school year because all of the other schools were fully enrolled.  T1 44:17-45:13; T2 122:9-13.  The French school did state, however, that the children would be prioritized for the following school year if still interested.  T1 45:23-25.

36. When there were no options left in Brussels, the parties agreed that the children would attend school in New Jersey for a year and live with Respondent's parents while the parties searched for more permanent schooling in Brussels.   T1  45:16-25;  T2  131:11-15.  Petitioner also agreed to look for employment opportunities in New Jersey.  T2 127:13-128:23, 132:15-133:20.

37. Petitioner testified that his and Respondent's relationship was deteriorating from spring of 2018 until she left with the children for New Jersey.  T1 48:13-49:6.  He stated that Respondent held him responsible for the failure of the Japan move and for her losing her job at ISB.  T1 49:7-50:6.

**G.  Respondent's Move to New Jersey with the Children**

38. The parties agreed that the children would attend school in Montvale, New Jersey for the 2018-2019 school year.  Stip. Facts ¶ xxxviii.

39. Petitioner encouraged A.L.S. to embrace her time in the United States.  T1 97:23-24.

40. On August 17, 2018, Respondent registered with Belgian authorities "to report her temporary absence from Belgium."  See P-2, T1 59:17-60:5.

41. It was understood by the parties' friends in Brussels, family in Paris, and the children's pediatrician that the trip to New Jersey beginning in August 2018 was to be temporary and only for one year.  T2 34:3-5; T3 10:20-11:11, 38:17-20.

42. Petitioner drove Respondent and the children to the airport on August 20, 2018 for their flight to New Jersey.  Stip. Facts ¶ xl.  Petitioner provided a written consent for Respondent to travel abroad with their children to New Jersey, because the parties understood that "travel authorization" was required when one parent travels with the children without the other parent.  Stip. Facts ¶ xli; T1 55:15-57:18; T2 148:14-149:15.

43. Upon their arrival to New Jersey on August 21, 2018, Respondent and the children stayed with Respondent's parents in the Montvale home where Respondent grew up.  Stip. Facts ¶ xlii.  The children shared a bedroom.  T2 153:15-18.  Respondent borrowed a car in New Jersey during the 2018-2019 school year, first from her parents and then from a friend.  Stip. Facts ¶ xliii.  The parties left many of the children's belongings in Brussels in August 2018.  T1 142:8-11.

44. A.L.S. was eight years old and A.H.S. was two years old when they left for New Jersey in August 2018.  T1 19:6-8.

**H. Life in New Jersey**

45. A.L.S. began third grade at Memorial Elementary School in Montvale, New Jersey in September 2018.  T2 174:20-25.

10

46. The parties routinely facilitated and initiated FaceTime communications between Petitioner and the children to keep Petitioner up to date on the children's growth, progress, and activities and to connect the children with their father.  T2 187:22-25.  Petitioner visited Respondent and the children in New Jersey for a week or two in October 2018; February 2019; and May 2019.  Stip. Facts ¶ xliv.  Petitioner planned his visits around work trips to New Jersey, so that he could work in the local J&J offices and also visit his family.  T1 79:5-10, 128:15-129:6.

47. Petitioner hoped that spending a year apart would be good for his and Respondent's relationship, but when he first visited in October 2018, he sensed no improvement between the two of them.  T1 51:18-52:6.

48. The parties kept their house in Brussels, despite the significant costs, T1 64:21-24, and did not discuss getting permanent housing of their own in New Jersey, T1 64:18-20.

49. A.L.S. began dance lessons in New Jersey in September 2018 with a friend and next-door neighbor from Brussels.  Stip. Facts ¶ liv, T1 167:12-22.  A.L.S. also joined the elementary school chorus, ran for student government, and took piano lessons and an art workshop. Stip. Facts ¶¶ lv-lvi; T1 163:8-164:2; R-68.  By spring, A.L.S. joined the Montvale recreational softball team.  Stip. Facts ¶ lviii.  Petitioner was aware of and encouraged A.L.S.'s participation in these activities.  R-66; R-72; R-73; R-77; T1 168:10-15.

50. Respondent did not initially have a job in New Jersey but wished to find temporary work in the United States, so the parties started discussing daycare options for A.H.S.  T1 64:25-65:10.  Respondent began applying for employment in New Jersey in October 2018.  Stip. Facts ¶¶ xlviii, xlix; R-40 to R-45.

11

51. In October 2018, A.H.S. began attending daycare at Am-Tree Developmental Nursery School, which Petitioner visited and approved.  Stip. Facts ¶ lxi; T1 158:5-18.

52. Respondent eventually accepted a temporary position as a one-on-one assistant with Bergen County Special Services on November 18, 2018.  R-42.

53. A.H.S.'s teacher in Montvale, Jessica Raymond, described A.H.S. as very happy, well-behaved, well-adjusted, and polite, and said he liked to play sports.  T3 22:23-24:12.

54. The children attended the French Institute Alliance Française in Montclair, New Jersey in July 2019 for a week.  Stip. Facts ¶ lx; T2 181:25-182:10, 185:12-17.  These were the only French lessons that the children had while in the United States apart from A.L.S.'s French classes in school.  T1 207:13-21.

55. A.L.S. and A.H.S. engaged in play dates and attended birthday parties while living in New Jersey.  R-67; R-71; T2 178:15-179:16, 197:8-24.

56. For Christmas break 2018, Respondent and the children returned to Belgium and visited Petitioner's family in France.  Stip. Facts ¶ xlvi.  Petitioner said that his worsening relationship with Respondent became even more apparent during this visit.  T1 52:4-7.  The parties agreed that Respondent would return to Brussels with the children in summer of 2019, and the parties' discussions did not suggest that Respondent would only be returning for summer vacation.  T1 68:23-69:7.

57. On December 30, 2018, Petitioner provided another written consent for Respondent to travel abroad with their children to New Jersey.  Stip. Facts ¶ xlvii; J-1.  However, on this travel authorization, Petitioner specifically included a return date of July 10, 2019 and asked Respondent to sign the document, which he did not do on the first authorization.  J-

12

1, T1 70:3-71:11.  He used the word "trip" and not "move" on the authorization because they were only going for that specific stay.  T1 71:6-11.

**I.  Petitioner's Inability to Secure Employment in New Jersey and Plans to Return to Belgium**

58. Petitioner made substantial and good faith efforts to secure a transfer to a position with J&J in New Jersey throughout the winter and communicated that to Respondent.  R-78; T2 210:5-212:9.  Petitioner eventually determined that working in the United States was not feasible, again in part due to his perception that a top J&J executive was precluding him from doing so.  T1 80:6-81:13.

59. Respondent admittedly understood the trip to New Jersey was temporary if Petitioner did not find employment in New Jersey.  T2 236:19-237:7, 249:15-253:19, 262:2-263:3; see also R-36.  Petitioner did not find employment in New Jersey from August 2018 to July 10, 2019, or at any time thereafter.  R-78; T1 80:3-81:13, 84:2-85:21; T2 260:15-20. Nonetheless, Respondent did not return the children to Belgium on July 10, 2019.  T2 246:17-247:1, 250:7-20.

60. Respondent testified that if Petitioner got a job elsewhere—i.e. not in New Jersey—then the family would have followed him.  T2 250:2-253:19.  She stated that she simply did not want to live in Belgium, although she had lived there continuously with her family for over a decade.  Id.  Respondent also claimed that she did not want to "keep switching things around" on the children and that she stayed in New Jersey so that they could have a more stable lifestyle, although she had very much wanted to move to Japan the year before, which would not have been permanent.  T2 144:21-148:9; R-79.

61. By March of 2019, Petitioner attended an open house at the Lycée Français, the same school they were planning to attend after the Japan relocation fell through, to secure enrollment for his children in the upcoming school year.  T1 46:4-47:15.  Respondent provided A.L.S.'s report cards for Petitioner to submit to the Lycée Français.  T1 76:16-77:11; Stip. Facts ¶ lxii; R-79.

62. In April 2019, the children were accepted at Lycée Français and Petitioner submitted a deposit.  R-83.  When Petitioner told Respondent about the acceptance, she objected and expressed her desire to keep them in the Montvale public schools.  Stip. Facts ¶¶ lxiii-lxiv; R-82.

63. In May 2019, Respondent filed a complaint in New Jersey family court to obtain custody of the children and keep them in New Jersey for purposes of schooling.  T1 88:5-89:13; T2 224:15-225:10.

64. The children were nine and three years old on July 10, 2019.  T1 19:9-11.

65. Respondent and the children continue to reside in Respondent's parents' home with her mother since Respondent's father's passing in December 2020.  T2 155:8-156:4.  Unlike their home in Brussels, the children share a bedroom.  T2 153:15-22.

66. When asked if she had objections about going back to Belgium, A.L.S. only expressed concerns about her fluency in French compared to other students, since her main language is English.  T1 211:3-15.  A.L.S. testified that she used to keep in contact with her Belgian friends, but that they have not done so recently.  T1 202:12-22.  She expressed concern that her Belgian friends may have moved on and that she would miss her New Jersey friends. T1 210:18-211:15.  She otherwise did not seem opposed to moving back.

67. The children's paternal grandmother, a physician in France, cannot visit her grandchildren in the United States due to health issues.  T3 39:5-11.  The paternal grandparents and the extended paternal family have not seen the children since they traveled to New Jersey in December of 2018.   T1 31:17-24; T2 241:16-23.

**J.  Procedural History**

68. Respondent filed a non-dissolution Complaint in Bergen County on May 20, 2019 (1) seeking joint legal custody; (2) naming her as the Parent of Primary Residence and Petitioner as the Parent of Alternate Residence; (3) establishing a parenting time schedule; (4) ordering that the children remain in New Jersey for purposes of schooling; and (5) establishing a child support award.  Stip. Facts ¶ lxv.

69. On May 31, 2019, Petitioner filed a unilateral emergent application in Belgium seeking a divorce on an expedited time frame, which was denied on June 3, 2019, but granted on appeal on June 6, 2019.  Stip. Facts ¶ lxvi.  Respondent was served with Petitioner's Belgian divorce papers on June 27, 2019.  Stip. Facts ¶ lxvii.  The parties were officially divorced in Belgium.  Stip. Facts ¶ lxxv.

70. On July 10, 2019, Petitioner filed a Motion to Dismiss Respondent's non-dissolution Complaint in Bergen County on the basis of lack of jurisdiction.  Stip. Facts ¶ lxviii.

71. On July 11, 2019, Petitioner filed a Hague Convention notice application with the Belgian authorities.

72. On July 15, 2019, the French Speaking Court of First Instance of Brussels, Family Court issued a judgment suspending its decision regarding issues related to the parties' children pending resolution by the courts of New Jersey.  Stip. Facts ¶ lxix.

73. On August 1-2, 2019, the Bergen County Superior Court conducted a plenary hearing and dismissed Respondent's complaint by declining jurisdiction under New Jersey's Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA").[2]   Given the denial of jurisdiction, the Bergen County court also declined Petitioner's request for the children's immediate return to Belgium.   The Bergen County court declined to stay its decision pending any appeal.  Stip. Facts ¶ lxx.  Respondent appealed.  Stip. Facts ¶ lxxvii.

74. On September 4, 2019, the Brussels Court of Appeals issued a Final Judgment affirming the lower court's decision declining jurisdiction over the children pending resolution of the appeal in New Jersey.  Stip. Facts ¶ lxxii.

75. On November 7, 2019, Petitioner filed a Hague Convention application in Bergen County Superior Court via an Order to Show Cause, which the court denied on November 14, 2019 finding that it was inconsistent with the appellate process of the earlier Bergen County Superior Court action.  Stip. Facts ¶ lxxiii.

76. Petitioner filed a Motion for Reconsideration on November 25, 2019, which was denied on January 30, 2020.  Stip. Facts ¶ lxxiv.

77. On April 21, 2020, Petitioner filed the instant Hague Convention petition with the United States District Court for the District of New Jersey.  Stip. Facts ¶ lxxvi.

78. On April 29, 2020, the New Jersey Appellate Division stayed Respondent's appeal of the custody lawsuit pending resolution of this matter.  Stip. Facts ¶ lxxvii.

79. On May 11, 2020, Respondent filed a Motion to Dismiss Petitioner's Hague Convention Petition in the United States District Court for the District of New Jersey based on lack of

---

[2] The court declined jurisdiction given the circumstances of the case and conduct of the parties—specifically that Matsumoto unilaterally decided to keep the children longer than a year when it was clearly the parties' original plan to return to Belgium.

subject matter jurisdiction, which was denied by this Court on December 4, 2020, ECF No.

24.  Stip. Facts ¶ lxxviii.

80. On April 27-29, 2022, this Court conducted a bench trial.

## III. CONCLUSIONS OF LAW[3]

The Hague Convention is a treaty between multiple signatory countries wherein the countries agree to cooperate in returning children to their home country for custody proceedings.[4] The purpose of the Hague Convention is "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." See Convention, pmbl.  The United States Congress enacted the International Child Abduction Remedies Act, 22 U.S.C. § 9001 et seq., as the implementing legislation for the Hague Convention.

A petitioner seeking the return of a child under the Convention must prove by a preponderance of the evidence that the child "has been wrongfully removed or retained within the meaning of the Convention."  22 U.S.C. § 9003(e)(1)(A).  The removal or retention of a child is "wrongful" under the Convention when (1) "it is in breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the removal or retention"; and (2) "at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." Convention, Art. 3.  The Hague Convention applies to children under sixteen years of age who are "habitually resident" in a contracting state, Convention, Art. 4, and are "wrongfully removed to or

---

[3] This Court has jurisdiction pursuant to 22 U.S.C. § 9003(a), which provides that "[t]he courts of the States and the United States district courts shall have concurrent original jurisdiction of actions arising under the [Hague] Convention."

[4] Oct. 25, 1980, T. I. A. S. No. 11670, S. Treaty Doc. No. 99–11 (the "Convention").

retained in" another contracting state, Convention, Art. 1.  The court's inquiry is limited to the merits of the abduction claim and not the merits of the underlying custody battle.  See Convention, Art. 14.

A court generally must answer four questions to resolve a petition under the Convention: (1) when the removal or retention took place; (2) the child's habitual residence immediately prior to such removal or retention; (3) whether the removal or retention breached the petitioner's custody rights under the law of the child's habitual residence; and (4) whether the petitioner was exercising his or her custody rights at the time of removal or retention.  Karpenko v. Leendertz, 619 F.3d 259, 263 (3d Cir. 2010) (quoting Tsai-Yi Yang v. Fu-Chiang Tsui, 499 F.3d 259, 270-71 (3d Cir.2007)). If a petitioner meets his initial burden, then "the authority concerned shall order the return of the child forthwith," unless the respondent establishes one of the affirmative defenses enumerated in the Convention.  See Convention, Arts. 12-13; Karpenko, 619 F.3d at 263.

This case requires the Court to determine the following: whether Respondent wrongfully retained A.L.S. and A.H.S. and, if so, on what date that retention occurred; and whether A.L.S.'s and A.H.S.'s habitual residence on the date of the purported wrongful retention was New Jersey or Brussels.  Respondent seemingly does not dispute whether, if wrongfully retained, Petitioner's custody rights under Belgium law would be violated.  Nor does Respondent seem to contest whether Petitioner was exercising his custody rights at the time of the alleged wrongful retention. Respondent does, however, assert multiple affirmative defenses under the Convention.  The Court addresses each issue in turn.

**A. Wrongful Retention**

The first step is for the Court to determine what date the allegedly wrongful retention occurred, "so as to establish the relevant date of [A.L.S.'s and A.H.S.'s] habitual residence for purposes of the Hague Convention." Karkkainen v. Kovalchuk, 445 F.3d 280, 290 (3d Cir. 2006).

Here, the parties both signed a document stating that the children would return to Belgium from the United States no later than July 10, 2019. J-1. Petitioner thus alleges that the wrongful retention occurred on July 10, 2019, when Respondent failed to return to Belgium with the children. The Court agrees and finds July 10, 2019 as the wrongful retention date.

**B. Habitual Residence**

The next "threshold question is which country was the child's habitual residence immediately before the alleged wrongful . . . retention." Bejarno v. Jimenez, No. 19-17524, 2020 WL 4188212, at *4 (D.N.J. July 21, 2020), aff'd, 837 F. App'x 936 (3d Cir. 2021) (citing Feder v. Evans-Feder, 63 F.3d 217, 222-23 (3d Cir. 1995)). The Third Circuit has defined a child's habitual residence as "the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a degree of settled purpose from the child's perspective." Karpenko, 619 F.3d at 263 (quoting Karkkainen, 445 F.3d at 291-92). Recently, the United States Supreme Court clarified that an evaluation of habitual residence requires an analysis of the totality of the circumstances and does not turn on the existence of an actual agreement between the parents. Monasky v. Taglieri, 140 S. Ct. 719, 726 (2020). Habitual residence is the "place where a child is at home" at the time of retention. Monasky, 140 S. Ct. at 726 (citing Karkkainen, 445 F.3d at 291).

"Because locating a child's home is a fact-driven inquiry, courts must be sensitive to the unique circumstances of the case and informed by common sense." Monasky, 140 S. Ct. at 727

(internal citations omitted).  "For older children capable of acclimating to their surroundings, courts have long recognized, facts indicating acclimatization will be highly relevant."  Id. "Because children, especially those too young or otherwise unable to acclimate, depend on their parents as caregivers, the intentions and circumstances of caregiving parents are relevant considerations." Id.  "No single fact, however, is dispositive across all cases." Id.  A determination of whether any particular place satisfies this standard therefore "must focus on the child and consists of an analysis of the child's circumstances in that place and the parents' present, shared intentions regarding their child's presence there."  Bejarno, 2020 WL 4188212, at *4 (citations omitted); see also Karkkainen, 445 F.3d at 296 (holding that even in cases involving older children, shared parental intent remains relevant to habitual residence and must be given some weight).

Here, taking into account all relevant facts and circumstances, Petitioner has established by a preponderance of the evidence that, under the Hague Convention, Belgium was the children's habitual residence as of July 10, 2019 and that they were wrongfully retained in New Jersey as of that date.

First, there is overwhelming evidence that the move to New Jersey was meant to be temporary and that the shared parental intent was not to abandon Belgium as the habitual residence.[5]  Regardless of whether the parties intended for the stay in New Jersey to be temporary with a hard-set return to Brussels on July 10, 2019 or whether they planned for the stay in New Jersey to be permanent only if Petitioner secured a job in New Jersey by July 2019, the outcome remains the same.

---

[5] While the Third Circuit has found that there can still be a change in habitual residence of a child even when the parents have a settled purpose in moving a child for only a limited period of time, see, e.g., Tsai-Yi Yang, 499 F.3d at 272, the Court may still consider the parties' agreed-upon temporary move as a factor in the overall analysis of shared intent.

Respondent claimed that she did not want to keep moving the children around, that she planned to stay in New Jersey so that they had a more stable lifestyle, and that she viewed New Jersey as their permanent home once they arrived in 2018.  T2 142:6-148:9; R-79.[6]  However, Respondent also testified that if Petitioner secured a job elsewhere—i.e. not in New Jersey—then the family would have followed him; she simply did not want to live in Belgium.  T2 250:2-253:19.  Her testimony is not credible for multiple reasons.  First, her professed desire to keep the children in New Jersey for a stable lifestyle is inconsistent with her claims that she would go anywhere except Brussels and her desire for a temporary relocation to Japan.  Second, Respondent stated that at the end of 2018, if the children had gotten into the French school, then they would have stayed in Brussels.  The parties brought the children to New Jersey for a year of school only as a last resort after there were no schooling options in Brussels for the 2018-2019 school year.  Third, Respondent stated that it was unclear to her what would happen if they lived in New Jersey and Petitioner did not get a job and that she was not sure what her own expectations were.  Would Petitioner continue to live and work in Belgium in the large apartment and visit his family a few times a year while his family lived in his mother-in-law's house?  Would Petitioner make the move to New Jersey and live in his mother-in-law's house without a job and any source of income?

In fact, Respondent repeatedly admitted that she did not expect Petitioner to move to New Jersey without gainful employment, and it is undisputed that he did not in fact secure a job before the wrongful retention date.  There is no convincing evidence in the record to show that if Petitioner did not get a job in New Jersey or elsewhere, that Respondent would stay in New Jersey alone with the children.  While emails between Respondent and Petitioner show that Petitioner was open to eventually moving to the United States, this fact does not change that the retention in July 2019

---

[6] It bears noting that the children never moved and the only home they knew from birth until 2018 was Brussels.

was wrongful, because Petitioner had not secured a new job and could not move to New Jersey to join his family by that date.  See e.g., R-80; see also Feder, 63 F.3d at 222 (noting that for habitual residence, parties' "future intentions . . . to reside in the United States [are] irrelevant to its inquiry").  Respondent's maintenance of her United States license, bank accounts, and certificates does not bolster her argument that the move to New Jersey from 2018 to 2019 was meant to be permanent, but rather that the family might eventually move to the United States at some point in the future.[7]  Respondent's own witness, Rachel Avenick, even confirmed that Petitioner would rejoin his family in New Jersey if he secured a job.  T2 280:2-282:22.  Therefore, once it became clear that securing a new job in New Jersey was not feasible for Petitioner—whether it was because of the high-ranking J&J executive preventing him from getting a job or other reasons—the shared intent was for Respondent and the children to rejoin Petitioner in Brussels in July 2019.

Additionally, while in Brussels, the parties agreed to a "one person, one language" household, whereby Respondent would speak to the children primarily in English and Petitioner would speak to the children primarily in French.  T1 136:10-21.  Petitioner and Respondent placed A.L.S. in ISB not only because tuition was free, but also because it had a diverse cultural background.  Both Petitioner and Respondent were raised in a dual culture family, and they wanted the same for their children.  T1 24:23-25:4; R-83.  Keeping the children permanently in New Jersey without their father would be contrary to the shared intent of educational and cultural goals between the parents.

Next, at the young age of two when arriving in New Jersey, the Court finds that A.H.S. was too young to fully acclimate to his new environment and that there was no "degree of settled

---

[7] The Court also notes that she was able to utilize her United States licenses and certificates in Brussels, which further diminishes her argument.  T2 15:6-16:1.

purpose from the child's perspective."  Karpenko, 619 F.3d at 263 (quoting Karkkainen, 445 F.3d at 291-92).  A.H.S. only began daycare in October 2018, and while he may have attended a few birthday parties thereafter and presented as "well-adjusted," there is simply not enough in the record to show that, at the age of two and three during 2018 to 2019, A.H.S. was fully acclimatized in New Jersey and capable of becoming firmly rooted in his new surroundings.

A.L.S., on the other hand, was older and more involved in social and academic activities once she arrived in New Jersey.  See Karkkainen, 445 F.3d at 293 ("In Feder, we noted that academic activities are among 'the most central . . . in a child's life' and therefore highly suggestive of acclimatization.").  The record reflects her participation in school programs, student government, and sports while in New Jersey, and the Court submits that at eight years old, A.L.S. was more capable than her younger brother to develop meaningful connections and make friends.  However, even if the Court accepts that A.L.S. was old enough at the time of wrongful retention to acclimatize to New Jersey, the record does not reflect that there would have been a degree of "settled purpose" from A.L.S.'s perspective.

Respondent argues that Petitioner's knowledge of and encouragement of A.L.S.'s participation in activities during her year in New Jersey gave A.L.S. the perception that she would be staying in New Jersey long term.  The record indeed does show that Petitioner encouraged A.L.S. to embrace her time in the United States and did not preclude A.L.S. from joining numerous clubs and activities during that time.  However, Petitioner's encouragement to stay involved in school was not new to A.L.S. or out of the ordinary, as both parties discussed that A.L.S. was very social and always academically involved, not only in New Jersey but also in Brussels.  Using Petitioner's encouragement that the children join activities during their year in New Jersey as a substantial factor in the analysis would (1) allow abducting parents to simply enter their children

into as many activities as possible to attempt to establish a new habitual residence and (2) encourage parents—in this case Petitioner—to dissuade their children from making friends or engaging in any activities during their temporary stay abroad out of fear of changing the children's habitual residence.  Neither satisfies the intent of the Hague Convention.[8]

Instead, the family discussions regarding staying in New Jersey were always conditioned around Petitioner securing a job there, and it would have been clear from the children's perspective that the stay in New Jersey was temporary and not their forever home.  For example, Respondent and the children moved into Respondent's parent's home where the children shared a room, rather than securing their own residence.  Petitioner and Respondent did not discuss securing a more permanent residence in New Jersey, but rather Petitioner continued to live in the family home in Brussels, which he was able to afford because he continued to work as a high-ranking pharmaceutical executive in Belgium.  In 2018, Respondent and the children returned to the family home where they rejoined their father for the Christmas holiday.  Respondent did not buy or lease a car, but borrowed a car for the 2018-2019 school year.  Respondent took a couple of temporary employment positions in the beginning of the stay in New Jersey, which did not provide benefits. Respondent de-registered from Belgium on a temporary basis.  While the parties would have broken the nine-year lease on their Brussels apartment if they moved to Japan or elsewhere, Petitioner's continued retention of the Brussels home during the year Respondent and the children were in New Jersey—instead of downsizing from a four-bedroom home—underscores the expectation that the family would return to Belgium.  Both Petitioner and Respondent also signed

---

[8] See Karkkainen, 445 F.3d at 296 ("Were a court to exclude shared parental intent entirely from the habitual residence inquiry, and instead focus solely on a child's contacts and experiences, it would fail to consider whether a parent is acting unilaterally to alter what was jointly intended or agreed upon.") (emphasis added).

a travel authorization reflecting a specific return date to Brussels for July 10, 2019.[9]  Finally, there is no evidence that Respondent or the children were unhappy while living in Belgium.

It is abundantly clear that the shared parental intent was for the stay in New Jersey to be temporary until July 2019, unless Petitioner secured a job, which became evidently unfeasible early on.  Taking all relevant facts under consideration, the Court does not find that possible acclimatization of A.L.S. to the new country outweighs all the other circumstances present in this case or that there was a degree of settled purpose from the children's perspective to remain in New Jersey.  Therefore, the habitual residence immediately prior to the wrongful retention on July 10, 2019 was Belgium, and the children were wrongfully retained under Article 3 of the Hague Convention.

## C.  Affirmative Defenses

Finally, the affirmative defenses under the Hague Convention are as follows: (1) returning the child to his or her habitual residence would place the child in grave risk of physical or psychological harm or otherwise place the child in an intolerable situation, (2) the child's human rights and fundamental freedoms would be threatened if returned, (3) the petitioning parent consented or acquiesced to the retention, (4) the petitioner was not actually exercising custody rights at the time of the alleged wrongful retention, (5) the child is well-settled in his or her new environment and the petition to return the child was filed one year or more after the alleged

---

[9] Respondent recognized that she did not sign the original authorization in August 2018 and that it did not contain a specific date, whereas the second authorization did.  Given the parties' noticeably deteriorating relationship, Petitioner insisted on adding a return date to ensure Respondent returned to Brussels with the children that summer, and he intentionally called the travel a "trip" rather than a "move."  T1 69:23-71:17.

Respondent alleges that she thought the return date was for a return to Europe for summer vacation only, not to return to Belgium permanently.  T2 205:11-207:15.  She claims that she and the children would return to Brussels for the summer and then head back to New Jersey for the school year, as Petitioner continued to search for a job in New Jersey.  T2 207:5-8.  The Court does not find this testimony credible, for reasons already discussed, including that the stay in New Jersey past summer 2019 was specifically conditioned on Petitioner finding a job, which did not occur.

wrongful removal or retention, and (6) the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of the child's views.  Convention, Arts. 12-13, 20; see also Bejarno, 2020 WL 4188212, at *4.  All defenses against removal are construed narrowly.  Feder, 63 F.3d at 226.

Respondent asserts four affirmative defenses: intolerable situation, consent or acquiescence, the well-settled exception, and the mature child exception.[10]

### 1.   Grave Risk of Harm or Intolerable Situation

Respondent has the burden of proof under 22 U.S.C. § 9003(e)(2) to prove by clear and convincing evidence that "[t]here is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Convention, Art. 13(b).  Respondent argues that Petitioner is an absentee father who works a lot, rendering him unable to care for the children in Belgium, and that she has always been the primary caregiver but will not be able to return to Belgium now that the parties are divorced.

The Court finds this argument unavailing.  These arguments are more appropriate for a custody proceeding, which is not before this Court.  See, e.g., Walsh v. Walsh, 221 F.3d 204, 218 (1st Cir. 2000) ("Courts are not to engage in a custody determination, so it is not relevant who is the better parent in the long run, or whether the absconding parent had good reason to leave her home and terminate her marriage.").  The facts of this case fall far short of demonstrating the type of "grave risk" or "intolerable situation" envisioned by the Hague Convention, such as a war-torn country or an abusive parent.  See, e.g., Golan v. Saada, 142 S. Ct. 1880, 1894 (2022) ("Sexual abuse of a child is one example of an intolerable situation.  Other physical or psychological abuse,

---

[10] Courts have routinely "declined to separate siblings, finding that the sibling relationship should be protected even if only one of the children can properly raise an affirmative defense under the Hague Convention." Ermini v. Vittori, No. 12-6100, 2013 WL 1703590, at *17 (S.D.N.Y. Apr. 19, 2013).

serious neglect, and domestic violence in the home may also constitute an obvious grave risk to the child's safety."); Salame v. Tescari, 29 F.4th 763, 767 (6th Cir. 2022) (finding that relatively minor abuse would likely not pose a grave risk or intolerable situation for the child and that while Venezuela's conditions were less stable than the United States, there was not sufficient evidence that it is a zone of war, famine, or disease for purposes of the affirmative defense); Baxter v. Baxter, 423 F.3d 363, 374 (3d Cir. 2005) (finding no grave risk of harm or intolerable situation where the child was not being returned to a zone of war or famine or to serious abuse or neglect). To the contrary, the overwhelming record evidence is that Petitioner has gone to great lengths to create and continue a stable and loving environment for his children, including re-enrollment to ISB school, when they return.

      2.   Consent or Acquiescence

Respondent has the burden of proof under 22 U.S.C. § 9003(e)(2) to show by a preponderance of the evidence that Petitioner "consented to or subsequently acquiesced in the removal or retention." Convention, Art. 13(a). Respondent argues that Petitioner consented to the relocation of the children to the United States and that the petition was filed solely as a retaliatory measure in response to Respondent's New Jersey state filing requesting primary responsibility over the children's schooling.

The Court agrees that Petitioner consented to the relocation of the children to the United States but finds that he only did so up until the wrongful retention date of July 10, 2019. There is no evidence in the record that Petitioner filed the instant action in retaliation. Respondent has failed to prove this affirmative defense by a preponderance of the evidence.

3.   The Well-Settled Exception

Respondent has the burden of proof under 22 U.S.C. § 9003(e)(2) to show by a preponderance of the evidence that the children are "now settled in [their] new environment." Convention, Art. 12.  A court is not bound to order the return of a child if the respondent demonstrates that (a) the proceedings were commenced more than one year after the date of the wrongful removal or retention, and (b) the child is now settled in his or her new environment.

Petitioner filed this petition on April 21, 2020, less than a year from the July 10, 2019 wrongful retention date, and thus this affirmative defense does not apply.  Respondent does not sufficiently claim otherwise.

4.   Mature Child Objection

Respondent has the burden of proof under 22 U.S.C. § 9003(e)(2) to prove by a preponderance of the evidence that the child "objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views."  Convention, Art. 13.  If Respondent puts forth such evidence, the Court may refuse to order the return of the child.  "As with any of the affirmative defenses under the Convention, this defense is to be construed narrowly."  Tsai-Yi Yang, 499 F.3d at 278.

"An analysis of whether to apply the 'wishes of the child' exception requires consideration of the goals of the Convention and a determination of whether the child is of sufficient age and maturity for his or her views to be taken into account."  Id. at 279.  "The Convention does not set an age at which a child is automatically considered to be sufficiently mature, rather the determination is to be made on a case-by-case basis."  Id.  In Yang, the District Court found, and the Court of Appeals affirmed, that a ten-year-old child was not of sufficient age or maturity for her views to be appropriately considered.  Id.  "Given the fact-intensive and idiosyncratic nature

of the inquiry, decisions applying the age and maturity exception are understandably disparate." Id. (internal citations omitted).

Construing the exception narrowly as the Convention intended, this is not an appropriate case to apply the mature child exception. First and most importantly, A.L.S. did not express any particularized objections to returning to Belgium, but rather expressed mere concerns about her fluency in French and a preference to remain with her friends in New Jersey. A.L.S.'s concerns about returning to Brussels, namely missing her friends and having difficulty with French, are those expected of a twelve-year-old girl and are not sufficient for the Court to disregard the narrow grounds in which the "wishes of the child" exception applies. See, e.g., Saltos v. Severino, No. 18-8704, 2018 WL 3586274, at *7 (D.N.J. July 25, 2018) (holding that the child's objections were those expected of a girl her age and not enough for the court to apply the exception).

In addition, A.L.S. stated that she and her friends in Brussels exchanged letters for some time while she lived in New Jersey, but that they have not sent notes recently and that her Belgian friends have probably moved on. Thus, the passage of time during the years of wrongful retention—from July 2019 until now—has clearly increased A.L.S.'s desire to remain in New Jersey. Applying the exception in this case would improperly reward Respondent for violating Petitioner's custody rights and encourage parents to wrongfully retain a child for as long as possible. See Tsai-Yi Yang, 499 F.3d at 280.

Based on the above, the mature child objection does not apply.

IV. **CONCLUSION**

For the reasons stated above, Petitioner Soulier's Petition is **GRANTED**. An appropriate Order will follow.

**Date: July 8, 2022**

*/s Madeline Cox Arleo*
**MADELINE COX ARLEO**
**UNITED STATES DISTRICT JUDGE**